ACCEPTED
14-15-00695-cv
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
12/17/2015 5:50:10 PM
CHRISTOPHER PRINE
CLERK

## NO. 14–15–00695–CV

**IN THE FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS**

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
12/17/2015 5:50:10 PM
CHRISTOPHER A. PRINE
Clerk

*Garden Ridge, L.P., Appellant*

**V.**

*Clear Lake Center, L.P., Appellee*

**From the 215th District Court, Harris County, Texas
Cause No. 2009–58038, consolidated with Cause No. 2012–46099**

**Clear Lake Center, L.P.'s Combined
Cross–Appellant's Brief and
Appellee's Brief**

HIRSCH & WESTHEIMER, P.C.
Eric Lipper
State Bar No. 12399000
elipper@hirschwest.com
Michael D. Conner
State Bar No. 04688650
mconner@hirschwest.com
1415 Louisiana, 36th Floor
Houston, Texas 77002
Telephone: 713–223–5181
Facsimile: 713–223–9319

**Attorneys for Appellee/Cross Appellant
Clear Lake Center, L.P.**

**ORAL ARGUMENT REQUESTED**

20020862.20090455/2250814.1

## Identity of Parties and Counsel

**Appellant:**
**Garden Ridge, L.P.**

**Attorneys for Appellant:**
Elizabeth G. Bloch
State Bar No. 02495500
Heidi.bloch@huschblackwell.com
Stephen W. Lemmon
State Bar No. 12194500
Stephen.Lemmon@huschblackwell.com
Bradley W. Cole
State Bar No. 04535980
brad@bwc–law.net
HUSCH BLACKWELL LLP
111 Congress A venue, Suite 1400
Austin, Texas 78701
Telephone: (512) 472–5456
Facsimile (512) 479–1101

**Appellee/Cross–Appellant:**
**Clear Lake Center, L.P.**

**Attorneys for Appellee/Cross–Appellant:**
Michael D. Conner
State Bar No. 04688650
mconner@hirschwest.com
Eric Lipper
State Bar No. 12399000
elipper@hirschwest.com
HIRSCH & WESTHEIMER, P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002
Telephone: (713) 223–5181
Facsimile: (713) 223–9319

20020862.20090455/2250814.1

# Table of Contents

Identity of Parties and Counsel ................................................................... i

Table of Authorities ................................................................................ v

Statement of the Case ............................................................................. 1

Clear Lake Center, L.P.'s Cross–Appellant's Brief ................................... 1

Clear Lake's Cross Issues ......................................................................... 2

    Issue 1: Clear Lake conclusively established Garden Ridge's claims are precluded based on affirmative defenses of waiver, ratification, novation, accord and satisfaction, and/or estoppel; Clear Lake is entitled to complete judgment in its favor. ....................................... 2

    Issue 2: The trial court erred by excluding evidence offered to support Clear Lake's affirmative defenses; error was harmful and, at minimum, Clear Lake is entitled to a new trial. ............................................... 2

    Issue 3: Because the trial court erred by excluding admissible, critical evidence, the findings of liability and damages are unsustainable. .......................................... 2

    Issue 4: Without sustainable findings of liability and damages, attorneys' fees are not recoverable. ................................ 2

    Issue 5: All claims for amounts paid before September 10, 2005, are barred by limitations; it was error for the trial court to include in the judgment any damage amount for periods before September 10, 2005. ....................................... 2

20020862.20090455/2250814.1

Issue 6:  Based on Clear Lake's counterclaim for breach of contract, its recovery of "offset" damages, its unrebutted evidence proving attorneys' fees, Clear Lake is entitled to judgment in its favor or, alternatively, a new trial. ....................................................................2

Statement of Facts ..............................................................................3

Introduction .......................................................................................6

Summary of the Argument ................................................................11

Standard of Review ..........................................................................12

Argument and Authority ...................................................................14

Issue 1:  Clear Lake's affirmative defenses preclude Garden Ridge's suit as a matter of law. .......................................14

Issue 2:  The trial court erroneously applied the parol evidence rule. ...........................................................................18

Issue 3:  Based on the erroneous exclusion of evidence, findings of liability and damages must fail.................................28

Issue 4:  Garden Ridge is not entitled to recover attorneys' fees as found by the jury. ...............................................28

Issue 5:  Limitations bars recovery of any damages incurred prior to September 10, 2005. .........................................29

Issue 6:  Clear Lake is entitled to judgment in its favor, including its attorneys' fees. .......................................................31

Conclusion .......................................................................................32

iii

Clear Lake's Appellee's Brief ....................................................................33

[Clear Lake incorporates the Statement of the Case and Statement
of Facts in it Cross Appellant's Brief] .....................................................33

Standard of Review ...................................................................................33

Argument and Authorities..........................................................................34

      The Lease does not include an agreement for interest on
      the disputed refunds claimed. .........................................................34

      No pre–judgment interest is warranted...........................................37

Conclusion ................................................................................................39

Certificate of Compliance ..........................................................................41

Certificate of Service .................................................................................41

Appendix ...................................................................................................42

20020862.20090455/2250814.1

# Table of Authorities

## Cases

*Alford. Meroney & Co. v. Rowe,*
619 S.W.2d 210 (Tex. 1981) ..........................................................................22

*Am. Mfrs. Mut. Ins. Co. v. Schaefer,*
124 S.W.3d 154 (Tex. 2003) .........................................................................35

*Anchor Casualty Co. v. Bowers*,
393 S.W.2d 168 (Tex. 1965) .........................................................................32

*Avila v. U. S. Fid. & Guar. Co.*,
551 S.W.2d 453 (Tex. Civ. App.–San Antonio 1977, writ ref'd n.r.e.)...............26

*Bartosh v. Gulf Health Care Ctr.–Galveston*,
178 S.W.3d 434 (Tex. App.–Houston [14th Dist.] 2005, no pet.) .......................25

*Bayer Corp. v. DX Terminals, Ltd.*,
214 S.W.3d 586 (Tex. App.–Houston [14th Dist.] 2006, pet. denied) ............... 13

*Behzadpour v. Bonton, 14–09–01014–CV,*
2011 WL 304079 (Tex. App.–Houston [14th Dist.] Jan. 27, 2011, no pet.) .......13

*Bueckner* v. Hamel,
886 S.W.2d 368 (Tex. App.–Houston [1st Dist.] 1994, writ denied) ..................22

*Champlin Oil & Ref. Co. v. Chastain*,
403 S.W.2d 376 (Tex. 1965) ..................................................................... 15, 16

*City of Brownsville v. Alvarado*,
897 S.W.2d 750 (Tex. 1995) .........................................................................13

*Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*,
416 S.W.3d 527 (Tex. App.–Houston [14th Dist.] 2013, no pet.) .............. passim

*Clear Lake Water Auth. v. Friendswood Dev. Co. Ltd.*,
344 S.W.3d 514 (Tex. App.–Houston [14th Dist.] 2011, pet. denied) ............... 37

20020862.20090455/2250814.1

*Cochran v. Wool Growers Central Storage Co.*,
140 Tex. 184, 166 S.W.2d 904 (1942) ............................................................ 31-32

*Columbia Gas Trans. Corp. v. New Ulm Gas, Ltd.*,
940 S.W.2d 587 (Tex. 1996)...................................................................................34

*ConocoPhillips Co. v. Noble Energy, Inc.*,
462 S.W.3d 255 (Tex. App.–Houston [14th Dist.] 2015, pet. filed)....................33

*Corcoran v. Atascocita Cmty. Imp. Ass'n, Inc.*,
14-12-00982-CV, 2013 WL 5888127
(Tex. App.–Houston [14th Dist.] Oct. 31, 2013, pet. denied)..............................22

*Creel v. Houston Indus., Inc.*,
124 S.W.3d 742 (Tex. App.–Houston [1st Dist.] 2003, no pet.)..........................25

*Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*,
176 S.W.3d 80, 87 (Tex. App.–Houston [1st Dist.] 2004, no pet.) .....................17

*Falcon Enterprises, Inc. v. Sugar Creek Section 25,*
14–97–00817–CV, 1999 WL 966645
(Tex. App.–Houston [14th Dist.] Oct. 21, 1999, pet. denied).............................17

*Fillion v. Osborne*,
585 S.W.2d 842 (Tex. Civ. App.—Houston [1st Dist.] 1979, no writ) ....... 19, 26

*Forbau v. Aetna Life Ins. Co.*,
876 S.W.2d 132 (Tex. 1994) .................................................................................34

*Fox v. State,*
115 S.W.3d 550
(Tex. App.–Houston [14th Dist.] 2002, pet. ref'd) ...............................................7

*Franco v. Slavonic Mut. Fire Ins. Ass'n*,
154 S.W.3d 777 (Tex. App.–Houston [14th Dist.] 2004, no pet.) .......................29

*Freezia v. IS Storage Venture, LLC,*
14–14–00174–CV, 2015 WL 4983705
(Tex. App.–Houston [14th Dist.] Aug. 20, 2015, no pet.) ................ 17, 18, 21, 23

vi

*Gulf Paving Co. v. Lofstedt*,
    144 Tex. 17, 188 S.W.2d 155 (Tex. 1945) ............................................................31

*Hand & Wrist Ctr. of Houston, P.A. v. Republic Services, Inc.*,
    401 S.W.3d 712 (Tex. App.–Houston [14th Dist.] 2013, no pet.) .......................33

*Helmerich & Payne Intern. Drilling Co. v. Swift Energy Co.*,
    180 S.W.3d 635 (Tex. App.–Houston [14th Dist.] 2005, no pet.) ..... 34-35, 36, 37

*Henry v. Masson*,
    453 S.W.3d 43 (Tex. App.–Houston [1st Dist.] 2014, no pet.) .................... 38, 39

*Hexter v. Pratt*,
    10 S.W.2d 692 (Tex. Comm'n App. 1928, judgm't adopted) .............................15

*Hooper v. Chittaluru*,
    222 S.W.3d 103 (Tex. App.–Houston [14th Dist.] 2006, pet. denied) ..................7

*Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*,
    352 S.W.3d 462 (Tex. 2011) ....................................................................... 20, 24

*Iliff v. Iliff,*
    339 S.W.3d 74 (Tex. 2011) .................................................................................33

*In re N.R.C.,*
    *94 S.W.3d 799* (Tex. App.–Houston [14th Dist.] 2002, pet. denied) .................25

*Jernigan v. Langley*,
    111 S.W.3d 153 (Tex. 2003) ..............................................................................22

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*,
    962 S.W.2d 507 (Tex. 1998) ..............................................................................17

*Kamat v. Prakash*,
    420 S.W.3d 890 (Tex. App.–Houston [14th Dist.] 2014, no pet.) .......................17

*Kelley–Coppage, Inc. v. Highlands Ins. Co.*,
    980 S.W.2d 462 (Tex. 1998) ..............................................................................34

vii

*Little v. Smith*,
  943 S.W.2d 414 (Tex. 1997) ......................................................................15

*Love v. Barber*,
  17 Tex. 312 (1856) ....................................................................................16

*Lyons v. Montgomery*,
  701 S.W.2d 641 (Tex. 1985) ......................................................................34

*Marsh v. Marsh*,
  949 S.W.2d 734 (Tex. App.–Houston [14th Dist.] 1997, no writ)............... 33, 38

*McCraw v. Maris*,
  828 S.W.2d 756 (Tex. 1992) ......................................................................13

*McGilliard v. Kuhlmann*,
  722 S.W.2d 694 (Tex. 1986) ......................................................................32

*Meridien Hotels, Inc. v. LHO Financing Partnership I, L.P.*,
  255 S.W.3d 807 (Tex. App.–Dallas 2008, no pet.) ....................................37

*Moreno v. Sterling Drug, Inc.*,
  787 S.W.2d 348 (Tex. 1990) ......................................................................30

*Meroney & Co. v. Rowe*,
  619 S.W.2d 210 (Tex. 1981) ......................................................................22

*Motor Vehicle Bd. v. El Paso Indep. Auto Dealers Assn., Inc.*,
  1 S.W.3d 108 (Tex. 1999) ..........................................................................22

*Pickens v. Alsup*,
  568 S.W.2d 742 (Tex. Civ. App.–Austin 1978, writ ref'd n.r.e.) ........................38

*Prestige Ford Co. Ltd. P'ship v. Gilmore*,
  56 S.W.3d 73 (Tex. App.–Houston [14th Dist.] 2001, pet. denied) ....................13

*Ragsdale v. Progressive Voters League*,
  801 S.W.2d 880 (Tex. 1990) ......................................................................31

20020862.20090455/2250814.1

*Reliance Steel & Aluminum Co. v. Sevcik*,
 267 S.W.3d 867 (Tex. 2008) .............................................................. 13, 24, 26, 27

*Saba Zi Expl., L.P. v. Vaughn*,
 448 S.W.3d 123 (Tex. App.–Houston [14th Dist.] 2014, no pet.) .......................20

*Steubner Realty 19, Ltd. v. Cravens Rd. 88, Ltd.*,
 817 S.W.2d 160 (Tex. App.–Houston [14th Dist.] 1991, no writ) .............. 17, 23

*Sun Oil Co. (Delaware) v. Madeley*,
 626 S.W.2d 726 (Tex. 1981) ...............................................................................25

*Sun Operating Ltd. P'ship v. Holt*,
 984 S.W.2d 277 (Tex. App.–Amarillo 1998, pet. denied) ...................................34

*Tanner Dev. Co. v. Ferguson*,
 561 S.W.2d 777 (Tex.1977) .................................................................................24

*Tarleton State University v. K.A. Sparks Contractor, Inc.*,
 695 S.W.2d 362 (Tex. App.–Waco 1985, writ ref'd n.r.e.) .................................31

*Tawes v. Barnes*,
 340 S.W.3d 419 (Tex. 2011) ...............................................................................33

*Tenneco, Inc. v. Enterprise Prod. Co.*,
 925 S.W.2d 640 (Tex. 1996) ...............................................................................22

*TH Healthcare Ltd. v. Patino*,
 No. 13–06–602–CV, 2007 WL 2128909
 (Tex. App.–Corpus Christi July 26, 2007, pet. denied) ................................. 14-15

*Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*,
 644 S.W.2d 443 (Tex. 1982) ...............................................................................12

*Via Net v. TIG Ins. Co.*,
 211 S.W.3d 310 (Tex. 2006) ...............................................................................15

*Vickery v. Vickery*,
 999 S.W.2d 342 (Tex. 1999) ...............................................................................22

ix

*Walker v. Rangel,*
  14–08–00643–CV, 2009 WL 4342505
  (Tex. App.–Houston [14th Dist.] Dec. 3, 2009, no pet.)......................................13

*Wagner v. Morris,*
  658 S.W.2d 230 (Tex. App.–Houston [1st Dist.] 1983, no writ).........................19

*Washington Square Fin., LLC v. RSL Funding, LLC,*
  418 S.W.3d 761 (Tex. App.–Houston [14th Dist.] 2013, pet. denied) ...............33

*White v. Harrison,*
  390 S.W.3d 666 (Tex. App.–Dallas 2012, no pet.) ............................................22

*Williams Distrib. Co. v. Franklin,*
  898 S.W.2d 816 (Tex. 1995) ...............................................................................26

## Other Authority

*Pickard v. Sears*, Eng.
  C.L. vol. 33, p. 117, (112 Eng.Rep. 179) .........................................................16

## Statutes

Tex. Fin. Code § 304.002...........................................................................................34

Tex. Fin. Code § 304.003..................................................................................... 34, 37

Tex. Civ. Prac. & Rem. Code § 16.004 ....................................................................30

Tex. Civ. Prac. & Rem. Code § 16.051 ....................................................................30

Tex. Civ. Prac. & Rem. Code § 38.001 ............................................................. 28, 31

20020862.20090455/2250814.1

## Rules

Tex. R. App. P. 9.4.........................................................................................41

Tex. R. App. P. 44.1(a)(1) .............................................................................13

Tex. R. Evid. 403 ...........................................................................................25

20020862.20090455/2250814.1

## Clear Lake Center, L.P.'s Cross–Appellant's Brief

## Statement of the Case

*Nature of Case*

Tenant Garden Ridge sued landlord Clear Lake to recover alleged overpayments of management fees under a commercial real property lease.

*Trial Court*

215th District Court, Harris County, Texas, Hon. Elaine Palmer presiding.

*Course of Proceedings*

This is the second appeal. The first appeal was from cross motions for summary judgment. This Court reversed the summary judgment in favor of Garden Ridge, affirmed, in part, the summary judgment in favor of Clear Lake, and remanded for trial on the narrowed issues. *See Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527 (Tex. App.–Houston [14th Dist.] 2013, no pet.).

*Trial Court's Disposition*

On remand, a jury answered favorably to Garden Ridge. CR262–80. Judgment was entered awarding Garden Ridge damages of $594,700 and $350,000 in attorneys' fees; 5% post–judgment interest; and, conditional appellate fees. CR359–61.

1

## Clear Lake's Cross Issues

**Issue 1:** Clear Lake conclusively established Garden Ridge's claims are precluded based on affirmative defenses of waiver, ratification, novation, accord and satisfaction, and/or estoppel; Clear Lake is entitled to complete judgment in its favor.

**Issue 2:** The trial court erred by excluding evidence offered to support Clear Lake's affirmative defenses; error was harmful and, at minimum, Clear Lake is entitled to a new trial.

**Issue 3:** Because the trial court erred by excluding admissible, critical evidence, the findings of liability and damages are unsustainable.

**Issue 4:** Without sustainable findings of liability and damages, attorneys' fees are not recoverable.

**Issue 5:** All claims for amounts paid before September 10, 2005, are barred by limitations; it was error for the trial court to include in the judgment any damage amount for periods before September 10, 2005.

**Issue 6:** Based on Clear Lake's counterclaim for breach of contract, its recovery of "offset" damages, its unrebutted evidence proving attorneys' fees, Clear Lake is entitled to judgment in its favor or, alternatively, a new trial.

2

## Statement of Facts

Clear Lake[1] is owner and landlord and Garden Ridge is the tenant under a Shopping Center Lease (the "Lease") executed in 1995. 8RRPX1. The Lease was amended in 1996 and in 2005.[2] 8RRPX2; 8RRPX3. Among other things, the Lease requires Clear Lake to "operate, manage and maintain" the Common Area. 8RRPX1, § 6.3. The Lease requires Garden Ridge to pay "Tenant's Share of Common Area Costs" described as "all sums expended" by Clear Lake:

> in operating, managing, policing, equipping, lighting, repairing, replacing and maintaining the Common Areas, and an allowance to Landlord for Landlord's supervision of the Common Areas in an amount equal to seven and one–half percent (7–1/2%) of the total of all Common Area Costs.

8RRPX1, § 6.4.

Clear Lake billed and collected a management fee as a component of Common Area Maintenance Charge, *see* 8RRPX1, § 1.1 (i) ("CAM"), a part of Garden Ridge's rent. *See* 8RRPX1. With the exception that "the manner of operation, management and maintenance and the expenditures therefor" are to be "in the sole discretion of Landlord," the Lease does not specify a formula for calculating the management fee. *See* 8RRPX1, article VI.

---

[1]      Clear Lake bought the shopping center from the original owner/landlord in 2003.

[2]      The terms of first amendment do not materially affect the Lease for purposes of this suit. *See* 8RRPX2.

Garden Ridge paid the management fee for the years beginning in 2003 until shortly before it sued in September 2009. It paid later fees "under protest." *See, e.g.*, 8RRPX57, PX58.

In February 2004, Garden Ridge filed for chapter 11 bankruptcy protection. *See* 6RR131; 8cRRDX13. As part of its reorganization plan, Garden Ridge elected to keep the store at Clear Lake Center. *See, e.g.,* 6RR128–29. Garden Ridge and Clear Lake spent about six months negotiating terms under which Garden Ridge would remain a tenant, subject to bankruptcy court approval. *See* 6RR138–39.

In these negotiations, Garden Ridge employed a team that included: (a) one "principal of the owner of Garden Ridge"; (b) two of its "day–to–day operations guy[s]"; (c) Garden Ridge's bankruptcy counsel; (d) its "leasing counsel"; and (e) a commercial leasing consultant. 6RR127–31. Based on negotiations between the Garden Ridge team and Clear Lake's representatives, the parties agreed to and signed the Second Amendment to Lease (the "Amendment") in February 2005. *See* 8RRPX3.

In the Amendment, Clear Lake agreed to reduce Garden Ridge's Base Rental payments. 8RRPX3, ¶ 3. It agreed to extend the Lease term through January 2024. *Id.*, ¶ 2. The Amendment also included Garden Ridge's agreement to pay (over 24 months and without interest) an "Agreed Cure Amount" of $326,132.98, inclusive of the 2003 CAM charge of $82,573.33. *Id.*, ¶ 4; 8cRRDX13 (proof of claim). Per

4

the 2003 reconciliation statement,[3] which Garden Ridge had, the CAM includes a management fee of $58,259.14. 8RRPX11. Thus, Garden Ridge expressly agreed that the proper amount of CAM charges, including the management fee, was $82,573.33. 8RRPX3; 8RRPX11. With the right to do so, 8RRPX1, § 6.5, Garden Ridge did not ask to audit Clear Lake's books before signing the Amendment.

The Amendment also includes the parties' ratification, confirmation and approval of all terms of the Lease except those specifically modified by the Amendment. 8RRPX3, ¶ 14(b). Both Garden Ridge and Clear Lake "waived" all existing "defaults . . . offsets and defenses . . . under the Lease." *Id.* Both Garden Ridge and Clear Lake "release[d] each other from all liabilities, claims, controversies, causes of action and other matters of every nature which, through [February 4, 2005], have or might have arisen out of or in any way in connection with the Lease and/or the Demised Premises demised thereunder." *Id.*

In addition to the waiver and release, Garden Ridge also "represent[ed]" to Clear Lake that, except for the "amounts that compromise [*sic*] the Agreed Cure Amount, there exists no breach, default, event or condition which with the giving of notice or passage of time, or both, would constitute a breach or default under the

---

[3] CAM charges were paid monthly, in advance, based on estimated annual costs, subject to year-end adjustment based on actual costs for which Clear Lake provided annual reconciliation statements. 8RRPX1, §§ 6.4, 6.5; *see also, e.g.*, 8RRPX11. Garden Ridge had the right to inspect and audit Clear Lake's records. 8RRPX1, § 6.5.

Lease either by Lessee or Lessor, and (iii) except as provided otherwise in this Agreement, Lessee has no existing claims, defenses or offsets against rental due or to become due under the Lease." 8RRPX3, ¶ 14(h).

After the Bankruptcy court approved Garden Ridge's assumption of the Lease as amended, the parties continued to perform as they had since Clear Lake's purchase of the shopping center in 2003. Clear Lake billed estimated CAM charges monthly, provided reconciliation statements annually–each containing the same detailed, line item disclosures as the one for 2003, and Garden Ridge paid the CAM charges, including management fees. In 2009, Garden Ridge exercised its audit right, *see* 8RRPX1, § 6.5, and engaged an outside firm to conduct an "audit of annual operating costs" for the store. *See* 8RRPX52.

**Introduction**

Beginning with voir dire and his analogy to a cell–phone "charge showing up that you really did not order that you found out about later," *see* 3RR40–46, counsel for Garden Ridge repeatedly infused into the proceedings that Garden Ridge "did not know" what the management fee was for. In opening statement, Garden Ridge's lawyer told the jury, "we found out for the very first time" in 2009. 3RR121–22. In closing argument, he told the jury, "In 2009, they say, 'Gee, this seems like a big number.'" 7RR69. Yet, but for the exclusion of evidence, the jury would have known that four years earlier when the insolvent Garden Ridge was trying to keep the store

6

open, before the parties agreed to reduce Garden Ridge's rent, extend the Lease term, permit Garden Ridge to pay out an agreed cure amount over time without interest, and to give Garden Ridge a $150,000.00 credit for a new air conditioner, Garden Ridge's negotiating team said practically the same thing: "the estimate for 2005 [CAM] is around $15,000 per month which seems excessive" … "Let's discuss so there is no misunderstanding going forward." 8dRRDX16–F; *see also* 7RR4 (Clear Lake's proffer of Mr. Freedman's testimony about the conversation he had with Mr. Spargo, the author of the excluded email).[4]

Contrary to Garden Ridge's recurring theme that it "did not know," the excluded evidence would have shown the jury that five years before Mr. Boystun was hired to do an audit, during the months leading up to the February 2005 Amendment, Garden Ridge, its counsel, its in–house leasing staff, and its outside leasing consultants were fully apprised of all components of the CAM charges, including the management fee. *See* 8dRR16A–F; *see also* 8RRPX11. Garden Ridge did know; all material facts were available to Garden Ridge's negotiating team in 2004.

---

[4]    *See Hooper v. Chittaluru*, 222 S.W.3d 103, 108 (Tex. App.–Houston [14th Dist.] 2006, pet. denied) ('The 'nature of the disputed evidence was apparent to all,' and thus the offer was sufficiently specific." (quoting *Fox v. State,* 115 S.W.3d 550, 559 (Tex. App.–Houston [14th Dist.] 2002, pet. ref'd))).

20020862.20090455/2250814.1

The excluded evidence would have illuminated further that the Amendment did not appear out of a vacuum; it was negotiated for months. *See, e.g.*, 8dRRDX14. But for the exclusion of evidence, the jury would have seen the mid–November 2004, email asking for "more information to support" the $82,573.33 2003 CAM charge. 8dRRDX16–C. But for the exclusion of evidence, the jury would have seen that two weeks later, Garden Ridge's negotiating team was still "checking on" the cure amounts. 8dRRDX16–E. But for the exclusion of evidence, the jury would have known that less than a week before signing the Amendment that extended the Lease through January 31, *2024*, Garden Ridge's negotiating team member, Mr. Spargo, wrote that the estimate for future CAM "seems excessive" and asked for (and got, *see* 7RR4) "discuss[ion] so there is no misunderstanding going forward." 8dRRDX16–F. An objective observer could only conclude that all possible misunderstandings about CAM charges "going forward" were resolved because Garden Ridge would not have signed the Amendment otherwise.

There is no dispute that the management fee component of CAM was determined the same way for 2003 as it was for the years after 2003. It is Garden Ridge's pro rata share of the 5% fee paid by Clear Lake to its property manager.

20020862.20090455/2250814.1

So, when Garden Ridge knew (or is legally charged with knowledge) how the management fee was determined is important. Garden Ridge's attorney thought so; he did his best to convince the jury that Garden Ridge was in the dark until 2009. But, as the Court wrote in the first appeal addressing limitations:

> Garden Ridge paid the 2004 CAM charge without question and without requesting an audit, for which it had a contractual right under Section 6.5 of the lease. Garden Ridge could have inquired about the management fee as soon as Clear Lake sent the reconciliation, but Garden Ridge did not do so. Instead, Garden Ridge waited four years to request an audit, and there is no evidence Clear Lake provided false information during the course of the audit–indeed, the management agreement that Clear Lake provided during the audit is precisely how Garden Ridge learned of the breach.
>
> * * *
>
> We hold as a matter of law that a tenant acting with due diligence could have discovered this type of injury by asking Clear Lake for information needed to verify contractual performance.

*Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 544 (Tex. App.–Houston [14th Dist.] 2013, no pet.).

The same analysis applies to Clear Lake's affirmative defenses, particularly, estoppel. *See Champlin Oil & Ref. Co. v. Chastain*, 403 S.W.2d 376, 388 (Tex. 1965) ("imputed actual notice carries with it the same legal consequences as conscious knowledge."). The Court should hold, consistently with the first appeal, that Garden Ridge, acting with due diligence, could have discovered the injury complained of in this case by asking Clear Lake before signing the Amendment for any information it needed before representing that:

9

there exists no breach, default, event or condition which with the giving of notice or passage of time, or both, would constitute a breach or default under the Lease either by Lessee or Lessor, and (iii) except as provided otherwise in this Agreement, Lessee has no existing claims, defenses or offsets against rental due or to become due under the Lease.

8RRPX3, ¶ 14(h).

But for the exclusion of Clear Lake's evidence, the jury would have known that when Garden Ridge represented in the Amendment that "there exists no breach, default, event or condition which … would constitute a breach or default under the Lease," 8RRPX3, ¶ 14(h), Garden Ridge either knew how the management fee was determined or, if not, it was either willfully or negligently ignorant of the available facts. The jury should have been permitted to see and hear all the evidence—including precluded cross examination on excluded facts and documents—of what Garden Ridge knew, *see, e.g.*, 7RR4, when it made the representation relied on by Clear Lake. The jury should have seen and heard the excluded evidence before it was asked to decide if Garden Ridge was precluded from complaining in 2009 about the same method of determining the management fee that it represented in the 2005 Amendment was not a breach of the Lease. The trial court erred by excluding critical evidence offered by Clear Lake in support of its affirmative defenses.

10

## Summary of the Argument

Clear Lake's non–compliance, if there was any, was excused.

Garden Ridge is legally precluded to have sued in 2009 for refund of CAM charges determined the same way after the Amendment as they were determined before it. Garden Ridge is charged with knowledge of its claimed injury–what the management fee was for–before February 2005. With that knowledge, Garden Ridge affirmatively represented in writing, in exchange for substantial value, that there was no breach, default, event or condition which would constitute a breach or default under the Lease and that it had no existing claims, defenses or offsets against rental due *or to become due* under the Lease. Having enjoyed the benefits of the Lease as amended for years, Garden Ridge is estopped, or otherwise legally precluded, to deny its prior, contractual representations or their effect.

Clear Lake was not allowed to use certain evidence in support of its affirmative defenses. Garden Ridge's objection was that admission of the evidence in issue would offend the parol evidence rule. Following Garden Ridge's lead, the trial court erred, misconstruing and misapplying the parol evidence rule. Exclusion of the evidence was error and the erroneous rulings resulted in an incorrect judgment.

11

Because Clear Lake is entitled, at minimum, to a new trial based on exclusion of its evidence, the jury's findings of liability and damages cannot stand. Without sustainable findings of liability and damages, Garden Ridge may not recover attorneys' fees.

The Court concluded in the first appeal in this case that all claims which accrued before September 10, 2005 are barred by limitations. It is undisputed that Clear Lake charged and Garden Ridge paid management fees each month, including January through September, 2005. It is undisputed that Garden Ridge had the right to audit at any time but did not invoke it until 2009. Thus, each monthly payment of supposedly overstated fees marked accrual of any cause of action for the claimed overpayment. Garden Ridge is not entitled to damages for all of 2005 as found by the jury and as incorporated into the Judgment.

Additionally, Clear Lake counterclaimed for breach of contract and for declaratory relief. Clear Lake prevailed on a claim for offset. Plus, Clear Lake adduced unrebutted evidence of its attorneys' fees. Clear Lake is entitled to judgment in its favor, including its proven attorneys' fees.

### Standard of Review

An issue is conclusively established when the evidence is such that ordinary minds cannot differ as to the conclusion to be drawn from it. *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex. 1982);

12

*Behzadpour v. Bonton*, 14–09–01014–CV, 2011 WL 304079, at *3 (Tex. App.–Houston [14th Dist.] Jan. 27, 2011, no pet.).

The exclusion of evidence generally is within the discretion of the trial court. *See Bayer Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586, 609 (Tex. App.–Houston [14th Dist.] 2006, pet. denied) (citing *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex. 1995)). When error is shown and that error probably resulted in an improper judgment, the Court should reverse. *See City of Brownsville v. Alvarado,* 897 S.W.2d at 753–54; *see also Prestige Ford Co. Ltd. P'ship v. Gilmore,* 56 S.W.3d 73, 78 (Tex. App.–Houston [14th Dist.] 2001, pet. denied); *Walker v. Rangel*, 14–08–00643–CV, 2009 WL 4342505, at *6 (Tex. App.–Houston [14th Dist.] Dec. 3, 2009, no pet.); Tex. R. App. P. 44.1(a)(1). The Texas Supreme Court has further explained that, "if erroneously admitted or excluded evidence was crucial to a key issue, the error was likely harmful." *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008). This is not a "but for" test; the complaining party is only required to show that the exclusion of evidence probably resulted in the rendition of an improper judgment. *Id.* (citing *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex. 1992)). In determining whether harm resulted, the Court "must evaluate the whole case from voir dire to closing argument." *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d at 871.

13

## Argument and Authority

Garden Ridge claimed that the way Clear Lake determined the annual management fee amount was a breach of the Lease. Clear Lake pleaded affirmative defenses including waiver, estoppel, ratification, novation, accord and satisfaction, judicial estoppel, and release. CR194–98. Because Garden Ridge knew or should have known how the fee was calculated before February 4, 2005, it is charged with knowledge and was estopped, or otherwise precluded, from bringing suit for the supposed breach.

**Issue 1:     Clear Lake's affirmative defenses preclude Garden Ridge's suit as a matter of law.**

Garden Ridge could have inquired about the management fee as soon as Clear Lake sent the 2003 reconciliation; it did not. With compelling incentive to successfully reorganize, Garden Ridge did not use its contractual right to audit during the 2004 or 2005 negotiations leading to the Amendment.[5] By analogy to this Court's accrual analysis in the first appeal, with the 2003 reconciliation in hand, the contractual right to audit, and motivated by the desire to keep its store, Garden Ridge could have and should have discovered in 2004 how Clear Lake determined the management fee. *See Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 544 (Tex. App.–Houston [14th Dist.] 2013, no pet.) (citing *TH Healthcare Ltd. v.*

---

[5]     Garden Ridge waited until 2009 to first request an audit. *See Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 544 (Tex. App.–Houston [14th Dist.] 2013, no pet.).

14

*Patino,* No. 13–06–602–CV, 2007 WL 2128909, at \*5 (Tex. App.–Corpus Christi July 26, 2007, pet. denied) (mem. op.) (where contract allowed for reconciliation of overpayments to be conducted, if the plaintiff had conducted its reconciliation and audit, it would or should have known of the injury at that time). Had Garden Ridge exercised diligence as it negotiated the Amendment, *see Clear Lake Ctr., L.P.*, 416 S.W.3d at 543 (citing *Via Net v. TIG Ins. Co.,* 211 S.W.3d 310, 314 (Tex. 2006)), including invoking its right to audit, it would have known how the management fee was determined, the essence of the breach it claims.

On the record of this case,[6] especially as illuminated by the excluded evidence of negotiations, *see, e.g*, 8dRRDX16–C, DX16–F, 7RR4, Garden Ridge, as a matter of law, is charged with knowledge on February 4, 2005, of the "prior CAMS," including the management fee. *See Champlin Oil & Ref. Co. v. Chastain*, 403 S.W.2d 376, 388–89 (Tex. 1965) ("*Means of knowledge* with the duty of using them are in equity equivalent to knowledge itself.") (quoting *Hexter v. Pratt,* 10 S.W.2d 692, 693 (Tex. Comm'n App. 1928, judgm't adopted) (emphasis added)); *see also Little v. Smith*, 943 S.W.2d 414, 421 (Tex. 1997). Because Garden Ridge had "knowledge or information of facts sufficient to put [it] upon inquiry which if reasonably pursued would lead to the discovery of the controlling fact" (the use of

---

[6] As this Court observed in the first appeal, "Garden Ridge's … injury could have been discovered with the exercise of due diligence." *Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 544 (Tex. App.–Houston [14th Dist.] 2013, no pet.).

15

the plant allocation formula in *Champlin*; the management fee calculation here), Garden Ridge is "**charged with actual knowledge of such controlling fact**." *Champlin Oil & Ref. Co. v. Chastain*, 403 S.W.2d at 403–04 [emphasis added]. Charged with such knowledge, Garden Ridge represented in the Amendment that "there exists no breach, default, event or condition which … would constitute a breach or default under the Lease" and that it had no "existing claims, defenses or offsets against rental **due or to become due**[7] under the Lease." 8RRPX3, ¶ 14(h) [emphasis added]. Having made the representations, Garden Ridge is bound by them and estopped to sue for an alleged breach based on post–Amendment management fees determined using the same method used before Garden Ridge signed the Amendment. *See Champlin Oil & Ref. Co. v. Chastain*, 403 S.W.2d at 388.[8]

The elements of estoppel are: (1) a false representation or concealment of material facts; (2) made with knowledge, actual **or constructive**, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or

---

7    *See* 8dRRDX16-F ("[I]t looks like the estimate for 2005 is around $15,000 per month which seems excessive. Some reasonable increase over the $8,500 amount would seem to be more realistic. Let's discuss so there is no misunderstanding going forward.").

8    The *Champlin Oil* case quotes from *Love v. Barber*, 17 Tex. 312 (1856): "[In *Pickard v. Sears*, Eng. C.L. vol. 33, p. 117, (112 Eng.Rep. 179), Lord Denman] says 'that the rule of law is clear, that when one, by his words or conduct, willfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring, against the latter, a different state of things, as existing at the same time …'"; and from a later Lord Denman opinion: "'A party, who negligently or culpably stands by and allows another to contract on the faith and understanding of a fact which he can contradict, cannot afterwards dispute that fact in an action against the person whom he has himself assisted in deceiving.'"

16

means of obtaining knowledge of the facts; and (5) who detrimentally relies on the representations. *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998); *see also Kamat v. Prakash*, 420 S.W.3d 890, 900 (Tex. App.–Houston [14th Dist.] 2014, no pet.); CR267, 268 (Questions 2 and 3).

Relying on the truth of Garden Ridge's representation that nothing Clear Lake had done or omitted to do in connection with the Lease through 2004 constituted a breach or a default and its representation that Garden Ridge had "no defenses or offsets against rental due **or to become due**," 8RRPX3, Clear Lake agreed to and did change its position to its detriment. CR268 (Question 3); *see Falcon Enterprises, Inc. v. Sugar Creek Section 25,* 14–97–00817–CV, 1999 WL 966645, at \*12 (Tex. App.–Houston [14th Dist.] Oct. 21, 1999, pet. denied) (not designated for publication); *see also Freezia v. IS Storage Venture, LLC,* 14–14–00174–CV, 2015 WL 4983705, at \*6 (Tex. App.–Houston [14th Dist.] Aug. 20, 2015, no pet.) (Doctrine of quasi–estoppel forbids a party from accepting the benefits of a transaction and then subsequently taking an inconsistent position to avoid corresponding obligations or effects); *Steubner Realty 19, Ltd. v. Cravens Rd. 88, Ltd.*, 817 S.W.2d 160, 164 (Tex. App.–Houston [14th Dist.] 1991, no writ); *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.,* 176 S.W.3d 80, 87 (Tex. App.–Houston [1st Dist.] 2004, no pet.). The Lease term was extended to 2024, Garden Ridge's rent was reduced. 8RRPX3. Garden Ridge was permitted to pay out the agreed cure

17

amount in default over time, without interest, and was given a $150,000 credit for new air conditioning. *Id*. On these conclusively established facts and the applicable law, Garden Ridge was estopped to challenge how Clear Lake determined the management fees.

There is no dispute that the fees were determined the same way after the Amendment as they were before it. Thus, Garden Ridge is precluded by law from accepting the benefits of the Amendment for years, then taking an inconsistent position to avoid obligations or effects of the clear language of its representations in the Amendment. *Freezia v. IS Storage Venture, LLC, supra.* The law is clear and reasonable minds cannot differ as to the facts. Clear Lake is entitled to reversal and rendition of judgment in its favor.

**Issue 2:      The trial court erroneously applied the parol evidence rule.**

In the alternative, the trial court's exclusion of evidence based on the parol evidence rule was reversible error.

With pleadings and evidence to submit jury questions, the trial court, nevertheless, erroneously excluded much of Clear Lake's evidence offered to prove its affirmative defenses. *See* CR267–68 (Jury Questions 2 (excuse) and 3 (estoppel)). The evidence excluded concerns several months of negotiation immediately before the parties executed the February 4, 2005 [second] Amendment to the Lease. The

18

trial court's rulings were predicated on Garden Ridge's ill–founded objection, its often repeated refrain: "parol evidence rule."[9]

The parol evidence rule generally excludes extrinsic evidence of a **prior or contemporaneous agreement** between the parties to a written contract, **if such evidence changes or contradicts the terms** of the written contract. *See Wagner v. Morris,* 658 S.W.2d 230, 231 (Tex. App.–Houston [1st Dist.] 1983, no writ). Clear Lake made no effort to vary the any term of the original Lease or the Lease as amended. The parol evidence rule is neither applicable to nor a proper basis for excluding the proffered evidence. On the other hand, the failure of the trial court to afford the Clear Lake the opportunity to present pertinent evidence and to cross-examine witnesses about that evidence was error rendering the trial materially unfair. *See Fillion v. Osborne*, 585 S.W.2d 842, 845 (Tex. Civ. App.—Houston [1st Dist.] 1979, no writ); *Avila v. U. S. Fid. & Guar. Co.*, 551 S.W.2d 453, 457 (Tex. Civ. App.–San Antonio 1977, writ ref'd n.r.e.).

The validity and scope of the management fee is part of the original Lease executed in 1995. *See* 8RRPX1, §§ 6.1 ("Common Area"), 6.3 ("Operation of Common Area"), 6.4 ("Common Area Costs"). There is no formula or calculation for determining the management fee contained in the Lease. *See id.* The excluded

---

[9] *See, e.g.*, 2RR5, 11, 17, 19, 21, 22, 33, 38, 55; 3RR16, 89-91, 98, 100, 102, 103; 4RR161-62, 168, 170, 173-73, 174, 176, 178; 6RR18, 22.

19

evidence has nothing to do with any such formula or calculation. Rather, the evidence relates to actions and communications occurring in 2004 or 2005, before execution of the Amendment. Obviously, it is not evidence of anything (agreement or otherwise) occurring prior to or contemporaneous with signing the 1995 Lease. Lease terms establishing the validity and scope of the management fee, moreover, are not changed by the Amendment. *See* 8RRPX3. The evidence of communications during the 2004 and 2005 negotiations does not constitute and was not offered as evidence of an "agreement" at all. It is evidence of what Garden Ridge said and did and what it knew and, implicitly, should have known when it signed the Amendment. Simply, Clear Lake did not offer the excluded evidence to change any provision of the original Lease.

If it is the Amendment that concerned the trial court, still, the parol evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011); *Saba Zi Expl., L.P. v. Vaughn*, 448 S.W.3d 123, 131 (Tex. App.–Houston [14th Dist.] 2014, no pet.). Clear Lake did not advocate changing any provision of the Amendment. To the contrary, it argued that the unambiguous representations that "there exists no breach, default, event or condition which … would constitute a breach or default under the Lease" and that there are "no defenses or offsets against rental due or to

20

become due," 8RRPX3, should be enforced as written. It remains Clear Lake's position that Garden Ridge cannot avoid its corresponding obligations or the effect of its words by taking the inconsistent position that is the heart of its case. *See, e.g., Freezia v. IS Storage Venture, LLC, supra.* Because the management fee was determined in exactly the same way in 2003 as it was through 2014, Clear Lake was entitled to put on evidence of what Garden Ridge's negotiating team knew as it negotiated the Amendment. This is not parol evidence.

But for the trial court's erroneous application of the parol evidence rule, the jury would have seen that Garden Ridge specifically asked for "more information to support" the $82,573.33 2003 CAM charge. 8dRRDX16–C. The jury would have seen the email where Garden Ridge wrote that it was "checking on" the cure amounts. 8dRRDX16–E. Clear Lake was prevented from asking any Garden Ridge witness what it did to check on the cure amounts. But for the trial court's erroneous application of the parol evidence rule, the jury would have known that Garden Ridge's Mr. Spargo wrote in January 2005, before execution of the Amendment: the estimate of $15,000 per month for CAM charges going forward "seems excessive." 8dRRDX16–F. Mr. Spargo wrote, "Let's discuss so there is no misunderstanding going forward." *Id.* This is not parol evidence. With no evidence or suggestion that

21

Clear Lake withheld anything Garden Ridge's negotiating team asked for,[10] and, had

it heard Mr. Freedman's excluded testimony "about the conversation that he had

with Dave Spargo related to the negotiations of the second amendment to the lease,"

7RR4, the jury could (and should) reasonably have believed that Clear Lake's failure

to comply, if any, was excused,[11] CR267 (Question 2), and/or that Garden Ridge

was estopped to pursue this case. *See* CR268 (Question 3).

_____

[10]    *See Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 544 (Tex. App.–Houston [14th Dist.] 2013, no pet.) Discussing the 2004 reconciliation in its limitations analysis, the Court noted that Garden Ridge could have inquired about the management fee as soon as Clear Lake sent the reconciliation, but did not do so; "Garden Ridge waited four years to request an audit." *Id.* It noted the absence of evidence that Clear Lake withheld any information. *Id.*

[11]    Question 2 includes, *e.g.*, waiver, novation, ratification, and accord and satisfaction. CR267; *see also* CR194-98. Waiver is the intentional relinquishment of a known right, or conduct which is inconsistent with claiming the right. *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003). While ordinarily a question of fact, when the surrounding facts and circumstances are undisputed, the question becomes one of law. *Id.*; *Motor Vehicle Bd. v. El Paso Indep. Auto Dealers Assn., Inc.*, 1 S.W.3d 108, 111 (Tex. 1999). Silence or inaction for so long a period as to show an intention to yield the known right is enough to prove waiver. *Tenneco, Inc. v. Enterprise Prod. Co.*, 925 S.W.2d 640, 643 (Tex. 1996); *Alford. Meroney & Co. v. Rowe*, 619 S.W.2d 210, 213 (Tex. 1981).

The elements of a **novation** are: (1) a previous, valid obligation; (2) a mutual agreement of the parties to the acceptance of a new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract. *Vickery v. Vickery*, 999 S.W.2d 342, 356 (Tex. 1999).

The elements of ratification are (1) approval by act, word, or conduct, (2) with full knowledge of the facts of the earlier act, and (3) with the intention of giving validity to the earlier act. *See, e.g., Corcoran v. Atascocita Cmty. Imp. Ass'n, Inc.*, 14-12-00982-CV, 2013 WL 5888127, at *6 (Tex. App.–Houston [14th Dist.] Oct. 31, 2013, pet. denied) (citing *White v. Harrison,* 390 S.W.3d 666, 672 (Tex. App.–Dallas 2012, no pet.). A party ratifies an agreement when—after learning all of the material facts—he confirms or adopts an earlier act that did not then legally bind him and that he could have repudiated. *Id.*

An **accord** requires a bargaining evidenced in a new contract, either express or implied, that replaces an old agreement. *Vickery v. Vickery*, 999 S.W.2d 342, 355 (Tex. 1999) (citing *Bueckner v. Hamel,* 886 S.W.2d 368, 372 (Tex. App.–Houston [1st Dist.] 1994, writ denied). In the new contract, the parties agree that one may give or perform, and the other will accept, something different from what each was expecting from the old contract. *Id.* The **satisfaction** is the actual performance of the new agreement. *Id.* The Amendment is the accord; performance from 2005 through at least the middle of 2009 is the satisfaction.

22

The jury could (and should) reasonably have found that Garden Ridge was estopped to complain about any alleged non–compliance. CR268 (Question 3). It was conclusively established that Garden Ridge, in fact, took voluntary action concerning the Lease. *See id.* Garden Ridge decided it was in the company's best interest to keep the store at Clear Lake Center. It negotiated the Amendment for which Clear Lake gave substantial value. In exchange for that value, Garden Ridge represented in the Amendment that the amount of the CAM, inclusive of the management fee, charged for 2003 (*and* the estimated CAM going forward) was not a "breach, default, event or condition which … would constitute a breach or default under the Lease" and that there were "no defenses or offsets against rental due or to become due." 8RRPX3.

But for the erroneous exclusion of, for example, Clear Lake's exhibit 16, the consequent inability to cross examine on those documents, and Mr. Freedman's excluded testimony about discussions he had with Mr. Spargo, the jury would have known that with incentive–even a duty–to negotiate the best deal obtainable, Garden Ridge was specifically focused on the 2003 CAM charges for over two months. 8dRRDX14, DX16; 7RR4. *See Freezia v. IS Storage Venture, LLC, supra*; *Steubner Realty 19, Ltd. v. Cravens Rd. 88, Ltd., supra.* Based on Garden Ridge's representations, Clear Lake agreed to extend the Lease term, reduce Garden Ridge's rent, let Garden Ridge pay out amounts in default over time, without interest, and,

23

give Garden Ridge a $150,000 credit for air conditioning. 8RRPX3. With information the trial court erroneously excluded, the jury could (and should) reasonably have found that to allow Garden Ridge to challenge the management fee determined exactly the same way it had been since 2003 would be contrary to Garden Ridge's "initial action" in procuring the Amendment and would result in harm to Clear Lake. CR268 (Question 3). The trial court's erroneous rulings based on misconception and misapplication of the parol evidence rule deprived the jury of relevant, critical information. *See Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008). It deprived Clear Lake of the opportunity to examine and cross-examine witness about the excluded documents. The error deprived Clear Lake of a fair trial, resulted in an incorrect judgment, and should be reversed.

Evidence of what questions Garden Ridge's negotiating team asked, what information Clear Lake provided, and what Garden Ridge did or did not do with information before signing the Amendment simply does not offend the parol evidence rule. It is admissible evidence and can be used to inform the contractual text without altering the objective intent embodied in the agreement. Evidence of the parties' negotiations is relevant to "ascertaining the dominant purpose and intent of the parties embodied in the contract interpreted as a whole." *Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469–70 (Tex. 2011) (quoting *Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777, 781 (Tex. 1977); *see also*

24

*Creel v. Houston Indus., Inc.*, 124 S.W.3d 742, 750 n.8 (Tex. App.–Houston [1st Dist.] 2003, no pet.) (citing, *inter alia, Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)). Emails evidencing Garden Ridge's specific focus on the CAM charges in negotiating the Amendment, *see, e.g.*, 8dRRDX16–F, and Clear Lake's (Mr. Freedman's) proffered testimony about discussions that followed, *see* 7RR4, clearly are relevant, to jury Questions 2 and 3. CR267, 268. It was error for the trial court to exclude the evidence and additional evidence the ability to examine and cross-examine would certainly have produced, particularly where the only objection was the parol evidence rule.

The excluded evidence provides details to the parties' months–long negotiation before signing the Amendment. *See, e.g.*, 8dRRDX14, DX15, DX16. The excluded evidence would have informed the jury about the time the parties devoted, their focus on various aspects of the proposed amendment, particularly, Garden Ridge's focus on the CAM charges, and information available to Garden Ridge–that which it asked for and that which it did not–during the negotiations.[12]

---

[12] Clear Lake was permitted to present deposition testimony of one of Garden Ridge's attorneys, Ms. Kimichik. *See* 6RR124, *et seq.* However, documents about which she testified were excluded. Any suggestion that specific information in excluded emails is cumulative is unfounded, specifically, *see,* 8dRRDX16-F. Mr. Freedman's proffered but excluded testimony about his discussions with Mr. Spargo is, likewise, not cumulative of anything Ms. Kimichik said. In any event, Garden Ridge did not invoke and the trial court did not mention evidence rule 403. Tex. R. Evid. 403; *see also In re N.R.C.,* 94 S.W.3d 799, 807 (Tex. App.–Houston [14th Dist.] 2002, pet. denied) ("The mere fact that another witness may have given the same or substantially the same
**Footnote continued on next page.**

25

*See* 8dRRDX14, DX15, DX16; 7RR4. The evidence would have shown the jury Garden Ridge's focus on the CAM charges and how they were determined both for 2003 and going forward, the controlling issue in this case. *See Reliance Steel & Aluminum Co. v. Sevcik, supra*; CR266 (Question 1). Evidence supporting Clear Lake's corresponding affirmative defenses is no less critical. *See* CR267, 268; *see also Bartosh v. Gulf Health Care Ctr.–Galveston*, 178 S.W.3d 434, 439 (Tex. App.–Houston [14th Dist.] 2005, no pet.) (citing *Williams Distrib. Co. v. Franklin*, 898 S.W.2d 816, 817 (Tex. 1995).

During the course of negotiating, in addition to the "cure amounts," including CAM charges, remaining "bracketed," 8dRRDX14, DX15, DX16–E (November 29 and December 20 emails), Garden Ridge wrote specifically about the CAM amount at least twice. On November 15, Garden Ridge's accounting department wanted "more information" about "prior" CAMs. 8dRRDX16–C. On January 27, Mr. Spargo asked to discuss CAM estimates for 2005 "so there is no misunderstanding going forward." 8dRRDX16–F. Had the jury been permitted to see this evidence in context with the undisputed fact that the Amendment was signed on February 4, its

---

**Footnote continued from previous page.**
testimony is not the decisive factor. Rather, we consider whether the excluded testimony would have added substantial weight to the complainant's case.") [internal citations omitted]. Without the evidence and with no opportunity to examine witnesses using it, the trial was materially unfair to Clear Lake. *See Fillion v. Osborne*, 585 S.W.2d at 845; *Avila v. U. S. Fid. & Guar. Co.*, 551 S.W.2d at 457.

20020862.20090455/2250814.1

only reasonably conclusion would be that these specific concerns expressly raised in the negotiating process all had been addressed to Garden Ridge's satisfaction. Why else would it sign the Amendment? Why else would Garden Ridge affirmatively represent in writing that, on February 4, 2005, "there exist[ed] no breach, default, event or condition which … would constitute a breach or default under the Lease[?]" 8RRPX3. Clear Lake was entitled to present evidence on the critical issues, its affirmative defenses to Garden Ridge's claim. The trail court's exclusion of the evidence, as parol evidence or otherwise, was harmful error. *See Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d at 873.

The excluded evidence clearly shows Garden Ridge's focus on the CAM charges, both past and future, before signing the Amendment. Assuming Garden Ridge's suit was not precluded as a matter of law, without Mr. Spargo's January 27 email without Mr. Freedman's testimony about his conversations with Mr. Spargo, the jury could not fairly answer Questions 2 and 3. The jury was prevented from fully and fairly assessing what Garden Ridge knew and what it considered important to find out before contractually waiving and releasing past breaches (if any), *and* before affirmatively representing that, except for its own defaults comprising the Agreed Cure Amount, "there exists no breach, default, event or condition which … would constitute a breach or default under the Lease either by Lessee or Lessor" and it had "no defenses or offsets against rental due or to become due." 8RRPX3, ¶14(h).

27

Assuming Garden Ridge's suit was not precluded, without testimony erroneous excluded as "parol evidence," the jury could not fairly and impartially answer whether Garden Ridge is estopped from complaining in 2009 about the method of determining the management fee that was the same method used in 2003. The exclusion of evidence was error and the error was harmful. At a minimum, the judgment should be reversed and the case remanded for a new trial.

**Issue 3:    Based on the erroneous exclusion of evidence, findings of liability and damages must fail.**

Because, as set forth above, the trial court erred by excluding admissible, critical evidence, the findings of liability and damages in favor of Garden Ridge are unsustainable and the Judgment must be reversed.

**Issue 4:    Garden Ridge is not entitled to recover attorneys' fees as found by the jury.**

Likewise, without sustainable findings of liability and damages, Garden Ridge is not entitled to recover attorneys' fees. *See* Tex. Civ. Prac. & Rem. Code § 38.001; 8RRPX1, § 19.4.

Additionally, the evidence shows that some of the fees claimed by Garden Ridge were not incurred by Garden Ridge; rather, the evidence clearly shows a portion of the claimed fees were incurred by a non–party venture capital firm called Three Cities Venture. *See, e.g.*, 8bRRPX90; 5RR74, 79, 132, 152 (Clear Lake's objection, overruled at 5RR81). Garden Ridge did not present evidence that fees

28

billed to Three Cities Venture were paid by Garden Ridge. Assuming the non–party incurred fees in order to monitor or even assist in Garden Ridge's prosecution of its claims, the Lease provides for recovery of fees "incurred by Tenant," not an affiliate, investor, or stranger. 8RRPX1, § 19.4. With no evidence that it paid or agreed to pay fees incurred by the non–party, Garden Ridge is not entitled to recover fees evidenced by plaintiff's exhibit 90. The exhibit should not have been admitted over Clear Lake's objection and, therefore, evidence to support the jury's response to Question 5 is insufficient.

**Issue 5:    Limitations bars recovery of any damages incurred prior to September 10, 2005.**

The statute of limitations for breach of contract claims bars all claims that accrued more than four years from the date that suit was filed. *See* Tex. Civ. Prac. & Rem. Code §§16.004, 16.051. The Court held in the first appeal that all claims accrued before September 10, 2005, are barred. *Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 546 (Tex. App.–Houston [14th Dist.] 2013, no pet.). The Court did not reach Clear Lake's argument that claims for estimated CAM charges paid prior to September 10, 2005, but subject to later reconciliation, had accrued and, therefore, were barred. *Id.* at 544–45.

Garden Ridge's claims accrued "when a wrongful act cause[d] an injury, regardless of when the plaintiff learn[ed] of the injury." *Franco v. Slavonic Mut. Fire Ins. Ass'n*, 154 S.W.3d 777, 789 (Tex. App.–Houston [14th Dist.] 2004, no pet.)

29

(citing *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990)). Suit was filed September 10, 2009. Therefore, the statute of limitations bars the recovery of any management fee paid before September 10, 2005. *See* Tex. Civ. Prac. & Rem. Code §§16.004, 16.051. The bar includes claims for the monthly management fee (a component of estimated CAM) paid at any time before September 10, 2005.

The estimated CAM charges for 2005 were $15,577.61 per month, inclusive of the management fee. 3CR 1173. The management fee for all of 2005 was $75,561.47, or $6,296.79 per month. *See* 8RRPX13. Even if Garden Ridge was entitled to sue for and recover any of the management fees at issue, it was barred from recovering any of the $56,671.10 2005 fees paid before September 10, 2005. Accordingly, the jury's response to question 4, $80,000, is necessarily overstated. Garden Ridge paid the estimated CAM charge every month without question and without requesting an audit. "Garden Ridge could have inquired about the management fee as soon as Clear Lake sent the [2003 or 2004] reconciliation, but Garden Ridge did not do so." *See Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 544 (Tex. App.–Houston [14th Dist.] 2013, no pet.). In fact, the contractual right to audit is not tied to the reconciliation at all. 8RRPX1, §§ 6.4, 6.5. Garden Ridge could have inquired at any time about the monthly estimated CAM amounts. Thus, at a minimum, all amounts adjudged as damages but incurred before September 10, 2005, must be excluded from the Judgment.

20020862.20090455/2250814.1

**Issue 6:** **Clear Lake is entitled to judgment in its favor, including its attorneys' fees.**

Clear Lake counterclaimed for breach of contract. CR198–200. Per the Judgment, it established the right of "offset" in the amount $5,300.00. CR359; *see also* CR279 (Question 13); Tex. Civ. Prac. & Rem. Code §38.001. Nevertheless and irreconcilably, the jury found $0 to be Clear Lake's reasonable and necessary attorneys' fees. CR275 (Question 9). The response to question 9 is not sustainable.

Generally, it is the province of the jury to determine the reasonable value of an attorney's services. *Tarleton State University v. K.A. Sparks Contractor, Inc.,* 695 S.W.2d 362, 367 (Tex. App.–Waco 1985, writ ref'd n.r.e.) (citing *Gulf Paving Co. v. Lofstedt,* 144 Tex. 17, 188 S.W.2d 155, 160 (Tex. 1945)). However, if the evidence is not contradicted by any other witness, or attendant circumstances, and the same is clear, direct and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law. *Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 882 (Tex. 1990).

Clear Lake offered unrebutted evidence of its attorney's fees; Mr. O'Connell opined that $350,000 to $400,000.00 would be reasonable fees for Clear Lake in the case. 6RR41; *see also* 8cRRDX20 (fee bills). Although the witness was cross examined, his testimony was not rebutted and no charge reflected on the attorneys' invoices, 8cRRDX20, was challenged. Clear Lake's fees can be and should have been determined as a matter of law. *Cochran v. Wool Growers Central Storage Co.,*

31

140 Tex. 184, 166 S.W.2d 904, 908 (1942); *see also McGilliard v. Kuhlmann,* 722 S.W.2d 694 (Tex. 1986); *Anchor Casualty Co. v. Bowers,* 393 S.W.2d 168, 169–170 (Tex. 1965). In any event, the jury's $0 response to question 9 is unsustainable.

## Conclusion

Because Garden Ridge is estopped or otherwise legally precluded from pursuing its claims in this case; because Clear Lake proved counterclaim damages of at least $5,300; and, because Clear Lake established its attorneys' fees as a matter of law, the judgment should be reversed and judgment rendered in favor of Clear Lake for damages of at least $5,300 plus attorneys' fees of at least $350,000. In the alternative, the judgment should be reversed and the case remanded for a new trial on Clear Lake's attorneys' fees. In the further alternative, the Judgment should be reversed and remanded for a new trial to permit Clear Lake to present erroneously excluded evidence in support of its affirmative defenses. In the further alternative, the Judgment should be reversed, or at minimum modified, to eliminate all damages and related attorneys' fees for claims accrued before September 10, 2005.

32

## Clear Lake's Appellee's Brief

**[Clear Lake incorporates the Statement of the Case and Statement of Facts in it Cross Appellant's Brief]**

### Standard of Review

Assuming the Judgment could survive this appeal, at what rate Garden Ridge might recover judgment interest depends on the Lease language, a question of contract construction reviewed *de novo. See ConocoPhillips Co. v. Noble Energy, Inc.*, 462 S.W.3d 255, 265 (Tex. App.–Houston [14th Dist.] 2015, pet. filed) (citing *Tawes v. Barnes,* 340 S.W.3d 419, 425 (Tex. 2011)); *Washington Square Fin., LLC v. RSL Funding, LLC,* 418 S.W.3d 761, 767 (Tex. App.–Houston [14th Dist.] 2013, pet. denied).

Assuming the judgment could survive and no statute controls, the decision to award prejudgment interest is within the trial court's discretion. *Hand & Wrist Ctr. of Houston, P.A. v. Republic Services, Inc.*, 401 S.W.3d 712, 717 (Tex. App.–Houston [14th Dist.] 2013, no pet.). As such, the Court reviews for abuse of that discretion. *Id.* (citing *Marsh v. Marsh,* 949 S.W.2d 734, 744 (Tex. App.–Houston [14th Dist.] 1997, no writ)). A trial court abuses its discretion when it fails to analyze or apply the law correctly. *Iliff v. Iliff,* 339 S.W.3d 74, 78 (Tex. 2011).

20020862.20090455/2250814.1

## Argument and Authorities

**The Lease does not include an agreement for interest on the disputed refunds claimed.**

Garden Ridge is not entitled to 18% interest either pre– or post–judgment based on any language found in the Lease. If any judgment in favor of Garden Ridge survives, applicable interest must conform to section 304.003 of the Texas Finance Code. *See* Tex. Fin. Code § 304.003. Section 304.002 of the Finance Code does not apply. *See* Tex. Fin. Code § 304.002. The Lease cannot be reasonably read to include an agreement providing 18% interest on disputed reimbursement amounts.

As with any contract, proper construction the Lease requires: (1) reviewing the Lease as a whole, not picking and choosing among isolated provisions, *Columbia Gas Trans. Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996); (2) giving effect to all of the terms, so that none is rendered meaningless, *Kelley–Coppage, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998); and (3) construing each provision to give it the intended effect. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). Words used in an unambiguous contract are to be given their plain meanings. *See Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985). Courts are "not at liberty to rewrite the contract or interpret it in a manner which the parties never intended." *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 283 (Tex. App.–Amarillo 1998, pet. denied); *see also Helmerich & Payne Intern. Drilling Co.*

20020862.20090455/2250814.1

*v. Swift Energy Co.*, 180 S.W.3d 635, 641 (Tex. App.–Houston [14th Dist.] 2005, no pet.) (citing *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003).

Garden Ridge first relies on section 4.3. *See* Brief, p. 8, *et seq.* The section, captioned "Failure to Pay Rental on Time," is part of Article IV, all of which relates to Garden Ridge's obligation to pay rent. *See* 8RRPX1, art. IV.[13] Garden Ridge argues that the phrase, "Past due Base Rental and other past due payments shall bear interest from maturity at the rate of eighteen percent (18%) per annum …" should be read to apply to reconciliation reimbursements[14] that Garden Ridge did not seek until 2009, that Clear Lake vigorously contested, and that were not adjudicated as "due" for another 6 years. *See* CR359–61.

Notwithstanding the strained reading Garden Ridge suggests, the other sentence in section 4.3 places the "past due payments" language in its proper context: "All other sums and charges of whatsoever nature required to be paid by Tenant to Landlord pursuant to the terms of this Lease constitute additional rent (whether or not the same be designated "additional rent"), and failure by Tenant to timely pay such other sums or charges may be treated by Landlord as a failure by Tenant to pay Base Rent." 8RRPX1, § 4.3. Implicitly, all of section 4.3 deals with payments "by

---

[13]     *See also* 8RRPX1, § 27.9 ("The captions used herein are for convenience only and do not limit or amplify the provisions hereof.").

[14]     The parties could have, but did not, make reference to sections 6.4 and 6.5 ("Common Area Costs") in section 4.3. 8RRPX1.

35

Tenant to Landlord" and the only reasonable reading of the section 4.3 cannot support Garden Ridge's argument.

Garden Ridge tries to bolster the argument by reference to sections 6.4 and 8.1. *See* Brief, p. 10, n. 20. First, section 8.1 of the Lease deals with "Landlord's Repairs" and expressly refers to the 18% interest cap "specified in Section 27.13." 8RRPX1, § 8.1. The case, of course, has nothing to do with any claim that Clear Lake failed to make some repair. Sections 6.4 (Garden Ridge's other referenced section) and 6.5 do not expressly provide for interest on reimbursements and, unlike section 8.1, neither refers to another section of the Lease with an interest provision. *See* 8RRPX1, §§ 6.4, 6.5.

As the Court wrote in *Helmerich & Payne*, "We cannot rewrite the [] Contract or add to its language under the guise of interpretation." *Helmerich & Payne Intern. Drilling Co. v. Swift Energy Co., supra.* As section 8.1[15] shows, the parties to the Lease clearly knew how to provide for contractual interest when that was the intent. By choosing not to include any such language in section 6.4 (or 6.5), there is no contractual basis for 18% interest on the Judgment. This Court is not permitted add

---

[15]     *See also* §§ 8.2, 13.2, 13.3, 19.3, and 27.13. Unlike section 19.3, "Landlord's Remedies," which references interest at the rate and in the manner specified section 27.13, section 19.4, "Tenant's Remedies," makes no such reference. 8RRPX1, article 19. Rather, the "Tenant's Remedies" provision says, if there is a final, non-appealable judgment against Landlord, Tenant may recover "interest thereon as provided in said judgment." *Id.*, § 19.4. If the parties intended a judgment for damages to accrue interest at 18%, they would have included that as one of "Tenant's Remedies." They did not; the Court may not do it for them.

to the language to support Garden Ridge's strained interpretation. *Helmerich &*
*Payne, supra.*

No reasonable reading of the Lease supports Garden Ridge's argument for 18% interest. Because there is no rate specified in the contract, interest, including pre–judgment interest, if any, can only be determined by section 304.003. Tex. Fin. Code §304.003; *see Clear Lake Water Auth. v. Friendswood Dev. Co. Ltd.*, 344 S.W.3d 514, 525 (Tex. App.–Houston [14th Dist.] 2011, pet. denied); *Meridien Hotels, Inc. v. LHO Financing Partnership I, L.P.*, 255 S.W.3d 807, 824–25 (Tex. App.–Dallas 2008, no pet.). That rate is currently 5%. Garden Ridge shows no basis for changing the trial court's judgment.

**No pre–judgment interest is warranted.**

Garden Ridge's "211th Day" formula is convenient but ignores the Lease language. The reimbursement amounts did not become "past due" as argued. Garden Ridge recites from section 6.4 that when the annual reconciliation statements are provided, "Tenant shall pay to Landlord the amount of any deficiency, or Landlord shall refund to Tenant the amount of any excess, as the case may be, such reimbursement or payment to be made within thirty days following the Tenant's receipt of such statement." 8RRPX1, section 6.4. The triggering event contemplated in the Lease never occurred. *See id.* Garden Ridge does not cite the Court to evidence that any "such statement" received by Garden Ridge required a refund. *Id*. To the

20020862.20090455/2250814.1

contrary, Garden Ridge's entire case is based on the claimed over charges reflected on serial reconciliation statements. Further, the damages award was not determined until 2015, six years after suit was filed, eleven years after the first, supposedly offending reconciliation statement was provided. For that entire period–and still–"there remained a serious and genuine dispute regarding ultimate liability, which was contested in good faith by the parties, and the amount of damages could not be ascertained until final judgment." *Henry v. Masson*, 453 S.W.3d 43, 50 (Tex. App.–Houston [1st Dist.] 2014, no pet.) (citing *Pickens v. Alsup,* 568 S.W.2d 742, 744 (Tex. Civ. App.–Austin 1978, writ ref'd n.r.e.)). The court in *Henry* concluded that the trial court's decision not to award pre–judgment interest was not an abuse of discretion. *Id.; see also Marsh v. Marsh*, 949 S.W.2d 734, 744 (Tex. App.–Houston [14th Dist.] 1997, no writ). Garden Ridge has shown no abuse here.

Until shortly before litigation began, Garden Ridge did not invoke its right to audit. The one "audit report" alleged is dated June 29, 2009, and was purportedly provided to Clear Lake on July 6, 2009, followed by "a formal notice of default" on August 11, 2009. *See* CR132 (Amended Petition, ¶¶ 53, 54); 8RRPX60 ("demand" letter). Clear Lake responded on August 28, noting its disagreement with Garden Ridge's assertions but, nevertheless, tendering over $50,000.00 8cRRDX17–P. Two weeks later, on September 10, 2009, Garden Ridge filed suit. CR2. Although some form of audit was done, apparently covering at least 8 years, *see, e.g.*, 3RR137, and

20020862.20090455/2250814.1

apparently identifying far more than a portion of the management fee as reimbursable, *see* 8RRPX60, no "audit report" was admitted in evidence. *See* 2RR3–6; *see also* 8RR; 8bRR. Garden Ridge should not be permitted to rely on an audit that presumably sought much more than the damages in the Judgment and is not in evidence to serve as the supposed triggering event upon which it would bootstrap pre–judgment interest. *See Henry v. Masson*, 453 S.W.3d at 50. The trial court did not abuse its discretion by declining to award pre–judgment interest. The Judgment should not be changed on that basis.

## **Conclusion**

Garden Ridge has shown no basis to alter the Judgment. Because Garden Ridge is estopped or otherwise legally precluded from pursuing its claims in this case; because Clear Lake proved counterclaim damages of at least $5,300; and, because Clear Lake established its attorneys' fees as a matter of law, the judgment should be reversed and judgment rendered in favor of Clear Lake for damages of at least $5,300 plus attorneys' fees of at least $350,000. In the alternative, the judgment should be reversed and the case remanded for a new trial on Clear Lake's attorneys' fees. In the further alternative, the Judgment should be reversed and remanded for a new trial to permit Clear Lake to present erroneously excluded evidence in support of its affirmative defenses. In the further alternative, the Judgment should be

39

reversed, or at minimum modified, to eliminate all damages and related attorneys'

fees for claims accrued before September 10, 2005.

Respectfully submitted,

HIRSCH & WESTHEIMER, P.C.

By:/s/ Michael D. Conner
    Eric Lipper
    State Bar No. 12399000
    elipper@hirschwest.com
    Michael D. Conner
    State Bar No. 04688650
    mconner@hirschwest.com
    1415 Louisiana, 36th Floor
    Houston, Texas 77002
    Telephone: 713–223–5181
    Facsimile: 713–223–9319

**ATTORNEYS FOR**
**APPELLEE/CROSS–APPELLANT**
**CLEAR LAKE CENTER, L.P.**

## Certificate of Compliance

Pursuant to TEX. R. APP. P. 9.4, I hereby certify that this Clear Lake's Combined Cross–Appellant's Brief and Appellee's Brief contains 9,578 words. This is a computer–generated document created in Microsoft Word, using 14–point typeface for all text, except for footnotes which are in 12–point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

/s/ Michael D. Conner
Michael D. Conner

## Certificate of Service

I hereby certify that on this 17th of December, 2015, a true and correct copy of the foregoing document was sent to the following counsel of record:

Elizabeth G. Bloch
Heidi.bloch@huschblackwell.com
Stephen W. Lemmon
Stephen.Lemmon@huschblackwell.com
Bradley W. Cole
brad@bwc–law.net
HUSCH BLACKWELL LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701
Phone: 512.472.5456
Fax: 512.479.1101
*Via E–Service*

/s/ Michael D. Conner
Michael D. Conner

20020862.20090455/2250814.1

# NO. 14–15–00695–CV

## IN THE FOURTEENTH COURT OF APPEALS
## HOUSTON, TEXAS

*Garden Ridge, L.P., Appellant*

**V.**

*Clear Lake Center, L.P., Appellee*

**From the 215th District Court, Harris County, Texas
Cause No. 2009–58038, consolidated with Cause No. 2012–46099**

## Appendix

Final Judgment signed May 19, 2015 (CR 359-61) ................................................Tab 1

Charge of the Court (CR262-80)................................................................................Tab 2

Shopping Center Lease (8RRPX1)............................................................................Tab 3

First Amendment to Shopping Center Lease (8RRPX2)...........................................Tab 4

Second Amendment to Lease (8RRPX3)...................................................................Tab 5

42

# Appendix
# Tab 1

CAUSE NO. 2009 58038

| | | |
|---|---|---|
| GARDEN RIDGE, L.P., | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| CLEAR LAKE CENTER, L.P., | § | |
| and DOES 1-10, | § | |
| Defendants. | § | 215th JUDICIAL DISTRICT |

CAUSE NO. 2012-46099

| | | |
|---|---|---|
| GARDEN RIDGE, L.P., | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| CLEAR LAKE CENTER, L.P., | § | |
| Defendant. | § | 215TH JUDICIAL DISTRICT |

FILED
Chris Daniel
District Clerk
MAY 19 2015
Time: 1:3 pm
Harris County, Texas

## FINAL JUDGMENT

On March 9, 2015, came on to be considered the trial of this cause. All parties appeared by and through counsel of record and announced ready for trial. After a jury was impaneled and sworn, it heard the evidence and arguments of counsel. In response to the jury charge, the jury made findings that the Court received, filed, and entered of record. The Court also considered the parties' request for declaratory relief. Having reviewed the verdict, the Court concludes that judgment should be rendered in favor of the Plaintiff, Garden Ridge, L.P., as set forth below.

IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED, that Garden Ridge, L.P. recover from Clear Lake Center, L.P. the sum of $594,700 (damages of $600,000 minus an offset of $5,300), plus pre-judgment interest at the rate of eighteen percent (18.00%) per annum from the date the damages became past due until the date of this judgment, in the amount of $498,915.42, for a total damages award as of the date of this judgment of $1,093,615.42.

AUS-6090669-2

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

IT IS FURTHER ORDERED that Garden Ridge, L.P. recover from Clear Lake Center, L.P. its reasonable and necessary attorneys' fees in the amount of $350,000, together with a conditional award in the event of an appeal in the following amounts:

$75,000 if an appeal is taken to the court of appeals;

$25,000 for filing or responding to a petition for review to the Texas Supreme Court;

$25,000 for filing or responding to a brief on the merits to the Texas Supreme Court;

$10,000 for oral argument in the Texas Supreme Court.

IT IS FURTHER ORDERED that all costs of court are adjudged against Clear Lake Center, L.P., for all of which execution shall issue.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all amounts awarded in this Judgment shall bear post-judgment interest at the rate of eighteen *five* percent (~~18~~ 5.00%) per annum from the date following this judgment, until this judgment is paid in full, for all of which execution shall issue.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED, as declaratory relief, that while the Lease between the parties allows Clear Lake Center, L.P. to charge a management fee, that fee is limited to sums expended for the management and maintenance of the common area and not the property as a whole. In addition, the Court declares that Garden Ridge, L.P. is not obligated under the Lease to pay for management fees that are not related to the management or maintenance of the common area of Clear Lake Center, as that term is defined in the Lease, and that the management fees must be comparable to similar shopping centers in Harris County, Texas. The Court further declares that a comparable fee, as determined by the jury, is 3% of the common area expenses.

All relief requested in this case which has not been expressly granted herein is denied.

2

This judgment is final and disposes of all parties and claims and is appealable.

SIGNED on the ___19TH___ day of ___May___, 2015.

HONORABLE ELAINE PALMER,
DISTRICT JUDGE PRESIDING

APPROVED AS TO FORM:

By:_____

Stephen W. Lemmon
State Bar No. 12194500
Bradley W. Cole
State Bar No. 04535980
Husch Blackwell LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701
Phone: 512.472.5456
Fax: 512.479.1101
Stephen.Lemmon@huschblackwell.com
brad@bwc-law.net

ATTORNEYS FOR PLAINTIFF GARDEN RIDGE, L.P.

By:_____

Eric Lipper
State Bar No. 12399000
Whitney Rawlinson
State Bar No. 24068655
Hirsch and Westheimer P.C.
1415 Louisiana, 36th Floor
Houston, Texas 77002
Telephone: 713.220.9162
Facsimile: 713.223.9319
elipper@hirschwest.com
wrawlinson@hirschwest.com

ATTORNEYS FOR DEFENDANT CLEAR LAKE CENTER, L.P.

3

361

# Appendix
# Tab 2

F I L E D
Chris Daniel
District Clerk

MAR 1 6 2015

Time _____
Harris County, Texas
By _____
Deputy

P-19

CAUSE NO 2009-58038

| GARDEN RIDGE, L P | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| VS | § | HARRIS COUNTY, T E X A S |
| | § | |
| CLEAR LAKE CENTER, L P | § | |
| And DOES 1-10, | § | 215th   JUDICIAL   DISTRICT |

CAUSE NO 2012-46099

| GARDEN RIDGE, L P | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| VS | § | HARRIS COUNTY, T E X A S |
| | § | |
| | § | |
| CLEAR LAKE CENTER, L P | § | 215th   JUDICIAL   DISTRICT |

**Charge of the Court**

LADIES AND GENTLEMENT OF THE JURY

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict   You may discuss the case with other jurors only when you are all together in the jury room

Remember my previous instructions   Do not discuss the case with anyone else, either in person or by any other means   Do not do any independent investigation about the case or conduct any research   Do not look up any words in dictionaries or on the Internet   Do not post information about the case on the Internet   Do not share any special knowledge or experiences with the other jurors   Do not use your phone or any other electronic device during your deliberations for any reason   I will give you a number where others may contact you in case of an emergency

Any notes you have taken are for your own personal use   You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations   Your notes are not evidence   Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes

You must leave your notes with the bailiff when you are not deliberating   The bailiff will give your notes to me promptly after collecting them from you   I will make sure your notes are kept in a safe, secure location and not disclosed to anyone   After you complete your deliberations, the bailiff will collect your notes   When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote

RECORDER S MEMORANDUM
This instrument is of poor quality
at the time of imaging

262

Here are the instructions for answering the questions

1  Do not let bias, prejudice, or sympathy play any part in your decision

2  Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions   Do not consider or discuss any evidence that was not admitted in the courtroom

3  You are to make up your own minds about the facts   You are the sole judges of the credibility of the witnesses and the weight to give their testimony   But on matters of law, you must follow all of my instructions

4  If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition

5  All the questions and answers are important   No one should say that any question or answer is not important

6  Answer "yes" or "no" to all questions unless you are told otherwise   A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise   Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise

    The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case   If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no "   A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence   For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true

7  Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision   Answer each question carefully without considering who will win   Do not discuss or consider the effect your answers will have

8  Do not answer questions by drawing straws or by any method of chance

9  Some questions might ask you for a dollar amount   Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average

10  Do not trade your answers   For example, do not say, "I will answer this question your way if you answer another question my way "

11  Unless otherwise instructed, the answers to the questions must be based on the decision of at least 10 of the 12 jurors   The same 10 jurors must agree on every answer   Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority

2

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

## Presiding Juror

1      When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2      The presiding juror has these duties:

a      have the complete charge read aloud if it will be helpful to your deliberations,

b      preside over your deliberations, meaning manage the discussions, and see that you follow these instructions,

c      give written questions or comments to the bailiff who will give them to the judge,

d      write down the answers you agree on,

e      get the signatures for the verdict certificate, and

f      notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

## Instructions for Signing the Verdict Certificate

1      Unless otherwise instructed, you may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2      If 10 jurors agree on every answer, those 10 jurors sign the verdict. If 11 jurors agree on every answer, those 11 jurors sign the verdict. If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3      All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

Do you understand these instructions? If you do not, please tell me now.

_____
JUDGE PRESIDING

3

# DEFINITIONS AND INSTRUCTIONS

## Instructions

In answering questions about damages, answer each question separately Do not increase or reduce the amount in one answer because of the instructions in or your answers to any other questions about damages Do not speculate about what any party's ultimate recovery may or may not be Any recovery will be determined by the court when it applies the law to your answers at the time of judgment ⁎

Burden of proof is the Plaintiff(s)'s responsibility to prove the truth of their claim(s) against the Defendant by a Preponderance of the evidence

## Definitions

Capitalized terms included in questions have the same meaning as in the lease

You are instructed that the "Lease" means the "Shopping Center Lease," the "First Amendment to Lease," and the "Second Amendment to Lease "

Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right

The following factors may be considered in determining the reasonableness of an attorney's fee award

a    the time and labor involved, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly,

b    the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer,

c    the fee customarily charged in the locality for similar legal services,

d    the amount involved and the results obtained,

e    the time limitations imposed by the client or the circumstances,

f    the nature and length of the professional relationship with the client,

g    the experience, reputation, and ability of the lawyer or lawyers performing the services, and

h    whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered

4

## QUESTION NO 1

Did Clear Lake Center fail to comply with the Lease by doing any of the following?

Charging Garden Ridge Common Area Costs for the costs for anything other than Common Area as defined in the Lease

Answer "Yes" or "No"

Answer **Yes**

If your answer to Question No 1 is "Yes," then answer the following question Otherwise, do not answer the following question

## QUESTION NO 2

Was Clear Lake Center's failure to comply excused?

Failure to comply by Clear Lake Center is excused if compliance is waived by Garden Ridge Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right

Failure to comply by Clear Lake Center is excused if the parties agreed that a new agreement would take its place. In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing You may not consider the parties' unexpressed thoughts or intentions

Failure to comply by Clear Lake Center is excused if a different performance was accepted as full satisfaction of performance of the original obligations of the agreement •

Failure to comply by Clear Lake Center is excused if the following circumstances occurred

1 Garden Ridge

    a By words or conduct made a false representation or concealed material facts, and

    b With knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and

    c With the intention that Clear Lake Center would rely on the false representation or concealment in acting or deciding not to act, and

2 Clear Lake Center

    a Did not know and had no means of knowing the real facts and

    b Relied to its detriment on the false representation or concealment of material facts

Answer "Yes" or "No"

Answer _____ **NO**

6

If your answer to Question No 1 is "Yes," then answer the following question Otherwise, do not answer the following question

## QUESTION NO 3

Is Garden Ridge estopped from complaining of Clear Lake Center's failure to comply?

To find estoppel, you must find that Garden Ridge took some voluntary action concerning the management fee on which Clear Lake Center relied in good faith, which led Clear Lake Center to change the position it held prior to such action, to its detriment and that to now allow Garden Ridge to challenge the management fee would be contrary to its initial action, and would result in harm to Clear Lake Center

Answer "Yes" or "No"

Answer __*No*__

If your answer to Question No 1 is "Yes," and your answer to both Question Nos 2 and 3 is "No," then answer the following question Otherwise, do not answer the following question

## QUESTION NO 4

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Garden Ridge for its damages, if any, that resulted from such failure to comply?

Consider the following element of damages, if any, and none other

The amount paid by Garden Ridge, if any, for sums expended by Clear Lake Center in managing something other than the Common Area, or amount paid by Garden Ridge for sums expended by Clear Lake Center in managing the Common Area that are not comparable to sums expended in managing Common Areas of similar shopping centers in Harris County, Texas

Do not add any amount for interest on damages, if any

Answer separately in dollars and cents, if any

For calendar year 2005

Answer        $ 72,000

For calendar year 2006

Answer        $ 11,000

For calendar year 2007

Answer        $ 69,000

For calendar year 2008

Answer        $ 63,000

For calendar year 2009

Answer        $ 79,000

For calendar year 2010

Answer        $ 80,000

For calendar year 2013

Answer        $ 84,000

8

For calendar year 2014

Answer $ _81,000_

## QUESTION NO 5

What is a reasonable fee for the necessary services incurred by Garden Ridge, if any, for its attorneys in this case?

Answer separately in dollars and cents, if any

For preparation and trial

Answer    $ _____350,000.00_____

If an appeal is taken to the Court of Appeals

Answer    $ _____75,000_____

For filing or responding to a petition for review to the Texas Supreme Court

Answer    $ _____25,000_____

For filing or responding to a brief on the merits to the Texas Supreme Court

Answer    $ _____25,000_____

For appearing to make oral arguments at the Texas Supreme Court

Answer    $ _____10,000_____

Did Garden Ridge fail to comply with the Lease?

Answer "Yes" or "No"

Answer ___ND___

If you answered "Yes" to Question No 6 then answer the following question Otherwise, do not answer the following question

## QUESTION NO  7

Was Garden Ridge's failure to comply excused?

Failure to comply by Garden Ridge is excused by Clear Lake's previous failure to comply with a material obligation of the same agreement

Failure to comply by Garden Ridge is excused if compliance is waived by Clear Lake

Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming the right

Failure to comply with one agreement is excused if the parties agreed that a new agreement would take its place

Failure to comply with an agreement is excused if a different performance was accepted as full satisfaction of performance of the original obligations of the agreement

**Answer "Yes" or "No "**

      **Answer** _____

12

273

If your answer to Question No 6 is "Yes," and your answer to Question No 7 is "No," then answer the following question  Otherwise, do not answer the following question

## QUESTION NO 8

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Clear Lake Center for its damages, if any, that resulted from such failure to comply?

Consider the following element of damages, if any, and none other

The amount not paid by Garden Ridge, if any, for sums expended by Clear Lake Center in managing the Common Area

Do not add any amount for interest on damages, if any

Answer separately in dollars and cents, if any

For calendar year 2011

Answer        $_____

For calendar year 2012

Answer        $_____

## QUESTION NO 9

What is a reasonable fee for the necessary services of Clear Lake Center's attorneys in this case?

Answer separately in dollars and cents, if any

For preparation and trial

Answer    $___0___

If an appeal is taken to the Court of Appeals

Answer    $___0___

For filing or responding to a petition for review to the Texas Supreme Court

Answer    $___0___

For filing or responding to a brief on the merits to the Texas Supreme Court

Answer    $___0___

For appearing to make oral arguments at the Texas Supreme Court

Answer    $___0___

## QUESTION NO  10

Did Clear Lake Center obtain or retain money from Garden Ridge that in equity and good conscience belongs to Garden Ridge?

Answer "Yes" or "No"

Answer _____Yes_____

If your answer to Question No 10 is "Yes," then answer the following question Otherwise, do not answer the following question

## QUESTION NO 11

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Garden Ridge for its damages, if any, that resulted from such action?

Consider the following element of damages, if any, and none other

The amount of money, if any, that Clear Lake Center obtained or retained from Garden Ridge that in equity and good conscience belongs to Garden Ridge

Do not add any amount for interest on damages, if any

Answer separately in dollars and cents, if any

For calendar year 2005

Answer        $_____0_____

For calendar year 2006

Answer        $_____0_____

For calendar year 2007

Answer        $_____0_____

For calendar year 2008

Answer        $_____0_____

For calendar year 2009

Answer        $_____0_____

For calendar year 2010

Answer        $_____0_____

For calendar year 2013

Answer        $_____0_____

For calendar year 2014   0

Answer        $_____

16

277

## QUESTION NO 12

Did Garden Ridge obtain or retain money from Clear Lake Center that in equity and good conscience belongs to Clear Lake Center?

Answer "Yes" or "No"

Answer ___ NO ___

If your answer to Question No 10 is "Yes," and your answer to Question No 12 is "No," then answer the following question Otherwise, do not answer the following question

## QUESTION NO 13

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Clear Lake Center for its damages, if any, that resulted from such action?

Consider the following element of damages, if any, and none other

The amount of money, if any, that Garden Ridge obtained or retained from Clear Lake Center that in equity and good conscience belongs to Clear Lake Center

Do not add any amount for interest on damages, if any

For calendar year 2011

Answer      $  2600

For calendar year 2012

Answer      $  2700

# Verdict Certificate

Check one

___✓___ Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us

_David W. Ford_         _DAVID W FORD_
Signature of Presiding Juror        Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below

| SIGNATURE | NAME PRINTED |
| --- | --- |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |

19

# Appendix
# Tab 3

## SHOPPING CENTER LEASE


This Lease is entered into as of the 29th day of December, 1995, by and between the Landlord and the Tenant hereinafter named.


### ARTICLE I.

Section 1.1.     Fundamental Lease Provisions.

    (a)   "LANDLORD":  Fiesta Mart, Inc., a Texas corporation

    (b)   LANDLORD'S ADDRESS: 5235 Katy Freeway
                                Houston, Texas  77007

    (c)   "TENANT": Garden Ridge, L.P., a Texas limited partnership

    (d)   TENANT'S ADDRESS:   19411 Atrium Place, Suite 170
                                        Houston, Texas  77084

    (e)   TENANT'S TRADENAME:  Garden Ridge

    (f)   "DEMISED PREMISES":  Approximately 150,757 square feet in area being a portion of the Shopping Center commonly known as Nasa Value Center constructed on the real property described in Exhibit "A" attached hereto, the Demised Premises (herein so called) being situated substantially in the location which is shown outlined in red on the plat attached hereto as Exhibit "B".  The term "Shopping Center", as used herein, shall refer to the real property described in Exhibit "A" and any existing and future buildings, parking areas, sidewalks, service areas and other improvements thereon.

    (g)   LEASE TERM:  Commencing on the "Closing Date" as such term is defined and determined under the terms of that certain Asset Purchase Agreement dated as of December 22, 1995 between Tenant, as Purchaser, and Pottery Mart, Inc., as Seller, but in no event later than April 1, 1996 (the "Commencement Date"), and continuing for twenty (20) years thereafter.

    (h)   BASE RENTAL: $975,000.00 for the first ten years of the Lease Term, payable in monthly installments of $81,250.00 each. After the first ten years of the Lease Term, Base Rental shall be adjusted on each five year anniversary of the Commencement Date (the "Adjustment Date") throughout the Lease Term (including any Extension Periods for which the Extension Option is exercised under Article XXIII hereof).  For the five year period commencing upon each Adjustment Date, Base Rental shall be equal to the product obtained by multiplying (x) the Base Rental in effect during the preceding calendar month (the "Determination Month") by (y) a fraction, the numerator of which shall be the most current Revised Consumer Price Index (all cities - Urban Wage Earners and Clerical Workers, U.S. City Average, All Items) of the Bureau of Labor Statistics of the United States Department of Labor (1982 to 1984 = 100) the ("CPI") for the Determination Month and the denominator of which shall be the CPI for the first calendar month of the Lease Term in the case of the first adjustment of Base Rental and for the calendar month sixty months prior to the Determination Month in the case of each subsequent adjustment.  Base Rental shall never decrease and increases in Base Rental based upon increases in the CPI shall be cumulative; provided, however, that the first increase in Base Rental following the first ten years of the Lease Term shall not exceed twenty percent (20%), and no single increase

P:\L9971644.LSE

**PLAINTIFF EXHIBIT 1**
**Clear Lake (2)**
**000904**

thereafter for any five year period shall exceed ten percent (10%).

(i) COMMON AREA MAINTENANCE CHARGE: Tenant's Share (hereinafter defined), estimated to be $90,000.00 for the first year of the Lease Term, payable in equal monthly installments of $7,500.00 each, subject to adjustment as provided in Section 6.4

(j) TAXES: Tenant's Share, estimated to be $125,000.00 for the first year of the Lease Term, payable in the manner provided in Section 18.2.

(k) INSURANCE: Tenant's Share, estimated to be $13,500.00 for the first year of the Lease Term, payable in equal monthly installments of $1,125.00 each, subject to adjustment as provided in Section 18.4.

(l) TENANT'S SHARE: As used in this Lease Agreement, Tenant's Share of Common Area Maintenance Charges, Taxes, Insurance and any other amounts payable under the terms hereof shall mean 37.24% of the total amount of all such charges and amounts. In the event any additional buildings, or additions to existing buildings in the Shopping Center, are added to the Shopping Center, Tenant's Share of Common Area Maintenance Charges, Taxes, Insurance and any other amounts payable under the terms hereof shall be equitably adjusted.

(m) PREPAID RENTAL: $89,875.00, inclusive of (i) Base Rental for the first month of the Lease Term, plus (ii) Tenant's Share of Common Area Maintenance Charges and Insurance for the first month of the Lease Term.

(n) PERMITTED USE: The Demised Premises shall be used for the purpose of operating therein a retail store selling silk and dried flowers, non-electric housewares, seasonal goods (holiday decoration and trim), party supplies, home decor and accessories, baskets, candles, pottery, (decorative and functional) crafts and pictures and picture frames (the "Primary Permitted Merchandise"). In addition, Tenant may sell such other merchandise which is offered for sale in a majority of Tenant's other stores provided the sale of such merchandise does not conflict with or violate any use, prohibition or restriction described in clauses (i) through (iii) immediately below in effect at the time such merchandise is offered for sale in the Demised Premises. After the first five years of the Lease Term, except as otherwise provided in this Lease, the Demised Premises may also be used for any other lawful retail purpose which is not in conflict with (i) the primary use of any other tenant's leased premises in the Shopping Center at the time of a proposed change in Tenant's use of the Demised Premises and (ii) any exclusive use provision contained in any lease covering other space in the Shopping Center in effect as of the date of a proposed change in Tenant's use of the Demised Premises and (iii) any prohibition or restriction contained in that certain Construction and Reciprocal Easement Agreement (the "REA") dated December 2, 1986, between Landlord and Wal-Mart Properties, Inc., recorded under Harris County Clerk's File No. K862087 (without amendment unless approved by Tenant) or any other restriction of record against the Demised Premises or the Shopping Center as of the date of this Lease. In addition, the Demised Premises shall not be used for any purpose which is inconsistent with the operation of a first class retail shopping center or for any of the following purposes collectively, the "Prohibited Uses"): (i) a second-hand or sample store, (ii) a surplus store, (iii) a bar, pub, nightclub, music hall or disco, (iv) a bowling alley, theater, billiard or bingo parlor or other similar entertainment purpose, (v) a flea market, (vi) a massage parlor, (vii) a funeral home, (viii) the sale of paraphernalia for use with illegal drugs, (ix) the illegal display of pornographic material, (x) an off-tract betting parlor, (xi) any use which is illegal, (xii) a banquet hall, auditorium or other place of public or private assembly, (xiii) a training or educational facility (including, without

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000905

limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers) or (xiv) a gymnasium, sport or health club or spa. In addition, except as expressly permitted above, Tenant shall not sell or offer for sale in the Demised Premises groceries, meats, produce, drugs, sundries and other foods or food products customarily sold from time to time in a grocery store or supermarket. Landlord recognizes that Tenant's customary business includes the operation of a prepared food service facility, and Landlord hereby approves the same.

Landlord hereby agrees that it shall not lease any portion of the Shopping Center for the purpose of conducting any Prohibited Use nor shall it permit the use of any portion of the Shopping Center for any Prohibited Use.

Section 1.2. Effect of Reference to Fundamental Lease Provisions. Each of the foregoing definitions and fundamental lease provisions shall be construed in conjunction with and limited by the references thereto in the other provisions of this Lease.

ARTICLE II.

Section 2.1. Demised Premises and Term. In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants and conditions hereof, Landlord hereby demises and leases to Tenant, and Tenant hereby takes from Landlord, the Demised Premises as described in Section 1.1(f). TO HAVE AND TO HOLD the Demised Premises for the Lease Term specified in Section 1.1(g), all upon the terms and conditions set forth in this Lease. Landlord further agrees that if Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the continuance of this Lease have peaceful and quiet possession of the Demised Premises. There is specifically excluded from the Demised Premises and reserved unto Landlord, however, the air space over and above and the subsurface below the Demised Premises and the Shopping Center. Landlord further reserves the use of the exterior walls and roof of the Demised Premises and the right to install, maintain, use, repair and replace pipes, ducts, conduits and wires leading through the Demised Premises and serving other parts of the Shopping Center in locations which will not materially interfere with Tenant's use thereof.

ARTICLE III.

Section 3.1. Acceptance of Demised Premises. By occupying the Demised Premises, Tenant shall be deemed to have accepted the same in its existing condition. Tenant warrants to Landlord that it has, prior to the execution hereof, fully inspected the Demised Premises and that it has made, performed, obtained and received all studies, inspections, reports, diagnoses and tests that Tenant desires relative to the Demised Premises and Tenant's proposed business use of the Demised Premises. Tenant understands and agrees that it is accepting the Demised Premises in its present "AS-IS", "WHERE-IS" condition, "WITH ALL FAULTS". Tenant acknowledges that Landlord has not made and does not make, and Landlord hereby disclaims, any and all warranties, express or implied, which in any way relate to the Demised Premises or the condition thereof, including, without limitation, any implied warranty of suitability or habitability. Tenant further understands that Landlord has relied upon Tenant's having made all inspections Tenant desires prior to leasing the Demised Premises from Landlord, and that but for such inspections by Tenant, Landlord would not have leased the Demised Premises to Tenant. Tenant waives and relinquishes any right to assert, either as a claim or as a defense, that Landlord is bound to perform or liable for the non-performance of any implied covenant or implied duty of Landlord not expressly set forth herein. Nothing in this section

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000906

shall operate and relieve Landlord from its obligations under this Lease for repair and maintenance to the extent provided for in Article VIII below.

Section 3.2. Tenant's Work. Tenant, at its sole cost, risk and expense, shall perform all work ("Tenant's Work") required to place the Demised Premises in the condition necessary for the conduct of Tenant's business, substantially in accordance with plans and specifications ("Tenant's Plans") submitted to and approved by Landlord, which approval shall not be unreasonably withheld or delayed. Landlord hereby approves, without the necessity of receiving plans therefor, Tenant's initial installation of fixtures and non-structural demising walls (for office purposes) and repainting of the interior of the Demised Premises so long as the same are substantially equivalent to Tenant's store located at The Meadows in southern Harris County, Texas. With regard to any other improvements, Tenant shall submit Tenant's Plans to Landlord for approval and Landlord shall approve or disapprove Tenant's Plans within five (5) business days following their submission to Landlord. If Landlord fails to approve or disapprove Tenant's Plans within such five (5) business day period, Landlord shall be deemed to have approved Tenant's Plans. Tenant shall also provide and install all other interior work, trade fixtures, furniture, furnishings and equipment of every description necessary or appropriate for the operation of Tenant's business in the Demised Premises. Upon approval of Tenant's Plans, no changes shall be made therein without Landlord's prior written approval. Tenant shall and does hereby indemnify and hold Landlord, its agents and employees, harmless from and against any and all claims, demands, suits and causes of action for injury to person or death and for damage to property, including property of Landlord, arising out of or in any way connected with the performance of Tenant's Work and the activities of Tenant and its contractors in the Demised Premises. At all times while Tenant is performing Tenant's Work and installing its trade fixtures, equipment, furniture and furnishings, Tenant shall not unreasonably interfere with the conduct of business in the Shopping Center. Tenant shall comply with such requests of Landlord as Landlord might make for the purpose of avoiding such interference. Tenant shall maintain the Demised Premises in a clean and orderly condition during the performance of Tenant's Work and shall promptly remove all unused construction materials, equipment, shipping containers, packaging, debris and flammable waste from the Demised Premises and shall not allow any such waste and debris to be placed upon or accumulate in the Common Areas. Common Areas shall not be used by Tenant for the storage of equipment, inventory, fixtures, refuse or debris. Tenant's Work shall be subject, at all times, to the general inspection and approval of Landlord or Landlord's architect. With respect to any contract for the furnishing of labor or materials for the performance of Tenant's Work, Tenant acts as a principal and not as the agent of Landlord. Tenant shall have no authority to place any lien upon the Demised Premises or any interest therein nor in any way to bind Landlord, and any attempt to do so shall be void and of no effect. If, because of any actual or alleged act or omission of Tenant, any lien, affidavit, charge or order for the payment of money shall be filed against Landlord, the Demised Premises or any portion thereof or interest therein, whether or not such lien, affidavit, charge or order is valid or enforceable, Tenant shall, at its sole cost and expense, cause the same to be discharged of record by payment, bonding or otherwise no later than fifteen (15) days after notice to Tenant of the filing thereof, but in all events prior to the foreclosure thereof.

ARTICLE IV.

Section 4.1. Payment of Rental. All Base Rental and all other amounts payable by Tenant shall accrue hereunder from the Commencement Date, and shall be payable to Landlord without, except as expressly permitted by the terms of this Lease, deduction,

**PLAINTIFF EXHIBIT 1**
**Clear Lake (2)**
**000907**

setoff, prior notice or demand at the address to which notices to Landlord are required to be given under the terms of this Lease.

Section 4.2. Base Rental. Tenant shall pay to Landlord Base Rental in monthly installments, in advance, in the amounts specified in Section 1.1(h) above. The first such monthly installment shall be due and payable on or before the execution of this Lease and subsequent installments shall be due and payable on or before the first day of each calendar month during the term of this Lease commencing with the calendar month following thirty (30) days after the Commencement Date.

Section 4.3. Failure to Pay Rental on Time. Past due Base Rental and other past due payments shall bear interest from maturity at the rate of eighteen percent (18%) per annum, provided, however, in no event shall any such sums bear interest at a rate greater than the highest non-usurious rate permitted by applicable law. All other sums and charges of whatsoever nature required to be paid by Tenant to Landlord pursuant to the terms of this Lease constitute additional rent (whether or not the same be designated "additional rent"), and failure by Tenant to timely pay such other sums or charges may be treated by Landlord as a failure by Tenant to pay Base Rent.

ARTICLE V.

INTENTIONALLY DELETED

ARTICLE VI.

Section 6.1. Common Area. The term "Common Area" is defined for all purposes of this Lease as that part of the Shopping Center intended for the common use of all tenants, including among other facilities (as such may be applicable to the Shopping Center) parking area, private streets and alleys, landscaping, curbs, loading area, sidewalks, drainage facilities, lighting facilities, drinking fountains, public toilets, and the like but excluding space in buildings (now or hereafter existing) designed for rental for commercial purposes, as the same may exist from time to time, and further excluding streets and alleys maintained by a public authority. Landlord reserves the right to change from time to time the dimensions and location of the Common Area, as well as the dimensions, identity and type of any buildings in the Shopping Center, and to construct additional buildings or additional stories on existing buildings (excluding, however, the Demised Premises) or other improvements in the Shopping Center, including, but not limited to free-standing buildings or kiosks; provided, however, in no event shall (i) any buildings or other improvements be constructed within that part of the Common Area outlined in green (the "Restricted Common Area") on the plat attached hereto as Exhibit "B" and (ii) no changes shall be made in the Restricted Common Area which reduce or change the number or configuration of parking spaces or driveways or access areas within the Restricted Common Area other than minor changes which singularly or in the aggregate with all other minor changes do not adversely affect the operation of Tenants' business in the Demised Premises. Tenant, and its employees and customers, and when duly authorized pursuant to the provisions of this Lease, its subtenants, licensees and concessionaires, shall have the non-exclusive right to use the Common Area as constituted from time to time, such use to be in common with Landlord, other tenants to the Shopping Center and other persons permitted by Landlord to use the same, and subject to such reasonable rules and regulations governing use as Landlord may from time to time prescribe, including the designation of specific areas within the Shopping Center or in reasonable proximity thereto in which automobiles owned by Tenant, its employees, subtenants, licensees and concessionaires shall be parked. In this regard, Tenant shall furnish to Landlord upon request a complete list of license numbers of all automobiles operated by Tenant, its

**PLAINTIFF EXHIBIT 1**
**Clear Lake (2)**
**000908**

employees, subtenants, licensees or concessionaires. Tenant shall not solicit business or display merchandise or offer any merchandise for sale within the Common Area or at any other point outside the Demised Premises, or distribute handbills therein, or take any action which would interfere with the rights of other persons to use the Common Area. Landlord may temporarily close any part of the Common Area for such periods of time as may be reasonably necessary to prevent the public from obtaining prescriptive rights or to make repairs or alterations. Landlord reserves the right to grant to third persons the non-exclusive right to crossover and use in common with Landlord and all tenants of the Shopping Center the Common Area as designated from time to time by Landlord. Specifically, Tenant acknowledges the existence of, and agrees to the terms and provisions of, the REA. Subject to the limitations on changes in the Restricted Common Area set forth in Section 6.1 hereof, Landlord shall have the right to make changes to the Common Area, including, without limitation, changes in the location or configuration of driveways, entrances, exits, vehicular parking spaces, parking area or the direction of the flow of traffic.

Section 6.2. Parking Area. Subject to the limitations on changes in the Restricted Common Area set forth in Section 6.1 hereof, Landlord may from time to time substitute for any parking area other areas reasonably accessible to the tenants of the Shopping Center, which areas may be elevated, surface or underground. Tenant will not load or unload any trucks or permit any trucks serving the Demised Premises, whether owned by Tenant or not, to be loaded or unloaded in the Shopping Center, except in the areas specifically designated for such use by Landlord. Landlord hereby designates the areas so indicated on Exhibit "B" for such purposes in respect to the Demised Premises.

Section 6.3. Operation of Common Area. Landlord shall operate, manage and maintain the Common Area, the manner of operation, management and maintenance and the expenditures therefor to be in the sole discretion of Landlord, provided such operation, management and maintenance shall be comparable to similar shopping centers in Harris County, Texas. Landlord shall have the right to select a person to maintain and operate any of the Common Area if at any time Landlord determines that the best interests of the Shopping Center will be served by having any of the Common Area maintained and operated by that person. Landlord shall have the right to negotiate and enter into a contract with that person on such terms and conditions and for such period of time as Landlord deems reasonable and proper, both as to services and as to cost.

Section 6.4. Common Area Costs. In addition to rentals and other charges prescribed in this Lease, Tenant shall pay to Landlord Tenant's Share of Common Area Costs (as hereinafter defined). "Common Area Costs", as used herein, means all sums expended by Landlord during the Lease Term in operating, managing, policing, equipping, lighting, repairing, replacing and maintaining the Common Areas, and an allowance to Landlord for Landlord's supervision of the Common Areas in an amount equal to seven and one-half percent (7-1/2%) of the total of all Common Area Costs. Common Area Costs shall include, without limitation, costs of resurfacing and restriping the parking and driveway areas; repainting, cleaning, sweeping, and other janitorial services; policing; purchase, construction, and maintenance of refuse receptacles, planting and relandscaping; directional signs and other markers; car stops; lighting and other utilities; installing, operating and maintaining Shopping Center identification signs; premiums on public liability and property damage insurance (excluding increases therein due to vacancy in the Shopping Center); maintenance, repair and replacement of utility systems, including water, sanitary and storm sewer lines and other utility lines, pipes and conduits serving the Shopping Center; drainage systems serving the Shopping Center; rental charges for machinery and equipment used in the operation, maintenance and repair of the

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000909

Common Areas; costs of personnel to implement all of the foregoing, including wages, unemployment taxes and social security taxes; personal property taxes; fees for required licenses and permits; supplies; and other costs necessary in Landlord's judgment for the maintenance, operation and management of the Common Areas, but excluding depreciation of the original cost of constructing the Common Areas. Notwithstanding the foregoing, Common Area Costs shall not include/(i) capital expenditures by Landlord unless the cost of such items are amortized over their useful lives (as determined in accordance with generally accepted accounting principles) in accordance with generally accepted accounting principles, in which event there may be included in Common Area Costs for any year the amortized portion of the cost of such items for such year as reflected in Landlord's books and records, (ii) the cost of any labor or materials purchased by Landlord from any subsidiary or affiliate of Landlord unless the cost of such labor or materials is competitive with the cost of similar labor and materials available from unrelated vendors and (iii) all costs and expenses (including penalties and fines) associated with the removal and clean up of hazardous wastes or toxic substances, (iv) work occasioned by casualty covered by insurance required to be maintained by Landlord pursuant to this Lease, or which is actually covered by insurance maintained by Landlord, (v) work resulting from condemnation to the extent the costs thereof are not in excess of the award received by Landlord, (vi) depreciation and other non-cash charges, (vii) amortization of debt, interest on debt, or ground rent, and (viii) any costs separately chargeable to or for which Landlord is entitled to reimbursement from other tenants in the Shopping Center. Tenant shall make such payments to Landlord at intervals not more frequent than monthly with the first monthly installment due and payable upon the execution of this Lease. Such monthly or other periodic charges shall be based upon the Landlord's estimated annual Common Area Costs, payable in advance but subject to adjustment after the end of each calendar year during the term of this Lease on the basis of the actual Common Area Costs for such year. Upon the computation of such adjustment (which shall be completed within 180 days following the end of the calendar year to which such adjustment relates) and notice to Tenant, Tenant shall pay to Landlord the amount of any deficiency, or Landlord shall refund to Tenant the amount of any excess, as the case may be, such reimbursement or payment to be made within thirty days following the Tenant's receipt of such statement.

Section 6.5. Common Area Costs. Landlord shall keep complete books and records for all Common Area Costs, and Tenant, at its expense, shall have the right to inspect, audit and copy such books and records upon reasonable notice during the business hours of Landlord or Landlord's property manager. Landlord shall promptly refund to Tenant any overpayment and Tenant shall promptly pay to Landlord any deficiency (in each case, within 30 days following completion of the audit), as the case may be, which is established by any such audit; provided, that, if such audit reflects that Landlord has overstated Common Area Costs by more than five percent (5%), Landlord shall also reimburse Tenant for the reasonable costs and expenses incurred by Tenant in performing such audit, not to exceed, however, $1,000.00.

ARTICLE VII.

Section 7.1. Use of Demised Premises. The Demised Premises shall be used only for the purpose or purposes specified in Section 1.1(n) above, and for no other purpose without the prior written consent of Landlord. So long as Tenant is conducting its business in the Demised Premises, Tenant shall use in the transaction of business in the Demised Premises the trade name specified in Section 1.1(e) above and no other trade name without the prior written consent of Landlord. At all times when Tenant is operating its business, Tenant shall operate its business with diligence, in accordance with the standards utilized in the majority of Tenant's stores. Nothing contained herein shall

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000910

require Tenant to operate its business in the Demised Premises. If, after opening, Tenant ceases to do business in the Demised Premises on a regular basis for a continuous period in excess of sixty days, Landlord shall thereafter at such time as it shall elect, until such time as Tenant reopens for business, have the right to terminate this Lease by giving written notice of termination to Tenant which shall become effective on the tenth day following receipt of such notice by Tenant. In the event of a termination hereunder, the parties hereto shall be released from any and all liability under this Lease for the terminated portion of the unexpired term. Nothing herein shall be deemed to affect or release Tenant's obligation to pay Base Rental and additional charges and to perform Tenant's other obligations hereunder until the effective date of said termination by Landlord. Periods of closing of the Demised Premises reasonably necessitated by (i) remodeling and/or repair or interruption due to loss of utility service, (ii) casualty, (iii) condemnation and (iv) periods of closing consented to by Landlord shall be exempt from the provisions of this Section 7.1 and shall not give Landlord the right to terminate as set forth herein. Tenant shall reimburse Landlord for any increase in the cost of insurance on the Shopping Center resulting from an election by Tenant to cease doing business in the Demised Premises.

Section 7.2. _Limitations on Use_. Tenant shall not, without Landlord's prior written consent, keep anything within the Demised Premises or use the Demised Premises for any purpose which increases the insurance premium cost or invalidates any insurance policy carried on the Demised Premises or other parts of the Shopping Center unless Tenant pays the cost thereof. All property kept, stored or maintained within the Demised Premises by Tenant shall be at Tenant's sole risk.

Tenant shall not permit any objectionable or unpleasant odors to emanate from the Demised Premises; nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside the Demised Premises or where the same can be seem or heard from outside the building; nor place any antenna, awning or other projection on the exterior of the Demised Premises; nor take any other action which would constitute a nuisance or would disturb or endanger other tenants of the Shopping Center or unreasonably interfere with their use of their respective premises.

Tenant shall take good care of the Demised Premises and keep the same free from waste at all times. Tenant shall keep the Demised Premises and sidewalks, service-ways and loading areas adjacent to the Demised Premises neat, clean and free from dirt or rubbish at all times, and shall store all trash and garbage within the Demised Premises or in such area outside the Demised Premises as may be designated for such purpose by Landlord, and Tenant shall arrange for the regular pick-up of such trash and garbage at Tenant's expense. Receiving and delivery of goods and merchandise and removal of garbage and trash shall be made only in the areas prescribed by Landlord. Tenant shall not operate an incinerator or burn trash or garbage within the Shopping Center.

No public or private auction or any fire, "lost-our-lease", "going out of business", bankruptcy or similar sales or auctions shall be conducted in or from the Demised Premises.

Section 7.3. _Displays and Advertisements_. Tenant shall maintain all display windows in a neat, attractive condition. Tenant shall include the address and identity of its business activities in the Demised Premises in all advertisements made by Tenant in which the address and identity of any similar local business activity of Tenant is mentioned.

Section 7.4. _Compliance with Laws_. Tenant shall procure at its sole expense any permits and licenses required for

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000911

the transaction of business in the Demised Premises and shall comply with all laws, ordinances, regulations and orders now in effect or hereafter enacted or passed during the term of this Lease insofar as the conduct of Tenant's business in the Demised Premises and any signs of Tenant are concerned, and shall make at Tenant's own cost and expense all repairs, additions and alterations to the Demised Premises ordered or required by any governmental authority as a result of Tenant's failure to make repairs or perform maintenance required of it under this Lease or because of Tenant's particular use of the Demised Premises. Landlord shall make at Landlord's expense any and all repairs, additions and alterations required as a result of failure to comply with any building code or other governmental requirements in connection with the original construction of the Demised Premises, because of Landlord's failure to make repairs required of Landlord under this Lease or because of the nature of the structure of the Demised Premises and not because of Tenant's particular use of the Demised Premises.

## ARTICLE VIII.

Section 8.1. Landlord's Repairs. Upon the condition precedent that Tenant shall have given Landlord prior written notice of the damage requiring repair, Landlord will repair damage to the roof (exclusive of flashing around any rooftop air-conditioning units except for the period of the manufacturer's warranty covering such units during which period Landlord shall maintain such flashing) and structural portions (including structural, interior walls, exterior walls, and foundation) of the Demised Premises and the building in which the same are situated, unless the required repairs are caused by the act or omission of Tenant or Tenant's employees or contractors; provided, however, in the event any such damage is caused by one or more acts or omissions of Tenant, its agents, employees, customers or invitees, or any burglar or unauthorized entrant, or any other person (with the exception of Landlord itself), Tenant shall bear the cost of such repairs unless the same is covered by the insurance maintained by Landlord hereunder in which case Landlord shall nonetheless be responsible for such repairs to the extent of the amount actually received from the insurer. If the Demised Premises or the building in which the same are situated should become in need of repairs required to be made by Landlord hereunder, Tenant shall give notice thereof to Landlord as soon as practicable after Tenant becomes aware of the need for such repairs, and if Landlord should fail or neglect to commence to make any such repairs within thirty days (or, in the case of an emergency, within two days) following the date of such notice from Tenant or should thereafter fail or neglect to prosecute the completion of such repairs with reasonable diligence, Tenant may make such repairs as may be necessary in which event Landlord shall reimburse Tenant for the reasonable cost of such repairs within twenty days following delivery to Landlord of paid invoices or other satisfactory evidence of the cost of such repairs, together with interest thereon at the rate specified in Section 27.13; provided, however, in the event Landlord notifies Tenant in writing within ten days following the date on which Tenant notifies Landlord of the need for such repairs that Landlord believes such repairs to be unnecessary, then Tenant shall not exercise its right to make such repairs pursuant to this Section 8.2 unless a majority of an informal arbitration committee selected in the manner described below has determined that such repairs are reasonably necessary or appropriate. Such arbitration committee shall be formed by Landlord and Tenant each selecting an individual and those two individuals in turn selecting a third individual.

Section 8.2. Tenant's Repairs. All damage, other than that which Landlord undertakes to repair in Section 8.1 (including, without limitation, all repairs, additions and alterations required as a result of failure to comply with any building code or other governmental requirements in connection with the original construction of the Demised Premises) or Articles XV and XVI will be repaired and all maintenance will be performed and replacements

**PLAINTIFF EXHIBIT 1**
**Clear Lake (2)**
**000912**

and renewals will be made by Tenant, at Tenant's sole cost and expense; and Tenant shall keep the Demised Premises in good, clean and habitable condition and shall, at its sole cost and expense, keep the Demised Premises free of infestation of insects, rodents, vermin and other pests and in all cases make all needed repairs and replacements, including replacement of cracked or broken glass. Without limiting any other provisions herein contained, it is understood that Tenant's responsibilities hereunder include the repair and replacement of all lighting, heating, air conditioning, plumbing and other electrical, mechanical and electromotive installations, equipment and fixtures and all utility repairs in ducts, conduits, pipes and wiring, and any sewer stoppage located in, under and above the Demised Premises. Tenant shall not make, or permit to be made, any penetration in the roof of the building of which the Demised Premises are a part, but shall be responsible for all rooftop flashing around all rooftop air-conditioning units. In the event that any such roof penetration is required in connection with any repairs, maintenance, renewals or replacements required to be made by Tenant under, Landlord shall perform such roof penetration at Tenant's cost within a reasonable time after notice from Tenant. If any repairs required to be made by Tenant hereunder are not made within ten (10) days after written notice delivered to Tenant by Landlord, (or if the same cannot reasonably be expected to be repaired within said 10 day period then such longer period of time as is reasonably necessary so long as Tenant commences such repairs within said 10 day period and prosecutes the same to completion with reasonable diligence) Landlord may at its option make such repairs without liability to Tenant for any loss or damage which may result to its stock or business by reason of such repairs; and Tenant shall pay to Landlord upon demand, as additional rent hereunder, the cost of such repairs plus interest at the rate and in the manner hereinafter specified in Section 27.13.

Section 8.3. Surrender of Demised Premises. Upon termination of this Lease, Tenant will surrender and deliver up the Demised Premises to Landlord broom-clean and in the same condition in which they existed at the commencement of this Lease, excepting only ordinary wear and tear, damage arising from acts of God, damage required hereunder to be repaired by Landlord, damage from condemnation or casualty and alterations and additions permitted hereunder or approved by Landlord.

ARTICLE IX.

Section 9.1. Alterations. Tenant shall not make any alterations, additions or improvements to the Demised Premises without the prior written consent of Landlord, except for interior, non-structural alterations and the installation of unattached, movable trade fixtures which may be installed without drilling, cutting or otherwise defacing the premises. All alterations, additions, improvements and fixtures (other than Tenant's unattached, readily movable furniture and office equipment) which may be made or installed by either party upon the Demised Premises shall immediately become and remain the property of Landlord and shall remain upon and be surrendered with the Demised Premises at the termination of this Lease.

Section 9.2. Mechanic's Liens. With respect to any contract for construction done by Tenant or caused to be done by it on the Demised Premises as permitted by this Lease, Tenant acts as a principal and not as the agent of Landlord, and Landlord expressly disclaims liability for the cost of labor performed or materials furnished by Tenant. Tenant shall pay promptly when due the entire cost of any work affecting the Demised Premises done by or for the account of Tenant so that the Demised Premises shall at all times be free of liens for labor and materials. In no event shall Landlord or any of Landlord's property be liable for or chargeable with any expense or lien for work, labor or materials

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000913

used in the Demised Premises or any improvements or change thereof made at the request of, or upon the order of, or to discharge the obligation of Tenant.

Section 9.3. Trade Fixtures. All trade fixtures and equipment installed by Tenant in the Demised Premises shall remain the property of Tenant except if and to the extent leased by Tenant. Provided Tenant is not in default hereunder, Tenant shall have the right, at the termination of this Lease, to remove any and all trade fixtures, equipment and other items of personal property not constituting a part of the freehold which it may have stored or installed in the Demised Premises, including but not limited to, counters, shelving, show cases, chairs and movable machinery purchased or provided by Tenant provided this right is exercised before the Lease is terminated and provided that Tenant shall repair any damage to the Demised Premises caused thereby. Tenant shall not have the right to remove any plumbing or electrical fixtures or equipment, heating or air-conditioning equipment, floor coverings (including wall-to-wall carpeting) glued or fastened to the floors or any paneling, tile or other materials fastened or attached to the walls or ceilings, all of which shall be deemed to constitute a part of the freehold, and, as a matter of course, shall not include the right to remove any fixtures or machinery that were furnished or paid for by the Landlord. If Tenant shall fail to remove its trade fixtures or other property at the termination of this Lease, such fixtures and other property not removed by Tenant shall be deemed abandoned by Tenant and, at the option of Landlord, shall become the property of Landlord.

ARTICLE X.

Section 10.1. Landlord's Right of Entry. Landlord shall have the right to enter upon the Demised Premises at any time for the purpose of inspecting the same, or making repairs to the Demised Premises, or of making repairs, alterations or additions to adjacent premises, or of showing the Demised Premises to prospective purchasers, lessees or lenders. Tenant will permit Landlord to place and maintain "For Rent" or "For Lease" signs on the Demised Premises during the last ninety days of the term of this Lease.

ARTICLE XI.

Section 11.1. Signs, Awnings and Canopies. Landlord may erect and maintain such suitable signs on and about the Shopping Center as Landlord, in its sole discretion, may deem appropriate to advertise the Shopping Center. Tenant may erect and maintain a flat wall sign which shall be of such size and type and in such location as Landlord may approve. Tenant shall submit to Landlord detailed drawings and specifications for such sign, which drawings and specifications shall be subject to the written approval of Landlord prior to the installation of such sign. Tenant shall be entitled to install its sign (subject to Landlord's prior approval thereof) in the existing pylon sign can containing Pottery Mart's existing sign. Except as herein otherwise expressly provided, Tenant shall not, without Landlord's prior written consent (a) make any changes to the store front or (b) install or place on or about the exterior of the Demised Premises any lighting, signs (including but not limited to, portable signs) decorations, paintings, awnings, canopies or the like or (c) erect or install any exterior or interior signs, window or door lettering, placards, decorations or advertising media of any type which can be viewed from the exterior of the Demised Premises, excepting only dignified displays of customary type for its display windows. All signs which Tenant is permitted to maintain hereunder shall be kept insured by Tenant, and Tenant shall maintain the same in good condition, repair and operating order at all times. Tenant shall keep all such signs lighted during the hours from sundown to 11:00 p.m. irrespective of whether or not the premises is open for business, unless Tenant shall be prevented from doing so by events beyond the control of

P:\L.9971644.LSE

11

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000914

Tenant. Any sign which Tenant is permitted to maintain hereunder shall comply with all laws, rules and ordinances and Tenant shall obtain any required governmental approval. Landlord makes no representation with respect to Tenant's ability to obtain such approval.

## ARTICLE XII.

**Section 12.1.** **Utilities.** Tenant shall promptly pay directly to the supplier all charges for electricity, water, gas, telephone service, sanitary, sewer service and other utilities furnished to the Demised Premises, and will save and hold Landlord harmless from any charge or liability for same.

**Section 12.2.** **Interruptions.** Landlord shall not be liable for any interruption or malfunction whatsoever of utility services and no such interruption shall constitute an eviction or disturbance of Tenant's use and possession of the Demised Premises or grant Tenant any right of set-off or recoupment. In the event of any such interruption of utility services, Landlord shall use reasonable diligence to restore such service in any circumstances in which such interruption is caused by Landlord's fault. In the event electrical service to the Demised Premises is interrupted, through no fault or act of Tenant, for a continuous period of six months, Tenant at any time thereafter prior to the restoration of such service, shall have the right to terminate this Lease by giving thirty days written notice of termination to Landlord unless, within such thirty day period, Landlord is successful in restoring electrical services to the Demised Premises, it being understood and agreed that Landlord shall have no obligation in this regard unless such interruption in service was caused by Landlord's fault.

## ARTICLE XIII.

**Section 13.1.** **Indemnity.** Landlord shall not be liable to Tenant or to Tenant's employees, agents, licensees, invitees, customers or visitors, or to any other person whomsoever, for any injury to person or damage to property on or about the Demised Premises or the Common Area caused by the negligence or misconduct of Tenant, its employees, subtenants, licensees or concessionaires, or of any other person entering the Shopping Center under express invitation of Tenant, or arising out of the use of the Demised Premises by Tenant and the conduct of its business therein, or arising out of any breach or default by Tenant in the performance of its obligations hereunder; and Tenant hereby agrees to indemnify Landlord and hold Landlord harmless from any loss, expense or claims arising out of such damage or injury. The furnishing of any insurance herein required to be furnished by Tenant shall not be deemed to limit Tenant's obligations under the provisions of this Section 13.1. Landlord hereby agrees to indemnify Tenant and hold Tenant harmless from any loss, expense or claims arising out of the negligence or misconduct of Landlord, its employees, subtenants, licensees or concessionaires or of any other person entering the Shopping Center under the express invitation of Landlord.

**Section 13.2.** **Liability Insurance.** Tenant shall procure and maintain throughout the term of this Lease a policy or policies of comprehensive general liability insurance, at its sole cost and expense, insuring both Landlord and Tenant against all claims, demands or actions arising out of or in connection with Tenant's use or occupancy of the Demised Premises, or by the condition of the Demised Premises. The limits of such policy or policies shall be not less than $2,000,000.00 combined single limit, which policy or policies shall include coverage for bodily injury and death, property damage and products liability coverage. Such policy or policies shall be issued by a company licensed to conduct business in the state of Texas. Tenant shall obtain a written obligation on the part of each insurance company to notify Landlord at least ten

**PLAINTIFF EXHIBIT 1**
**Clear Lake (2)**
**000915**

(10) days prior to cancellation of such insurance. Such policies or duly executed certificates of insurance shall be promptly delivered to Landlord and renewals thereof as required shall be delivered to Landlord at least thirty (30) days prior to the expiration of the respective policy terms. If Tenant should fail to comply with the foregoing requirements relating to insurance, Landlord may (but shall not be obligated to) obtain such insurance for Tenant, and Tenant shall pay to Landlord on demand as additional rent hereunder the premium cost thereof, plus interest at the rate and in the manner hereinafter specified in Section 27.13.

Section 13.3. Tenant's Fire Insurance. Tenant agrees to obtain and maintain at all times during the term of this Lease a policy of fire and extended coverage insurance on its fixtures, equipment, merchandise and other property placed in or upon the Demised Premises, insuring all such property for its full replacement value. Said policy shall be endorsed to provide that it may not be cancelled except upon ten (10) days prior written notice to Landlord. A duplicate original or certificate of such policy will be deposited with Landlord by Tenant upon Tenant's taking possession of the Demised Premises, and a duplicate original or certificate of each subsequent policy will be deposited with Landlord prior to the expiration of the preceding such policy. If Tenant should fail to obtain such insurance, Landlord may (but shall not be obligated to) obtain such insurance for Tenant, and Tenant shall pay to Landlord on demand as additional rent hereunder the premium cost thereof, plus interest at the rate and in the manner hereinafter specified in Section 27.13.

Section 13.4 Landlord's Insurance. Subject to Tenant's obligation to reimburse Landlord for Tenant's Share of the Cost of Insurance, as herein provided, Landlord shall keep the Demised Premises and the Shopping Center insured against loss or damage by fire and other hazards covered by extended coverage insurance from an insurance company or companies authorized to do business in the State of Texas, such coverage to be in an amount not less than eighty percent (80%) of the full replacement cost thereof. In addition, Landlord shall maintain in force public liability insurance with respect to the Common Areas of the Shopping Center in such amount as is customary for shopping centers of similar size and quality in Harris County, Texas. At Tenant's request, Landlord shall deliver to Tenant evidence of such insurance coverage. Landlord shall have the right to carry any of its insurance required to be maintained under this Lease under "blanket policies" covering the Shopping Center and other locations which it owns or leases provided, that, if Landlord elects to do so, such "blanket coverage" shall provide that the coverage with respect to the Shopping Center shall not be diminished or reduced due to claims associated with other properties covered thereby and in no event shall the amounts payable by Tenant as Tenant's Share of Insurance be greater than what they would otherwise be if the insurance for the Shopping Center were not being provided under a "blanket" policy, notwithstanding the provisions of Article XVIII below.

Section 13.5. Waiver of Subrogation. To the extent that the parties may legally so agree, neither Landlord nor Tenant shall be liable (by way of subrogation or otherwise) to the other party (or to any insurance company insuring the other party) for any loss or damage to any of the property of the Landlord or the Tenant, as the case may be, which loss or damage is covered by any insurance policies carried by the parties and in force at the time of any such damage or required to be carried by the parties, even though such loss or damage might have been occasioned by the negligence of Landlord or Tenant, and the party hereto sustaining such loss or damage so protected by insurance waives its rights, if any, of recovery against the other party hereto to the extent and amount that such loss is covered by such insurance. Each party shall use its best efforts (including payment of any additional premium) to have its insurance policies contain the standard waiver of

P:\L9971644.LSE

13

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000916

subrogation clause. In the event Landlord's or Tenant's insurance carrier declines to include in such carrier's policy the standard waiver of subrogation clause, Landlord or Tenant, as the case may be, shall promptly notify the other party, but in no event shall such refusal abrogate, diminish, or modify the waiver set forth in this Section 13.5.

## ARTICLE XIV.

**Section 14.1. Loss or Damage to Tenant's Property.** Landlord and Landlord's agents and employees shall not be liable to Tenant for any injury to person or damage to property caused by the Demised Premises or other portions of the Shopping Center becoming out of repair or by defect or failure of any structural element of the Demised Premises or of any equipment, pipes or wiring, or broken glass, or by the backing up of drains, or by gas, water, steam, electricity or oil leaking, escaping or flowing into the Demised Premises (except where due to Landlord's willful failure to make any repairs or perform any maintenance obligations required under the terms of this Lease), nor shall Landlord be liable to Tenant for any loss or damage that may be occasioned by or through the acts or omissions of other tenants of the Shopping Center or of any other persons whomsoever, excepting only duly authorized employees and agents of Landlord.

## ARTICLE XV.

**Section 15.1. Damage or Destruction by Fire or Other Casualty.** Tenant shall give immediate written notice to Landlord of any damage caused to the Demised Premises by fire or other casualty.

In the event that the Demised Premises shall be damaged or destroyed by fire or other casualty insurable under standard fire and extended coverage insurance and Landlord does not elect to terminate this Lease as hereinafter provided, Landlord shall proceed with reasonable diligence and at its sole cost and expense to rebuild and repair the Demised Premises. In the event (a) the building in which the Demised Premises are located shall be destroyed or substantially damaged by a casualty not covered by Landlord's insurance, or (b) such building shall be destroyed or rendered untenantable to an extent in excess of twenty-five percent (25%) of the first floor area by a casualty covered by Landlord's insurance, or (c) the holder of a mortgage, deed of trust or other lien on the Demised Premises at the time of the casualty elects, pursuant to such mortgage, deed of trust or other lien, to require the use of all or part of Landlord's insurance proceeds in satisfaction of all or part of the indebtedness secured by the mortgage, deed of trust or other lien, then in any such eventuality Landlord may elect either to terminate this Lease or to proceed to rebuild and repair the Demised Premises. Landlord shall give written notice to Tenant of such election within sixty (60) days after the occurrence of such casualty and if it elects to rebuild and repair shall proceed to do so with reasonable diligence and at its sole cost and expense. If Landlord elects to rebuild, such notice shall state the estimated time to complete such rebuilding and, in the event the estimated time to rebuild is greater than six (6) months, Tenant shall have the right to terminate this Lease by giving written notice of termination to Landlord within ten (10) days following receipt of such written notice from Landlord. Notwithstanding the foregoing, if any such casualty and the resulting damage affects only the Demised Premises and no other part of the Shopping Center and Landlord elects, pursuant to the foregoing, to terminate this Lease, Tenant may override such termination if it desires to rebuild the Demised Premises, at its sole cost, by giving written notice to Landlord within ten (10) days following receipt of such written notice from Landlord, stating Tenant's desire and agreement to so rebuild within six months after such notice.

**PLAINTIFF EXHIBIT 1**
**Clear Lake (2)**
**000917**

Landlord's obligation to rebuild and repair under this Article XV shall in any event be limited to restoring the Demised Premises, exclusive of any alterations, additions, improvements, fixtures and equipment installed by Tenant, to substantially the same condition in which the same existed prior to the casualty. Tenant agrees that promptly after completion of such work by Landlord, Tenant will proceed with reasonable diligence and at Tenant's sole cost and expense to restore, repair and replace all alterations, additions, improvements, fixtures, signs and equipment installed by Tenant and promptly reopen for business in the Demised Premises.

Tenant agrees that during any period of reconstruction or repair of the Demised Premises it will continue the operation of its business within the Demised Premises to the extent practicable. During the period from the occurrence of the casualty until Landlord's repairs are completed, the Base Rent shall abate proportionately during the period and to the extent that the Demised Premises are unfit for use by Tenant and not actually used by Tenant in the ordinary conduct of its business.

No damage or destruction to the Demised Premises shall allow Tenant to surrender possession of the Demised Premises or affect Tenant's liability for the payment of rent or any other covenant herein contained, except as may be specifically provided in this Lease. Landlord shall not be obligated to commence any repair, restoration or rebuilding until insurance proceeds are received by Landlord, and Landlord's obligations hereunder shall be limited to the proceeds received by Landlord under its insurance policy. In the event the Demised Premises shall be damaged, in whole or in substantial part, within the last 24 months of the term of this Lease, or any extension or renewal thereof, Landlord and Tenant shall each have the option, exercisable within thirty (30) days following such damage, of terminating this Lease, effective as of the date of mailing notice thereof.

### ·ARTICLE XVI.

Section 16.1. Condemnation. If more than thirty (30%) percent of the floor area of the Demised Premises should be taken for any public or quasi-public use under any governmental law, ordinance or regulation or by right of eminent domain or by private purchase in lieu thereof, this Lease shall terminate and the rent shall be abated during the unexpired portion of this Lease, effective on the date physical possession is taken by the condemning authority.

If less than thirty (30%) percent of the floor area of the Demised Premises should be taken as aforesaid, this Lease shall not terminate; however, the Base Rental payable hereunder during the unexpired portion of this Lease shall be reduced in proportion to the area taken, effective on the date physical possession is taken by the condemning authority. Following such partial taking, Landlord shall make all necessary repairs or alterations to the remaining premises in order to make the remaining portions of the Demised Premises an architectural whole.

Whether or not any portion of the Demised Premises should be taken as aforesaid, Landlord shall have the election to terminate this Lease or to continue this Lease in effect in the event that buildings containing twenty-five percent (25%) or more of the floor area of the Shopping Center should be taken as aforesaid.

Section 16.2. Taking of Common Area. If any part of the Common Area should be taken as aforesaid, this Lease shall not terminate, nor shall the rent payable hereunder be reduced, except that either Landlord or Tenant may terminate this Lease if the area of the Common Area remaining following such taking plus any additional parking area provided by Landlord in reasonable proximity to

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000918

the Shopping Center within ninety (90) days after the date of any such taking shall be less than eighty (80) percent of the area of the Common Area immediately prior to the taking. Any election to terminate this Lease in accordance with this provision shall be evidenced by written notice of termination delivered to the other party no sooner than ninety (90) days nor later than one hundred twenty (120) days after the date physical possession is taken by the condemning authority.

Section 16.3. Compensation. All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Demised Premises or Common Area shall be the property of Landlord, and Tenant hereby assigns its interest in any such award to Landlord; provided, however, Landlord shall have no interest in any award made to Tenant for Tenant's moving and relocation expenses or for the loss of Tenant's fixtures and other tangible personal property if a separate award for such items is made to Tenant.

ARTICLE XVII.

Section 17.1. Assignment and Subletting. Except as expressly permitted under the terms hereof, Tenant shall not assign or in any manner transfer this Lease or any estate or interest therein, by operation of law or otherwise, or sublet the Demised Premises or any part thereof, or grant any license, concession or other right of occupancy of any portion of the Demised Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed. Upon any violation of this provision, this Lease shall terminate, at Landlord's option. Consent by Landlord to one or more assignments or sublettings shall not operate as a waiver of Landlord's rights as to any subsequent assignments and sublettings. Any permitted assignment or sublease shall be only for a purpose specified in Section 1.1(n) hereof and for no other purpose. In no event shall any assignment or sublease of the Demised Premises relieve or release Tenant from any obligations under this Lease. Landlord shall be permitted to enforce the provisions of this instrument against the undersigned Tenant and/or any assignee without demand upon or proceeding in any way against any other person. In determining whether to grant its consent to a proposed assignment or sublease, Landlord shall take into consideration, among other factors, (i) objective evidence or information concerning the financial condition of the proposed assignee or subtenant (ii) the character and reputation of the proposed assignee or subtenant, (iii) the business experience of the proposed assignee or subtenant and (iv) the nature of the proposed use of the Demised Premises by the proposed assignee or subtenant. Any request for Landlord's consent to a proposed assignment or sublease shall be accompanied by financial and operating information with respect to the proposed assignee or subtenant and such other information concerning the proposed assignee or subtenant as Landlord may reasonably request. Tenant shall give Landlord written notice of Tenant's desire to assign or sublease ("Notice of Assignment"). Landlord shall be deemed to have withheld its consent to such assignment or sublease unless Landlord notifies Tenant, within thirty days after Tenant's Notice of Assignment, of Landlord's consent.

Section 17.2. Corporate or Partnership Ownership. If at any time during the primary term of this Lease or any renewal or extension thereof, the person or persons who own a majority of either the outstanding voting shares or partnership interests of Tenant at the time of the execution of this Lease cease to own a majority of such shares or interests (except as the result of transfers by devise or descent), the loss of a majority of such shares or interests shall be deemed an assignment of this Lease by Tenant and therefore subject in all respects to the provisions of Section 17.1 above.

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000919

**Section 17.3.** **Continuing Obligations.** Notwithstanding any assignment or subletting, Tenant shall at all times remain fully responsible and liable for the payment of the rent or other charges herein specified and for compliance with all of its other obligations under this Lease (even if future assignments and sublettings occur subsequent to an assignment or subletting by Tenant, and regardless of whether or not Landlord's approval has been obtained for such future assignments and sublettings). Moreover, in the event that the rental due and payable by a sublessee (or a combination of the rental payable under such sublease plus any bonus or other consideration therefor or incident thereto) less all reasonable costs and expenses (including, without limitation, renovation costs and brokerage commissions) incurred by Tenant in consummating such sublease or assignment) exceeds the rental payable under this Lease, or if with respect to a permitted assignment, permitted license or other transfer by Tenant permitted by Landlord, the consideration payable to Tenant by the assignee, licensee or other transferee exceeds the rental payable under this Lease, then Tenant shall be bound and obligated to pay Landlord one-half of all such excess rental and other excess consideration within ten (10) days following receipt thereof by Tenant from such sublessee, assignee, licensee or other transferee, as the case may be. Finally, in the event of any assignment or subletting, it is understood and agreed that all rentals paid to Tenant by an assignee or sublessee shall, to the extent the same are, in turn, due to Landlord hereunder, be received by Tenant in trust for Landlord, to be forwarded immediately to Landlord without offset or reduction of any kind; and upon election by Landlord such rentals shall be paid directly to Landlord as specified in Section 4.1 of this Lease (to be applied as a credit and offset to Tenant's rental obligations).

**Section 17.4.** **Encumbrance.** Tenant shall not mortgage, pledge or otherwise encumber its interest in this Lease or in the Demised Premises.

**Section 17.5.** **Landlord's Option to Terminate.** In lieu of consenting to an assignment or sublease, Landlord may, at its option, within thirty days after Tenant's Notice of Assignment, terminate this Lease and release Tenant from any and all obligations accruing under this Lease from and after the effective date of such termination. Landlord shall give to Tenant written notice of Landlord's exercise of this option ("Notice of Termination"), and this Lease shall terminate thirty (30) days after the Notice of Termination (the "Effective Date of Termination"), and Tenant shall be fully and completely released of all obligations accruing under this Lease from and after the Effective Date of Termination. If Landlord makes such election, Landlord shall be free to accept any proposed assignee or sublessee as the new tenant, in which case Landlord shall be entitled to retain all consideration paid by such assignee or sublessee. Notwithstanding anything to the contrary contained in this Section 17.5 or Section 17.1 above, Landlord shall not have the option hereinabove granted to terminate this Lease in the event of a proposed sublease of less than the entire Demised Premises; provided, however, the decision by Landlord as to whether or not to grant its consent to such proposed sublease, as required under the terms of Section 17.1, shall be within Landlord's sole and absolute discretion.

**Section 17.6.** **Assignment or Sublease Without Landlord's Consent.** Notwithstanding anything to the contrary contained in this Article XVII, Tenant shall have the right, without Landlord's consent, to assign this Lease or sublease the Demised Premises, in either case subject to all of the terms and provisions hereof, to any corporation, partnership or other entity controlled by, under common control with or controlling Tenant or to any corporation, partnership or other entity succeeding to substantially all of the assets of Tenant as a result of a consolidation, merger or sale, and following any such assignment or sublease, Tenant shall

**PLAINTIFF EXHIBIT 1**
**Clear Lake (2)**
**000920**

continue to remain liable and obligated under all of the terms and provisions of this Lease.

Section 17.7. Assignment by Landlord. In the event of the transfer and assignment by Landlord of its interest in this Lease and in the building containing the Demised Premises to a person expressly assuming Landlord's obligations under this Lease, Landlord shall thereby be released from any further obligations hereunder, and Tenant agrees to look solely to such successor in interest of the Landlord for performance of such obligations. Any security given by Tenant to secure performance of Tenant's obligations hereunder may be assigned and transferred by Landlord to such successor in interest, and Landlord shall thereby be discharged of any further obligation relating thereto.

ARTICLE XVIII.

Section 18.1. Personal Property Taxes. Tenant shall be liable for and shall pay all taxes, assessments, charges, levies and other sums levied by any governmental authority or other taxing authority against Tenant's leasehold interest and all personal property and trade fixtures placed by Tenant in the Demised Premises. If any such taxes are levied against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of personal property and trade fixtures placed by Tenant in the Demised Premises and Landlord elects to pay the taxes based on such increase, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder. Within twenty (20) days after notice from Landlord, Tenant shall furnish to Landlord a true copy of receipts evidencing the payment of such personal property taxes and assessments.

Section 18.2. Real Estate Taxes. Except as provided in Sections 18.1 and 18.3, Landlord shall pay or cause to be paid all general real estate taxes and governmental charges (hereinafter collectively referred to as the "General Taxes") levied against the Shopping Center for each real estate tax year. If Landlord is required under the terms of any mortgage or deed of trust covering the Shopping Center to deposit into an escrow or other account on a monthly or other periodic basis the General Taxes assessed against the Shopping Center, Tenant shall pay to Landlord in monthly installments, on the same dates as and in addition to the Base Rental and other charges prescribed in this Lease, an amount equal to one-twelfth (1/12th) of Tenant's share of the General Taxes, as estimated by Landlord in good faith from time to time. As soon as practicable after the close of each calendar year during the Lease Term, Landlord shall furnish a statement in writing to Tenant specifying the actual amount due by Tenant in respect of Tenant's share of the General Taxes. In the event the total of the monthly payments theretofore made by Tenant under this Section 18.2 for such year, if any, exceeds the actual amount due, then the excess shall be applied pro rata as a credit on the monthly installments thereafter coming due under this Section 18.2. In the event the total of the monthly payments theretofore made by Tenant under this Section 18.2 for such year, if any, is less than the actual amount due, or, if Tenant is not required under the terms of this Section 18.2 to pay Tenant's Share of the General Taxes on a monthly basis, any such deficiency or the full amount of Tenant's Share of the General Taxes, as the case may be, shall be due and payable by Tenant to Landlord within ten (10) days after Tenant's receipt of such statement. During any year which shall be less than a full tax year, Tenant's share of the General Taxes shall be prorated on a daily basis between the parties to the end that Tenant shall only pay for taxes attributable to the portion of the tax year occurring within the Lease Term.

Section 18.3. Substitute and Additional Taxes. If at any time during the primary term of this Lease or any renewal or extension thereof a tax or excise on rents, or other tax however

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000921

described (except any franchise, estate, inheritance, capital stock, income or excess profits tax imposed upon Landlord) is levied or assessed against Landlord by any lawful taxing authority on account of Landlord's interest in this Lease or the rents or other charges reserved hereunder, as a substitute in whole or in part for, or in addition to the General Taxes described in Section 18.2 above, Tenant agrees to pay to Landlord upon demand, and in addition to the rentals and other charges prescribed in this Lease, the amount of such tax or excise. In the event any such tax or excise is levied or assessed directly against Tenant, then Tenant shall be responsible for and shall pay the same at such times and in such manner as the taxing authority shall require.

Section 18.4. Insurance. Tenant shall pay to Landlord, upon demand, and in addition to the rentals and other charges prescribed in this Lease, Tenant's Share of the premiums for all fire and extended coverage insurance, boiler insurance, public liability and property damage insurance, rent insurance and other insurance which, from time to time, Landlord is required by any mortgagee, lender or insurance company or underwriter to carry with respect to the Shopping Center or which is customarily carried by owners of comparable shopping centers from time to time in Harris County, Texas (hereinafter collectively referred to as the "Insurance Premiums"). In no event shall the fire and extended coverage insurance maintained by Landlord on the Shopping Center be less than eighty percent (80%) of the replacement value of the buildings comprising the Shopping Center. For purposes hereof, premiums paid for insurance policies having policy years which do not coincide with calendar years shall be prorated on a per diem basis for each calendar year affected, and total premiums for policies issued for more than one year will be prorated equally over the number of years for the term of such policies, regardless of differences in premium amounts actually paid during any particular year or years of such term. Tenant shall pay to Landlord in monthly installments, on the same dates as and in addition to the Base Rental and other charges prescribed in this Lease, an amount equal to one-twelfth (1/12th) of Tenant's share of the Insurance Premiums, as estimated by Landlord in good faith from time to time. As soon as practicable after the close of each calendar year during the term hereof, Landlord shall furnish a statement in writing to Tenant specifying the actual amount due by Tenant in respect of Tenant's share of Insurance Premiums. In the event the total of the monthly payments theretofore made by Tenant under this Section 18.4 for such year exceeds the actual amount due, then the excess shall be applied pro rata as a credit on the monthly installments thereafter coming due under this Section 18.4. In the event the total of the monthly payments theretofore made by Tenant under this Section 18.4 for such year is less than the actual amount due, any such deficiency shall be due and payable by Tenant to Landlord within ten (10) days after Tenant's receipt of such statement. During any part of the Lease Term which shall be less than a full policy year, Tenant's share of the Insurance Premiums shall be prorated on a daily basis between the parties to the end that Tenant shall only pay for the Insurance Premiums attributable to the portion of the policy year occurring within the Lease Term.

ARTICLE XIX.

Section 19.1. Bankruptcy. If Tenant shall become bankrupt or insolvent or unable to pay its debts as such become due, or file any debtor proceedings; or if Tenant shall file or have filed against it in any court pursuant to any statute either of the United States or of any state a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's property, or if Tenant makes an assignment for the benefit of creditors, or petitions for or enters into an arrangement, then, this Lease shall terminate and Landlord, in addition to any other rights or remedies it may have, shall have the immediate right of re-entry and may

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000922

remove all persons and property from the Demised Premises and such property may be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of Tenant, all without service of notice or resort to legal process and without being deemed guilty of trespass, or becoming liable for any loss or damage which may be occasioned thereby.

Section 19.2. Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default" by Tenant:

(1) Failure to pay when due any installment of rent or any other obligation hereunder involving the payment of money, if the failure continues for ten (10) days after written notice to Tenant of such failure, but in no event shall Landlord be obligated to give more than two such notices in any twelve month period.

(2) Failure to perform or observe any term, provision or covenant of this Lease to be performed or observed by Tenant, other than as described in subsection (1) above, if such failure continues for thirty (30) days following written notice to Tenant of such failure; or, if such failure cannot be reasonably cured within said thirty day period, Tenant shall not have commenced to cure such failure within said thirty day period and shall not thereafter (and in any event within ninety days) continuously and diligently in good faith proceed to cure such failure.

Section 19.3. Landlord's Remedies. Upon the occurrence of any one or more of the foregoing Events of Default, without further notice or demand of any kind to Tenant or any other party, Landlord shall have the option to pursue, in addition to and cumulative of all other legal or equitable remedies now or hereafter available, the following described remedies:

(1) Landlord may elect to terminate this Lease and the term created hereby, in which event Landlord may immediately repossess the Demised Premises and Tenant shall pay at once to Landlord, as liquidated damages (discounted as hereinafter provided), the sum of money equal to the rent provided in this Lease to be paid by Tenant to Landlord for the balance of the stated term of this Lease, together with such expenses as Landlord may incur for legal expenses, brokerage fees and in putting the Demised Premises in good order and preparing the same for reletting, less the fair rental value of the Demised Premises for the same period. Such liquidated damages shall be discounted to present value at the rate of six percent (6%) per annum.

(2) Landlord may elect to terminate Tenant's right of possession of the Demised Premises without termination of this Lease, in which event Tenant agrees to surrender possession and vacate the Demised Premises immediately and deliver possession thereof to Landlord, and Tenant hereby grants to Landlord full and free license to enter into and upon the Demised Premises, or any part thereof, and to expel or remove Tenant and any other person, firm or corporation who may be occupying or within the Demised Premises or any part thereof, and remove any and all property therefrom, using such force as may be necessary, without terminating this Lease or releasing Tenant in whole or in part from Tenant's obligation to pay rent and perform any of the covenants, conditions and agreements to be performed by Tenant, as provided in this Lease, without being deemed in any manner guilty of trespass, eviction or forcible entry or detainer, and without relinquishing Landlord's right to rental or any other

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000923

right of Landlord under this Lease or by operation of law.

(3)  Landlord may alter locks and other security devises at the Demised Premises.

In the event Landlord exercises its rights to alter the locks at the Demised Premises, Landlord shall only be required to provide Tenant with a new key during Landlord's regular business hours, provided that in no event shall Landlord be required to provide Tenant a new key until such time as Landlord cures all defaults under the Lease and, if required by Landlord, Tenant pays to Landlord a security deposit in the amount equal to two times the Base Rent then due hereunder.  Tenant hereby waives (to the extent legally permissible) any and all notices otherwise required under common law or under Chapters 24 or 92 of the Texas Property Code, as same presently exists or may be hereafter amended (or any subsequent similar statute relating to notice prior to instituting such action or proceeding).  To the extent of any inconsistency between this Lease and the provisions of Section 92.008 of the Texas Property Code (as it may be hereafter amended), it is the agreement of the parties that the terms and provisions of this Lease shall prevail.

Upon and after entry into possession, with or without terminating this Lease, Landlord may, but shall not be obligated to, relet all or any part of the Demised Premises for the account of Tenant for such rent and upon such terms and to such person, firm or corporation and for such use or uses and such period or periods as Landlord, in Landlord's sole discretion, shall determine, and Landlord shall not be required to accept any prospective lessee offered by Tenant, or to observe any instruction given by Tenant about such reletting, or to do any act or exercise any care or diligence with respect to such reletting or to the mitigation of damages of Tenant.  For the purpose of such reletting, Landlord may decorate or make repairs, changes, alterations or additions in or to the Demised Premises to the extent deemed by Landlord desirable or necessary.  If the consideration collected by Landlord upon any such reletting for Tenant's account is not sufficient to pay, as liquidated damages, the rental reserved in this Lease, plus the cost of repairs, alterations, additions, redecorating and Landlord's other expenses, Tenant agrees to pay to Landlord the deficiency upon demand.

The service of any notice, demand for possession, notice that the tenancy hereby created will be terminated on the date therein named, institution of any action for forcible detainer or the entering of a judgment for possession in such action, or any other act or acts resulting in the termination of Tenant's right to possession of the Demised Premises, shall not relieve Tenant from Tenant's obligations to pay the rent hereunder during the balance of the term or any extension thereof, except as therein expressly provided.  Landlord may collect and receive any rent due from Tenant, and the payment thereof shall not constitute a waiver of, or affect, any notice or demand given, suit instituted or judgment obtained by Landlord, or be held to waive, affect, change, modify or alter the rights or remedies which Landlord has in equity or at law by virtue of this Lease.

The acceptance of liquidated damages by Landlord under any of the provisions of this Lease shall not preclude Landlord from the enforcement of any of the covenants or agreements herein, nor shall any other act which infers recognition of the tenancy operate as a waiver of Landlord's right to terminate this Lease, or any extension hereof, or operate as an extension of this Lease.

Landlord, at any time after the occurrence of an Event of Default, without being under any obligation to do so and without thereby waiving such default, may cure the default for the account of Tenant (and enter the Demised Premises for such purpose), and

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000924

thereupon Tenant shall be obligated and hereby agrees to pay to Landlord, upon demand, all costs, expenses and disbursements (including reasonable attorneys' fees) incurred by Landlord in curing such default, together with interest thereon at the rate and in the manner hereinafter specified in Section 27.13.

For all purposes of this Article XIX the rental agreed to be paid by the Tenant or the amount of rental payable by the Tenant as liquidated damages or otherwise, shall be deemed to be the Base Rental (as specified in Section 1.1(h) of this Lease), all items of additional rental (including, without limitation, the charges for maintenance of the Common Area, as specified in Section 1.1(i) of this Lease), and all other sums required to be paid by Tenant pursuant to the terms of this Lease. All such sums shall be computed on the basis of the average monthly amount thereof accruing or which was payable during the immediately preceding 24-month period, except that if it becomes necessary to compute such rental before such 24-month period has occurred, then the average monthly amount thereof accruing during such shorter period shall be the basis of such computation.

In the event Landlord shall have taken possession of the Demised Premises pursuant to the authority herein granted, then Landlord shall have the right to keep in place and use all of Tenant's fixtures, furniture, equipment, improvements, additions, alterations and other personal property at all times prior to any foreclosure thereon by Landlord or repossession thereof by any third party having a prior lien thereon or claim thereto.

Landlord may restrain or enjoin any breach or threatened breach of any covenant, duty or obligation of Tenant herein contained without the necessity of proving the inadequacy of any legal remedy or irreparable harm. The remedies of Landlord hereunder shall be deemed cumulative and not exclusive of each other.

In the event that Landlord institutes any action or proceeding to enforce payment of a monetary sum due hereunder or on account of any other breach or default by Tenant in the performance of its obligations hereunder and is the prevailing party in such action then, in such event, Tenant will pay to Landlord all reasonable costs incurred by Landlord in prosecuting such action, including reasonable attorneys' fees.

Section 19.4. Tenant's Remedies. Except as provided elsewhere herein, in the event of any default by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rent due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and Landlord shall thereupon have twenty (20) days, in which to commence to cure any such default. Unless and until Landlord fails so to commence to cure any default after such notice or having so commenced thereafter fails to exercise reasonable diligence to complete such cure, Tenant shall not have any remedy or cause of action by reason thereof. All obligations of Landlord hereunder will be construed as covenants, no conditions; and all such obligations will be binding upon Landlord only during the period of its ownership of the Shopping Center and not thereafter. In the event that Tenant institutes any action or proceeding on account of any breach or default by Landlord in the performance of its obligations hereunder and is the prevailing party in such action then, in such event, Landlord will pay to Tenant all reasonable costs incurred by Tenant in prosecuting such action, including reasonable attorneys' fees. Notwithstanding the provisions of Section 27.3 below, in the event Tenant receives a final, non-appealable judgment against Landlord assessing damages, which Landlord fails or refuses to pay within thirty (30) days after receipt of demand from Tenant, then Tenant shall have the right to recover the same, together with interest

PLAINTIFF EXHIBIT 1

Clear Lake (2)
000925

thereon as provided for in said judgment (collectively, the "Judgment Amount"), by offset against the Base Rental thereafter becoming due (and which may then be unpaid) hereunder; provided, however, in no event shall the amount so offset in any month exceed twenty-five percent (25%) of the Base Rental payable for such month, unless such limitation would render it impossible for Tenant to recover the Judgment Amount on or before the expiration of the primary Lease Term in which event Tenant shall be entitled to offset against Base Rental each month the amount equal to the Judgement Amount divided by the number of months then remaining in the primary Lease Term.

## ARTICLE XX.

Section 20.1. So long as Tenant is not in default hereunder and is actually occupying and using the Demised Premises for the sale of the Primary Permitted Merchandise, Landlord agrees that it shall not lease any portion of the Shopping Center or permit the use of any portion of the Shopping Center for the sale of the Primary Permitted Merchandise; provided, that this restriction on leasing (and resulting exclusive in favor of Tenant) shall not be deemed breached by Landlord to the extent (but no further) a tenant under any lease of space in the Shopping Center as of the date hereof has, as of the date hereof, the right (whether or not such right is exercised) under such lease to use such tenant's premises for the operation of a business selling all or a portion of the Primary Permitted Merchandise. Notwithstanding the foregoing, it shall not be a breach or violation of the above described restriction if any tenant now or hereafter leasing space in the Shopping Center uses such tenant's premises for the operation of a business selling all or any portion of the Primary Permitted Merchandise in no more than the lesser of (i) twenty-five percent (25%) of such Tenant's premises or (ii) 2,500 square feet of such tenant's premises. In addition, for the purpose of the restriction (and resulting exclusive in favor of Tenant) contained in this Article XX, Primary Permitted Merchandise shall not include linens, pillows, bathroom accessories, furniture, paint, hardware, lamps and fresh flowers. Tenant acknowledges that for the purposes of the foregoing restriction and all other provisions of this Lease, the term "shopping center" does not include the tract of land located southeast and contiguous to the land described on Exhibit "A" attached hereto and the building located thereon currently occupied by Wal-Mart.

## ARTICLE XXI.

Section 21.1. Surrender of Demised Premises. At the expiration or termination of this Lease, whether by lapse of time or otherwise, Tenant shall surrender the Demised Premises to Landlord in the same condition of the Demised Premises on the date hereof (excepting reasonable wear and tear, losses required to be restored by Landlord pursuant to Section 8.1, Article XV, and Article XVI of this Lease and damage from condemnation or casualty not required to be repaired by Tenant under the terms of this Lease) except for alterations which Tenant has the right or may be required to remove under the provisions of Section 9.1. Tenant also shall surrender all keys for the Demised Premises to Landlord at the expiration of this Lease (but no such surrender shall be deemed to be an acceptance by Landlord of surrender of the Demised Premises) and shall inform Landlord of all combinations on locks, safes and vaults, if any, in the Demised Premises. Landlord can elect to retain or dispose of in any manner any alterations or other property that Tenant does not remove from the Demised Premises on expiration or termination of the term of this Lease by giving at least ten (10) days' notice to Tenant. Title to any such alterations or other property that Landlord elects to retain or dispose of on expiration of such ten-day period shall vest in Landlord. Tenant waives all claims against Landlord for any damages resulting from Landlord's retention or disposition of any

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000926

such alterations or other property. Tenant shall be liable to Landlord for Landlord's costs for storing, removing and disposing of any such alterations or other property.

Section 21.2. Holding Over. In the event Tenant remains in possession of the Demised Premises after the expiration of this Lease and without the execution of a new lease, it shall be deemed to be occupying said premises as a tenant from month to month at a rental equal to the rental herein provided plus fifty percent (50%) of such amount and otherwise subject to all the conditions, provisions and obligations of this Lease insofar as the same are applicable to a month to month tenancy. The above described tenancy from month-to-month may be terminated by either party upon thirty (30) days written notice to the other.

ARTICLE XXII.

Section 22.1. Subordination. Subject to the condition precedent to subordination hereinafter set forth in this Section 22.1, Tenant accepts this Lease subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter placed upon the Demised Premises or the Shopping Center as a whole, and to any renewals and extensions thereof. Tenant agrees that any such mortgagee shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this Lease; provided, however, notwithstanding that this Lease may be (or made to be) superior to such mortgage, deed of trust or other lien, the provisions of such mortgage, deed of trust or other lien relative to the rights of the mortgagee with respect to proceeds arising from an eminent domain taking (including a voluntary conveyance by Landlord) and/or arising from insurance payable by reason of damage to or destruction of the Demised Premises shall be prior and superior to any contrary provisions contained in this instrument with respect to the payment or usage thereof. Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any mortgage, deed of trust or other lien hereafter placed upon the Demised Premises or the Shopping Center as a whole, and Tenant agrees upon demand to execute such further instruments subordinating this Lease as Landlord may request; provided, however, as a condition precedent to the effectiveness of any such subordination, the holder of any such mortgage, deed of trust or other lien to which this Lease is to be subordinated shall agree pursuant to a written agreement delivered to Tenant that so long as Tenant is in compliance with the provisions of this Lease, Tenant's use and occupancy of the Demised Premises and its rights under this Lease shall not be disturbed or affected by any foreclosure or other action (or by the delivery or acceptance of a deed or other conveyance or transfer in lieu thereof) which may be instituted or undertaken in order to enforce any right or remedy available to the holder of such instrument or any other document evidencing or given as security for the transaction secured thereby.

Section 22.2. Notice to Mortgagee of Landlord's Default. At any time when the holder of an outstanding mortgage, deed of trust or other lien covering Landlord's interest in the Demised Premises has given Tenant written notice of its interest in this Lease, Tenant may not exercise any remedies for default by Landlord hereunder unless and until the holder of the indebtedness secured by such mortgage, deed of trust or other lien shall have received written notice of such default and a reasonable time for curing such default shall thereafter have elapsed, which shall not be less than thirty (30) days.

Section 22.3. Right to Estoppel Certificates. Each party, within ten (10) days after notice from the other party, shall execute and deliver to the other party, in recordable form, a certificate stating that this Lease is unmodified and in full force and effect, or in full force and effect as modified, and stating the modifications. The certificate also shall state the

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000927

amount of Base Rental, the dates to which rent and other charges have been paid in advance, if any, and the amount of any security deposit or prepaid rent. The certificate also shall state whether or not, to the best knowledge of the signer of such certificate, the other party is in default in performance of any covenant, agreement or condition contained in this Lease, and, if so, specifying each such default of which the signer may have knowledge. Failure to deliver the certificate within the ten (10) days shall be conclusive upon the party failing to deliver the certificate for the benefit of the party requesting the certificate and any successor to the party requesting the certificate, that this Lease is in full force and effect and has not been modified, except as may be represented by the party requesting the certificate.

## ARTICLE XXIII.

Section 23.1. Option to Extend. Subject to the conditions herein stated and provided that Tenant is not then in default in the payment of rental or any other amount or in the performance of any other obligation of Tenant payable or performable under the terms of this Lease, Tenant shall have the right and option to extend the term of this Lease for four (4) additional periods of five (5) years each (the "Extension Periods"). Tenant's right to exercise the option herein granted (the "Extension Option") for each Extension Period is subject to and contingent upon the satisfaction of the following conditions:

(1) Tenant shall not have assigned this Lease or any interest herein or sublet all or any portion of the Demised Premises during the primary term or any previous Extension Period except as expressly permitted under the terms hereof; and

(2) Tenant shall have given to Landlord written notice of Tenant's election to exercise the first or any subsequent Extension Option not later than nine (9) months prior to the expiration of the original term of the Lease or the then current Extension Period, as the case may be. Unless Tenant shall have given Landlord timely notice of its election to exercise the Extension Option as required above, it shall be deemed that Tenant has not exercised such option and the term of this Lease shall terminate at the end of the original term or the then current Extension Period, as the case may be.

In the event Tenant exercises the Extension Option for any of the Extension Periods, all of the terms and provisions of this Lease which are applicable for and during the original term shall apply during the Extension Periods except that there shall be no further options to extend the Lease Term at the expiration of the fourth Extension Period. Further, the Base Rental during the first Extension Periods shall be determined in accordance with the provisions of Section 1.1(h) hereof. All references in this Lease to "Lease Term" shall refer to the original term and the four Extension Periods, if the Extension Option is effectively exercised for such Extension Periods or any of them, in accordance with the provisions hereof.

## ARTICLE XXIV.

Section 24.1. Definitions. For purposes of this Article, the following terms shall have the following meanings:

(i) "Hazardous Materials" shall mean any substance which now or hereafter is regulated by any Governmental Requirement (hereinafter defined) including, but not limited to (i) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976, as

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000928

amended, and any regulations promulgated thereunder; (ii) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended, and any regulations promulgated thereunder; (iii) asbestos in any form; (iv) polychlorinated biphenyls; and (v) any petroleum or any petroleum-based product.

(ii) "Governmental Requirements" shall mean all laws, ordinances, statutes, codes, rules, regulations, orders and decrees of the United States, the State of Texas, Harris County, the City of Webster or any other political subdivision, agency or instrumentality exercising jurisdiction over the Demised Premises or the Tenant.

(iii) "Hazardous Materials Contamination" shall mean the contamination of the improvements, facilities, soil, ground water, or air or other elements on, over or under the Demised Premises by Hazardous Materials at any time emanating from the Demised Premises.

Section 24.2. Covenants, Representations, and Warranties. Subject to the express rights granted to Tenant under the terms of this Lease, Tenant will not:

(i) Do anything upon the Shopping Center that would violate any Governmental Requirements;

(ii) Receive, store, dispose, generate, treat, use or place any Hazardous Materials on, from or in the Demised Premises or the Shopping Center in a manner which violates any Governmental Requirements;

(iii) Transport any Hazardous Materials to or from the Demised Premises or the Shopping Center in a manner which violates any Governmental Requirements;

(iv) Cause the existence of any Hazardous Materials Contamination in or on the Demised Premises.

During the term of this Lease, Tenant will give written notice to Landlord promptly upon Tenant's acquisition of knowledge of the deposit, release, placement or presence of any Hazardous Materials to the extent the same constitutes Hazardous Materials Contamination on, under or in the Demised Premises or of the transportation of any Hazardous Materials to or from the Demised Premises in violation of Governmental Requirements. Tenant shall comply at all times with all Governmental Requirements related to the Demised Premises with respect to Hazardous Materials introduced by Tenant into the Demised Premises. Tenant shall immediately comply with any and all Governmental Requirements requiring the removal, treatment or disposal of Hazardous Materials or a Hazardous Materials Contamination on the Demised Premises introduced by the Tenant into the Demised Premises or the Shopping Center, all at Tenant's sole cost and expense.

Section 24.3. Access and Cleanup Rights. Landlord and its agents and contractors shall have the right at any reasonable time to enter upon the Demised Premises to inspect and/or test the same for compliance with this Article XXIV or to correct, at Tenant's expense (should Tenant fail to do so following notice), any violation of this Article XXIV, but Landlord shall be under no obligation to do so. Further, Tenant acknowledges and agrees that the Landlord shall have the right (but not the obligation) to enter the Demised Premises or take other actions as it may deem necessary or advisable to clean up, remove, dispose, resolve or minimize the impact of, or otherwise deal with any Hazardous Materials or Hazardous Materials Contamination in, on, below or above the Demised Premises following receipt of any notice by any person or

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000929

entity asserting the existence of any Hazardous Materials or Hazardous Materials Contamination which, if true, could result in an order, notice, suit or fine against Landlord. Tenant shall indemnify, defend and save harmless Landlord and Landlord's owners, directors, officers, employees and contractors (collectively, the "Landlord Parties") from and against any suits, actions, legal or administrative proceedings, demands, claims, liabilities, fees, fines, penalties, losses, injuries, damages, expenses or costs, including remediation expenses, interest and attorneys' and consultants' fees (collectively, the "Claims") incurred or suffered by the Landlord Parties or any of them (i) that are incurred or imposed based upon any Governmental Requirement and that arise out of any introduction by Tenant, its owners, directors, officers, employees, agents, contractors, licensees, assignees or sublessees (collectively, the "Tenant Parties") of Hazardous Materials int or upon the Shopping Center or (ii) that otherwise arises from the breach by Tenant or Tenant Parties, or any of them, of any representation, warranty or covenant in this paragraph 6.

Section 24.4. Landlord's Indemnity. Landlord shall indemnify, defend and save harmless the Tenant Parties from and against all Claims incurred or suffered by the Tenant Parties or any of them (i) that are incurred or imposed based upon any Governmental Requirement and that arise out of any Hazardous Materials Contamination in the Shopping Center as of the date of the Lease or (ii) that are incurred or imposed based upon any Governmental Requirement and that arise out of any introduction by the Landlord Parties of Hazardous Materials into or upon the Shopping Center during the term of the Lease. Landlord shall immediately comply with any and all Governmental Requirements requiring the removal, treatment or disposal of Hazardous Materials or Hazardous Materials Contamination on the Shopping Center as of the date of the Lease or which is introduced by the Landlord Parties into or upon the Shopping Center during the term of the Lease.

ARTICLE XXV.

Section 25.1. Notices. Wherever any notice is required or permitted hereunder, such notice shall be in writing. Any notice or document required or permitted to be delivered hereunder shall be either delivered to the notice address of Landlord (addressed to the attention of the President) or Tenant set forth in Section 1.1 hereof, by hand or sent by United States registered or certified mail, postage prepaid, return receipt requested, to the same address. Either party's address may be changed from time to time by such party by giving notice as provided herein. A post office receipt for registration of such notice or signed return receipt shall be conclusive that such notice was delivered in due course of mail if mailed as provided above. For purposes of the calculation of various time periods referred to herein, notice delivered by hand shall be deemed received when delivered to the place for giving notice to a party referred to above and notice mailed in the manner provided above shall be deemed completed upon the earlier to occur of (i) actual receipt as indicated on the signed return receipt, or (ii) three (3) days after posting as herein provided. Any written notice addressed as provided hereinabove and actually received by the addressee, shall constitute sufficient notice for all purposes of this Lease.

ARTICLE XXVI.

Section 26.1. Governmental Regulations. Landlord and Tenant acknowledge that there are in effect federal, state, county and municipal laws, orders, rules, directives and regulations (collectively referred to hereinafter as the "Regulations") and that additional Regulations may hereafter be enacted or go into effect, relating to or affecting the Demised Premises or the Shopping Center, and concerning the impact on the environment of

P:\L9971644.LSE

27

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000930

construction, land use, maintenance and operation of structures, and conduct of business. Subject to the express rights granted under the terms of this Lease, neither Landlord nor Tenant will cause, or permit to be caused, any act or practice, by negligence, omission, or otherwise, that would adversely affect the environment, or do anything or permit anything to be done that would violate any of said laws, regulations, or guidelines. Moreover, Tenant shall have no claim against Landlord by reason of any changes Landlord may make in the Shopping Center or the Demised Premises pursuant to said Regulations or any charges imposed upon customers or other invitees pursuant to same.

## ARTICLE XXVII.

**Section 27.1. Negation of Partnership.** Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of landlord and tenant.

**Section 27.2. Independent Covenant to Pay Rent and Other Charges.** Tenant shall not for any reason withhold or reduce Tenant's required payments of rentals and other charges provided in this Lease, it being agreed that the obligations of Landlord hereunder are independent of Tenant's obligations, except as may be otherwise expressly provided.

**Section 27.3. Limitation of Landlord's Liability.** Under no circumstances whatsoever shall Landlord ever be liable hereunder for consequential or special damages; and all liability of Landlord (including any individual member thereof) to Tenant for any default by Landlord under the terms of this Lease shall be limited to the proceeds of sale on execution of the interest of Landlord in the Shopping Center; it being stipulated and agreed that Landlord shall not be personally liable for any deficiency. This clause shall not be deemed to limit or deny any remedies which Tenant may have in the event of default by Landlord hereunder, which do not involve the personal liability of Landlord. Specifically, Tenant shall have the right to seek injunctive or other equitable relief in connection with this Lease.

**Section 27.4. Consents and Permissions.** Except as may be otherwise herein provided, in all circumstances under this Lease where prior consent or permission of one party ("first party"), whether it be Landlord or Tenant, is required before the other party ("second party") is authorized to take any particular type of action, the matter of whether to grant such consent or permission shall be within the sole and exclusive judgment and discretion of the first party; and it shall not constitute any nature of breach by the first party hereunder or any defense to the performance of any covenant, duty or obligation of the second party hereunder that the first party delayed or withheld the granting of such consent or permission, whether or not the delay or withholding of such consent or permission was, in the opinion of the second party, prudent or reasonable or based on good cause.

**Section 27.5. Non-Waiver.** One or more waivers of any covenant, term or condition of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

**Section 27.6. Force Majeure.** Whenever a period of time is herein prescribed for action to be taken by Landlord, Landlord

**PLAINTIFF EXHIBIT 1**
**Clear Lake (2)**
**000931**

shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of Landlord.

Section 27.7. Short Form Lease. The parties agree not to place this Lease of record, but each party shall, at the request of the other, execute and acknowledge, so that the same may be recorded, a short form lease or memorandum of lease, stating that Tenant has accepted possession of the Demised Premises, indicating the lease term and any options to extend such term, but omitting rent and other terms, and an agreement specifying the date of commencement and termination of the lease term; provided, however, that the failure to record said short form lease, memorandum of lease or agreement shall not affect or impair the validity and effectiveness of this Lease. Tenant shall pay all costs, taxes, fees and other expenses in connection with or prerequisite to recording.

Section 27.8. Governing Law; Provisions Severable. The laws of the State of Texas shall govern the interpretation, validity, performance and enforcement of this Lease. If any provision of this Lease should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Lease shall not be affected thereby. Venue for any action under this Lease shall be the county in which rentals are due pursuant to Section 4.1 and Section 1.1 of this Lease.

Section 27.9. Captions. The captions used herein are for convenience only and do not limit or amplify the provisions hereof.

Section 27.10. Number and Gender. Whenever herein the singular number is used, the same shall include the plural, and words of any gender shall include each other gender.

Section 27.11. Successors. The terms, provisions and covenants contained in this Lease shall apply to, inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors in interest and legal representatives, except as otherwise herein expressly provided.

Section 27.12. Broker. In consideration of the services rendered in connection with the negotiation of this Lease by United Equities Incorporated ("Broker"), Landlord shall pay to Broker a leasing commission in the amount equal to 3% of the Base Rental only which is actually paid by Tenant for the Demised Premises and any additional space in the Shopping Center which may be added to and becomes a part of the Demised Premises, which commission shall be payable monthly if, as and when such Base Rental is received by Landlord, and not otherwise. In addition, in the event Tenant exercises the Extension Option for any of the Extension Periods under the provisions of Article XXIII hereof, Owner shall pay to Broker a further commission in the amount equal to 1-1/2% of the Base Rental only which is actually paid to Landlord during any Extension Period, which additional commission shall also be payable monthly if, as and when received by Landlord, and not otherwise. Landlord shall have the right and option of accelerating, at any time, the payment of all commission installments set forth above. If Landlord sells its interest in the Shopping Center and in connection therewith assigns Landlord's interest in this Lease, Landlord shall either (i) require the purchaser to assume the payment of all commission installments accruing after such sale in which event Seller shall be released of all further liability to Broker or (ii) Seller shall remain liable to Broker for the payment of all commission installments accruing after such sale. Landlord and Tenant each hereby represent and warrant to the other that Broker is the only agent, broker, finder or other party with whom

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000932

they have dealt who is or may be entitled to any commission or fee with respect to this Lease.

Section 27.13. Interest on Late Payments. In the event any installment of Base Rental or any other sum payable by Tenant to Landlord under the provisions of this Lease is not received within five (5) days after its due date for any reason whatsoever, it is agreed that the amount thus due shall bear interest at the maximum contractual rate which legally could be charged under the laws of the State of Texas in the event of a loan of such rental or other sum to Tenant (but in no event to exceed 18% per annum), such interest to accrue continuously on any unpaid balance due to Landlord by Tenant during the period commencing with the aforesaid due date and terminating with the date on which Tenant makes full payment of such amounts to Landlord. Any such interest shall be payable as additional rent hereunder.

Section 27.14. Entire Agreement. This Lease contains the entire agreement between the parties, and no agreement shall be effective to change, modify or terminate this Lease in whole or in part unless such is in writing and duly signed by the party against whom enforcement of such change, modification or termination is sought. Landlord and Tenant hereby acknowledge that they are not relying on any representation or promise of the other, except as may be expressly set forth in this Lease.

Section 27.15. Termination of Existing Lease. The obligations of the parties hereto are expressly conditioned upon and subject to the termination by mutual agreement of the parties thereto of the existing Shopping Center Lease dated December 3, 1989, between Landlord and Pottery Mart, Inc. (the "Existing Lease"). In the event the Existing Lease is not terminated effective as of the Commencement Date, either party hereto shall have the right to terminate this Lease by giving written notice of termination to the other party.

Section 27.16. Exhibits. The exhibits attached to this Lease are incorporated herein and made a part hereof for all purposes.

EXECUTED in multiple counterparts, each of which shall have the force and effect of an original as of the date first above written.

LANDLORD:

FIESTA MART, INC.

By: _____
Louis Katopodis, President

TENANT:

GARDEN RIDGE, L.P.

By: Garden Ridge Management, Inc., its sole general partner

By: _____
Armand Shapiro, Chairman

BROKER:

UNITED EQUITIES INCORPORATED

By: _____
Edwin Freedman, President

**PLAINTIFF EXHIBIT 1**
**Clear Lake (2)**
**000933**

## EXHIBIT "A"

47.6664 acres of land (2,076,348 square feet), a tract of land being part of and out of Lots 1, 2, 3, and 4, Block 9 of Webster Outlots as recorded in Volume 67, Page 197 of the Harris County Deed Records, in the Robert Wilson Survey, Abstract No. 88, in the City of Webster, Harris County, Texas, and being more fully described by metes and bounds as follows (with bearings referenced to the Southeasterly right-of-way line of F.M. 528, also known as Wilson Avenue, called N 52° 13' 00" E):

BEGINNING at a point marking intersection of the Southeasterly right-of-way line of said F.M. 528 with the Southwest line of said Lot 2 and being the most Northerly West corner of the herein described tract:

THENCE, N 52° 13' 00" E, along said right-of-way line of F.M. 528, a distance of 325.86 feet to the point of curvature of a curve to the right;

THENCE, NORTHEASTERLY, along a Southeast line of a Texas Highway Department right-of-way easement (recorded in Volume 2825, Page 495 of the Harris County Deed Records) and the arc of said curve to the right having a radius of 286.48 feet, a central angle of 45° 00' 00", a chord bearing N 74° 43' 00" E, 219.26 feet, an arc length of 225.00 feet to the point-of-tangency of said curve;

THENCE, S 82° 47' 00" E, continuing along said right-of-way easement, a distance of 186.05 feet to the point-of-curvature of a curve to the left;

THENCE, EASTERLY, continuing along said right-of-way easement and the arc of said curve to the left having a radius of 286.48 feet, a central angle of 45° 00' 00", a chord bearing N 74° 43' 00" E, 219.26 feet, an arc length of 225.00 feet to the point-of-tangency of said curve;

THENCE, N 52° 13' 00" E, continuing along said right-of-way easement, a distance of 175.80 feet to the point-of-curvature of a curve to the right;

THENCE, EASTERLY, along the arc of said curve to the right having a radius of 137.00 feet, a central angle of 90° 00' 00", a chord bearing S 82° 47' 00" E, 193.75 feet, an arc length of 215.20 feet to a point in the Southwest right-of-way line of Interstate Highway 45 (Gulf Freeway) marking the point-of-tangency of said curve;

THENCE, S 37° 47' 00" E, along the Southwest right-of-way line of said Interstate Highway 45, a distance of 680.20 feet to the point-of-curvature of a curve to the right;

THENCE, SOUTHEASTERLY, continuing along said right-of-way line and the arc of said curve to the right having a radius of 5,585.58 feet, a central angle of 08° 22' 26", a chord bearing S 33° 35' 47" E, 815.60 feet, an arc length of 816.33 feet to a point in the Southeast line of the aforementioned Lot 4 of the Webster Outlots;

THENCE, S 52° 13' 00" W, along the Southeast line of said Lot 4, a distance of 1,117.91 feet to a point for the South corner of this tract;

THENCE, N 37° 43' 16" W,, along the common Southwest line of said Lots 4, 3 and 2 of the Webster Outlots, a distance of 1,930.00 feet to the POINT OF BEGINNING and containing 47.6664 acres of land.

**PLAINTIFF EXHIBIT 1**

**Clear Lake (2)**

**000934**

SAVE AND EXCEPT THE FOLLOWING:

A 10.2652 acre (447,153 square foot) tract of land located in the Robert Wilson Survey, Abstract No. 88, being out of Lot 4 of the Webster Outlots as recorded in Volume 67, Page 197 of the Harris County Deed Records, in Harris County, Texas and being more particularly described by metes and bounds as follows (with bearing referenced to the Southeasterly right-of-way line of State F.M. 528, also known as Wilson Avenue, called N 52° 13' 00" E):

COMMENCING at a 1/2-inch iron rod found in the arc of a curve marking the intersection of the Southeast line of said Lot 4 with the Southwest right-of-way line of Interstate Highway No. 45 (Gulf Freeway), based on a 300-foot width;

THENCE, NORTHWESTERLY, along the Southwest right-of-way line of said Interstate Highway No. 45 and the arc of said curve to the left having a radius of 5,585.58 feet, a central angle of 01° 42' 55", a chord bearing N 30° 16' 02" W, 167.20 feet, an arc length of 167.21 feet to a 5/8-inch iron rod set for the most Easterly Southeast corner and POINT OF BEGINNING of the herein described tract;

THENCE, S 52° 16' 44" W, a distance of 557.60 feet to a 5/8-inch iron rod set for corner;

THENCE, S 37° 43' 16" E, a distance of 66.37 feet to a 2-inch iron pipe set for corner;

THENCE, S 52° 13' 00" W, along a line 100.00 feet Northwest of and parallel to the Southeast line of said Lot 4, a distance of 482.00 feet to a 2-inch iron pipe set for the South corner of this tract;

THENCE, N 37° 43' 16" W, along a line 100.00 feet Northeast of and parallel to the Southwest line of said Lot 4, a distance of 444.89 feet to a 2-inch iron pipe set for corner;

THENCE, N 52° 16' 44" E, a distance of 482.00 feet to a 5/8-inch iron rod set for corner;

THENCE, N 37° 43' 16" W, a distance of 57.00 feet to a 5/8-inch iron rod set for corner;

THENCE, N 52° 16' 44" E, a distance of 310.00 feet to a point for corner;

THENCE, S 37° 43' 16" E, a distance of 65.00 feet to a 5/8-inch iron rod set for corner;

THENCE, N 52° 16' 44" E, a distance of 277.97 feet to a 5/8-inch iron rod set in the arc of a curve in the Southwest right-of-way line of the aforementioned Interstate Highway No. 45 for the most Northerly East corner of this tract;

THENCE, SOUTHEASTERLY, along said right-of-way line of Interstate Highway No. 45 and the arc of said curve to the right having a radius of 5,585.58 feet, a central angle of 03° 48' 32" a chord bearing S 33° 01' 45" E, 371.24 feet, an arc length of 371.31 feet to the POINT OF BEGINNING and containing 10.2652 acres of land.

EXHIBIT "A"

-2-

PLAINTIFF EXHIBIT 1
Clear Lake (2)
000935

EXHIBIT "B"
PLAT



PLAINTIFF EXHIBIT 1
Clear Lake (2)
000936

NASA VALUE CENTER SITE PLAN

# Appendix
# Tab 4

# FIRST AMENDMENT TO SHOPPING CENTER LEASE

This First Amendment to Shopping Center Lease ("First Amendment") is made and entered into effective as of the 8th day of January 1996 by and between Fiesta Mart, Inc., a Texas corporation ("Landlord") and Garden Ridge, L.P., a Texas limited partnership ("Tenant").

## RECITALS

Landlord and Tenant have heretofore executed that certain Shopping Center Lease (the "Original Lease") dated December 29, 1995, the Original Lease covering approximately 150,757 square feet of area in a building comprising a portion of the Shopping Center in Harris County, Texas knows as the "Nasa Value Center." Reference is here made to the Original Lease for all purposes and words with initial capital letters used but not defined herein shall have the respective meanings ascribed to them in the Original Lease.

Landlord and Tenant executed and conditionally delivered the Original Lease pursuant to that certain letter agreement of even date with the Original Lease (the "Conditional Delivery Letter"), which Conditional Delivery Letter set forth certain conditions to the effectiveness of the Original Lease and the guaranty thereof by Garden Ridge Corporation ("Guarantor") evidenced by a Guaranty of Lease ("Guaranty") of even date with the Original Lease executed and delivered by Guarantor, pursuant to the Conditional Delivery Letter, concurrent with the execution and delivery of the Original Lease.

Landlord, Tenant and Guarantor desire to confirm that the conditions to the effectiveness of the Original Lease and the Guaranty set forth in the Conditional Delivery Letter have been satisfied and to make certain changes to the Original Lease, as more particularly set forth hereinafter.

## AGREEMENTS

NOW, THEREFORE, for and in consideration of the mutual covenants contained in the Original Lease and those set forth herein, Landlord and Tenant hereby agree as follows:

1. The Original Lease, as hereby amended, is effective as of the date of this First Amendment, both Landlord and Tenant hereby acknowledging that all of the conditions to the effectiveness thereof set forth in the Conditional Delivery Letter have been satisfied. Guarantor joins in this First Amendment for the purpose of acknowledging that the conditions to the effectiveness of the Guaranty of the Original Lease, as hereby amended, have been satisfied such that the Guaranty delivered pursuant to the Conditional Delivery Letter is and remains in full force and effect, notwithstanding this First Amendment.

2. Section 1.1(h) of the Original Lease is hereby amended by deleting the references therein to the dollar amounts of "$975,000" and "$81,250.00" and substituting therefor, respectively, "$945,750" and "$78,812.50".

**PLAINTIFF EXHIBIT 2**
**Clear Lake (2)**
**000937**

3.     Section 1.1(m) of the Original Lease is hereby amended by deleting the reference therein to the dollar amount of "$89,875" and substituting therefor the amount of "$87,437.50".

4.     Section 27.12 of the Original Lease is hereby amended by deleting the text thereof in its entirety and substituting therefor the following:

"In consideration of the services rendered in connection with the negotiation of this Lease by United Equities Incorporated ("Broker"), Tenant shall pay to Broker a leasing commission pursuant to a separate agreement between Tenant and Broker.  Broker shall look exclusively to Tenant for payment of any and all commissions in respect to this Lease and hereby releases Landlord therefrom. Landlord and Tenant each hereby represent and warrant to the other that Broker is the only agent, broker, finder or other party with whom they have dealt who is or may be entitled to any commission or fee with respect to this Lease."

5.     Broker joins in this First Amendment to evidence its consent and agreement to the provisions of paragraph 4 immediately above.

6.     Except as expressly amended hereby, the Original Lease shall remain in full force and effect.  The Original Lease as amended by this First Amendment is hereby ratified and confirmed.  This First Amendment shall be governed by and construed in accordance with the laws of the State of Texas.

FIESTA MART, INC.

By: _____
     Louis Katopodis, President

GARDEN RIDGE, L.P.

By:     Garden Ridge Management, Inc.,
        General Partner

By: _____
     ~~Armand Shapiro, Chairman~~
     Jane Arbuthnot, CFO

PLAINTIFF EXHIBIT 2
Clear Lake (2)
000938

2

GARDEN RIDGE CORPORATION

By: _____

~~Armand Shapiro, Chairman~~

Jane Arbuthnot, CFO

UNITED EQUITIES INCORPORATED

By: _____

Edwin Freedman, President

12072-2

**PLAINTIFF EXHIBIT 2**

**Clear Lake (2)**

**000939**

3

# Appendix
# Tab 5

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE (this "**Amendment**") is made and entered into as of February 4, 2005, by and between CLEAR LAKE CENTER, L.P., a Texas limited partnership ("**Lessor**"), and GARDEN RIDGE, L.P., a Texas limited partnership ("**Lessee**").

### RECITALS:

WHEREAS, Lessor (as assignee to Original Lessor) and Lessee, are parties to that certain Shopping Center Lease dated December 29, 1995 (the "**Lease**"), originally executed by Fiesta Mart, Inc., a Texas corporation ("**Original Lessor**") and Lessee, covering the Demised Premises (as defined in the Lease), such Demised Premises being more particularly described in the Lease;

WHEREAS, said Lease was subsequently amended by First Amendment to Shopping Center Lease (the "**First Amendment**") dated January 8, 1996, executed by and between Original Lessor and Lessee. The Lease as amended by the First Amendment is herein called, the "**Lease**";

WHEREAS, said Lease was subsequently assigned by Original Lessor to Lessor by assignment on or about April 30, 2003;

WHEREAS, on February 2, 2004 (the "**Petition Date**") Lessee filed a petition (the "**Bankruptcy Case**") under chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101-1330 et. seq., the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

WHEREAS, Lessor and Lessee desire to amend the Lease to provide for, among other things, the reduction of the Base Rental (as such term is defined in the Lease), pursuant to the terms and provisions set forth in this Amendment;

WHEREAS, Lessor and Lessee intend that, except where expressly specified, the terms of this Amendment shall be conditioned on the Bankruptcy Court's entry of an order as to which all applicable appeals periods have passed without an appeal or motion for reconsideration having been filed, or with any such appeal or motion for reconsideration having been finally resolved in favor of affirming such order, authorizing Lessee's assumption of the Lease pursuant to section 365 or 1123(b) of the Bankruptcy Code (the "**Final Assumption Order**," and the date such order becomes the Final Assumption Order, the "**Final Assumption Order Date**").

NOW, THEREFORE, for and in consideration of the premises and mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to amend the Lease as follows:

### AGREEMENT:

1.  **Defined Terms.** All capitalized terms not expressly defined herein shall take the meanings ascribed to them in the Lease, as amended by this Amendment.



EXHIBIT
6



COPY

PLAINTIFF EXHIBIT 3

Clear Lake
000037

2.    **Lease Term.** Section 1.1(g) of the Lease is hereby deleted in its entirety and is replaced with the following: "The base term of the Lease shall commence on January 8, 1996 (the "**Commencement Date**") and shall expire on January 31, 2024."

3.    **Rent Reduction.** The first two sentences of Section 1.1(h) of the Lease are hereby deleted in their entirety and are replaced with the following:

"Monthly Base Rental ("**Base Rental**") for the Lease Term shall be as follows:

Beginning with the first month after the Final Assumption Order Date to January 31, 2011 - $78,813.00;

February 1, 2011 to January 31, 2016 - $86,694; and

February 1, 2016 to January 31, 2024 - $95,363.

During any Extension Periods for which an Extension Option is exercised under Article XXIII hereof, the Base Rental shall be adjusted upon the expiration of the base term of the Lease and on each five year anniversary of the commencement date of the first Extension Period (the "**Adjustment Date**")." For the five year period commencing upon each Adjustment Date, Base Rental shall be equal to the product obtained by multiplying (x) the Base Rental in effect during the preceding calendar month (the "**Determination Month**") by (y) a fraction, the numerator of which shall be the most current Revised Consumer Price Index (all cities – Urban Wage Earners and Clerical Workers, U.S. City Average, All Items) of the Bureau of Labor Statistics of the United States Department of Labor (1982 to 1984 = 100) the ("**CPI**") for the Determination Month and the denominator of which shall be the CPI for the first calendar month of the Lease Term in the case of the first adjustment of Base Rental and for the calendar month sixty months prior to the Determination Month in the case of each subsequent adjustment. Base Rental shall never decrease and increases in Base Rental based upon increases in the CPI shall be cumulative; provided, however, that the first increase in Base Rental on the first Adjustment Date shall not exceed twenty percent (20%), and no single increase thereafter for any five year period shall exceed ten percent (10%).

4.    **Agreed Cure Amount and Timing of Payment.** Provided that (a) no Events of Default ("**Post-Amendment Defaults**") under the Lease by Lessee arise between the date of this Amendment and the Final Assumption Order Date, or (b) Lessee cures such Post-Amendment Defaults or compensates Lessor for any actual pecuniary loss resulting from any Post-Amendment Defaults within fifteen (15) days of the Final Assumption Order Date, (x) Lessor agrees to accept $326,132.98 (the "**Agreed Cure Amount**") in full and final satisfaction of Lessee's obligations under paragraphs (b)(1)(A) and (b)(1)(B) of section 365 of the Bankruptcy Code to cure all defaults or compensate Lessor for any actual pecuniary loss resulting from any defaults under the Lease, which defaults include, without limitation, Lessee's obligation under the Lease for 2003 real property taxes assessed against the Demised Premises in the amount of $142,385.68 (the "**2003 Taxes**"), Base Rental for the month of February, 2004 in the amount of $88,936.00 (the "**February Rent**"), 2003 common area maintenance charges of $82,573.33 (the "**2003 CAM**"), 2003 insurance of $11,992.29 and 2003 Pylon sign of $245.68 and (y) Lessor agrees that Lessee's payment of the Agreed Cure Amount as follows shall constitute adequate

**PLAINTIFF EXHIBIT 3**
Clear Lake

000038

assurance of Lessee's prompt cure of defaults or payment for actual pecuniary loss resulting from defaults under the Lease as required by paragraphs (b)(1)(A) and (b)(1)(B) of section 365 of the Bankruptcy Code: The Agreed Cure Amount shall be payable in twenty-four (24) equal monthly installments (without interest prior to the maturity or penalty) beginning with the first monthly installment of Base Rental payable after the Final Assumption Order Date. Lessor agrees that if Lessee pays the 2003 Taxes and/or the February Rent prior to the Final Assumption Order Date, (a) the Agreed Cure Amount shall be reduced by the amount of any such payment and (b) the amortization of the Agreed Cure Amount shall be adjusted in a manner to preserve the intent of the previous sentence. (E.g., if the 2003 Taxes are paid before the Final Assumption Order Date, the Agreed Cure Amount shall be reduced by the amount of such payment and shall be paid in twenty-four (24) equal monthly installments without interest or penalty beginning with the first monthly installment of Base Rental payable after the Final Assumption Order Date.) Failure to pay any installment of the Agreed Cure Amount shall constitute an Event of Default under the Lease, and Lessor shall have the right to accelerate the maturity of remaining installments. Further, interest on all past due installments of Agreed Cure Amount shall accrue at the rate provided in **Section 27.13** of the Lease and shall become part of the Agreed Cure Amount.

Lessee further acknowledges that in addition to the Agreed Cure Amount, Lessee is obligated to Lessor for 2004 Taxes, common area maintenance, insurance, and pylon sign charges (collectively, "**2004 Charges**") and that all such 2004 Charges first accruing from and after the Petition Date constitute administrative expenses of Lessee's Bankruptcy Case and (to the extent not already paid) shall be paid upon execution of this Amendment.

5. **Heating Ventilation and Air Conditioning (HVAC)**. Notwithstanding anything contained in the Lease to the contrary, if Lessee is required to replace any HVAC units located at the Demised Premises, Lessor agrees to permit Lessee a monthly rent credit against Base Rental under the Lease of up to $7,500.00 until such time as Lessee is fully reimbursed for Lessee's actual and direct costs incurred in connection with its purchase of such new HVAC units ("**HVAC Unit Costs**"), provided Lessee delivers to Lessor written receipts for the HVAC Unit Costs incurred. In no event shall the aggregate rent credit to Lessee hereunder exceed $150,000.00. Any new HVAC units replaced hereunder shall be of a quality equal to or better than is standard for premises of this type. In the event that Lessee replaces any HVAC units prior to the date of the Final Assumption Order Date, Lessor agrees to permit Lessee to commence the herein described rent credit against the first Base Rental due under the Lease after the Final Assumption Order Date.

6. **Tax Escrow**.

(a) Beginning the earlier to occur of (a) the first month after the Final Assumption Order Date and (b) January 1, 2005, and continuing through each subsequent month thereafter during the balance of the term of the Lease and any extensions thereof, Lessee shall make equal monthly deposits with Lessor in the amount determined under the provisions of **Section 18.2** of the Lease.

(b) Each payment made by Lessee pursuant to this **Section 6** shall be called a "**Tax Escrow Deposit**." Lessor agrees to accept and hold each Tax Escrow Deposit in

**PLAINTIFF EXHIBIT 3**

Clear Lake

escrow for use solely to pay the Taxes levied or assessed against the Demised Premises in accordance with the provisions of Section 18.2 of the Lease. The Tax Escrow Deposit may be commingled with Lessor's funds and shall be held by Lessor without the payment of interest.

7. **Notice to Parties.** Pursuant to Section 25.1 of the Lease, Lessee and Lessor hereby designate the following addresses for notices:

To Lessee:

Garden Ridge, L.P.
19411 Atrium Place
Houston, Texas 77084
Attention: Legal Department

with a copy to:

Andrews Kurth LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201-4605
Attention: Brigitte Gawenda Kimichik, Esq.

To Lessor:

Clear Lake Center, L.P.
c/o CL Group, Inc.
6909 Ashcroft, Suite 200
Houston, Texas 77081

with a copy to:

Hirsch & Westheimer, P.C.
25th Floor, Bank of America Center
700 Louisiana
Houston, Texas 77002
Attention: Ronald J. Stark

8. **Costs and Expenses.** Each party will bear the costs and expenses of its respective professional advisors, including counsel, in connection with the negotiation, documentation and implementation of the transactions contemplated by or referred to herein. In no event shall Lessor seek reimbursement of any such fees or expenses from the Chapter 11 estate of the Lessee (and its affiliates) or file or support an application for reimbursement by the estate of any professional, including counsel, acting or purporting to act on behalf of Lessor or on behalf of the Unofficial Committee of Landlords.

Garden Ridge, L.P.
Webster/No. 16 - Page 4

DAL:527418.8

**PLAINTIFF EXHIBIT 3**
Clear Lake
000040

9. **Non-Assumption of Lease; Amendment Conditioned Upon Assumption of Lease.**

(a)    Except as set forth in **Section 9(b)** of this Amendment, the terms of this Amendment shall be of no force or effect until the Final Assumption Order Date.

(b)    Notwithstanding anything to the contrary in this Amendment, the following obligations shall be binding and enforceable upon the parties' execution of this Amendment:   (i) Lessee's obligations under **Section 9(d)** of this Amendment, (ii) Lessor's and Lessee's obligations under **Section 13** of this Amendment, and (iii) the parties' agreement to amend the Lease as provided in this Amendment upon entry of the Final Assumption Order.

(c)    The parties to this Amendment acknowledge and agree that notwithstanding anything contained in this Amendment to the contrary, execution by Lessor and Lessee of this Amendment shall not constitute or in any way be deemed in any manner to be Lessee's (and/or its affiliates') assumption or novation of the Lease.

(d)    Lessee will make a good faith effort to procure entry of the Final Assumption Order as part of and simultaneously with the confirmation of a plan of reorganization.

10.    **Release of Antitrust Claims.**  Provided that Lessor refrains from supporting any effort by the Informal Landlord Committee of Garden Ridge (the "**ILC**") or its legal and/or financial advisors to recover fees and/or expenses from Lessee pursuant to Section 503(b) of the Bankruptcy Code (11 U.S.C. § 503(b)), Lessee releases, effective as of the Final Assumption Order, Lessor from all claims and causes of action based on the Sherman Act or any other applicable antitrust law. Lessee and its affiliates expressly reserve, however, all rights, remedies, causes of action, and claims against all other parties.

11.    **Lessee's Lender Financing; Subordination of Personal Property Liens.** Lessor acknowledges that Lessee is pursuing financing from a third party lender (whether one or more and including specifically Bank of America, N.A. as administrative agent for a group of lending institutions pursuant to such agreements and documents as may be entered into among Lessee, and such group of lending institutions, collectively herein "**Lender**") in the Bankruptcy Case and that Lender will be seeking a security interest in all personal property (including, inventory, removable fixtures, furnishings, equipment, and other tangible personal property) owned or leased by Lessee at the Demised Premises (collectively, the "**Lender Collateral**"). Accordingly, Lessor hereby agrees to subordinate any rights Lessor may have, if any, to maintain or enforce any landlord's lien, whether statutory, contractual, or otherwise, or any other liens or claims which Lessor now has or may hereafter have, against the Lender Collateral during the term of any loan from Lender.  In addition, Lessor further agrees, upon (a) a termination by Lessor of the Lease, (b) the taking of possession of the Demised Premises by Lessor (pursuant to a Lessor remedy under the Lease or under applicable state law), or (c) notice to Lessor that Lender has exercised any of its rights and remedies under the loan documents executed by Lessee, to permit Lender or its agents to enter upon and take possession of the Demised Premises for a reasonable period of time (not to exceed 60 days)  following receipt of notice from Lessor that the Lease has been terminated or that Lessor has taken possession of the Demised Premises

Garden Ridge, L.P.
Webster/No. 16 - Page 5

DAL:527418.8

**PLAINTIFF EXHIBIT 3**

Clear Lake
000041

(the "**Disposition Period**") for the purpose of (x) inspecting the Lender Collateral, (y) taking possession of or removing any of or all of the Lender Collateral from the Demised Premises, or (z) exhibiting for sale and/or conducting one or more sales (such sale(s) to be conducted in compliance with the terms of the Lease) of such collateral on the Demised Premises (and Lessor shall not in any manner hinder, interfere with or prevent any of the foregoing) provided that Lender (i) pays, when due, to Lessor Base Rental and all other amounts payable under the terms of the Lease and that are attributable to such period of possession, (ii) shall indemnify, defend, and hold harmless Lessor against any claim, loss, or damage based on damage to property or injury to persons resulting or claimed to have resulted from any entry by Lender, or any other exercise of Lender's rights with respect to the Lender Collateral and (iii) reimburses Lessor for any heat and/or electricity expense to the extent required by the Lease during such period of possession. Lessor agrees that Lender shall have no obligation or liability to cure any defaults of Lessee under the Lease. Upon Lessor's receipt of written notice of the Lender's contact information, Lessor agrees to use its reasonable efforts to provide notice to Lender of Lessor's exercise of any remedies of Lessor under the Lease, including termination of the Lease or taking possession of the Demised Premises. Lessor acknowledges and agrees that the provisions of this Section 11 are intended for the benefit of the Lender, and Lender may rely as a third party beneficiary on this Section 11. Notwithstanding anything to the contrary contained herein, if after the expiration of the Disposition Period the Lender Collateral has not been removed from the Demised Premises, the Lender Collateral shall be deemed abandoned by Lender and Lessor shall be entitled, but not obligated, to dispose of or sell the Leased Collateral in any manner it sees fit with no compensation or liability whatsoever to the Lender. At the request of Lessee and at Lessee's expense, Lessor shall execute and deliver to any Lender and/or to Lessee other documents that Lender deems reasonably necessary to effect the waiver of Lessor's rights with respect to any Lender Collateral as provided in this Section 11. Lessor acknowledges that the term "Lender" in this Section 11 shall include any lender that obtains a consensual security interest in Lender Collateral, whether in connection with confirmation of a plan of reorganization involving Lessee or subsequent thereto.

12. **Lessor's Lender Financing; Amendment Conditioned Upon Approval.** Lessee acknowledges that the Demised Premises and the Shopping Center of which the Demised Premises is a part are encumbered by a Deed of Trust, Assignment of Leases and Rents and Security Agreement and an Assignment of Leases and Rents which secure a first mortgage loan from John Hancock Real Estate Finance, Inc. ("**Lessor's Lender**") and that such documents prohibit the modification of the Lease without the prior written consent of Lessor's Lender. This Amendment and the respective obligations of Lessor and Lessee are subject to, and conditioned upon, Lessor's obtaining the prior written consent of Lessor's Lender to this Amendment prior to the Final Assumption Order Date. Lessor agrees to request such consent promptly following the execution of this Amendment by Lessor and Lessee and to diligently and in good faith attempt to obtain such consent no later than thirty (30) days following the execution of this Amendment by Lessor and Lessee.

13. **Confidentiality.** Lessor and Lessee agree until the Final Assumption Order to keep the terms of this Amendment confidential, to the extent permitted by applicable law, including the bankruptcy laws governing Lessee's pending bankruptcy filing, except that Lessee shall be permitted to disclose the terms of this Amendment to the Bankruptcy Court, and the creditor's committee, and Lessee's creditors, potential lenders, potential investors, accountants,

PLAINTIFF EXHIBIT 3
Clear Lake
000042

officers and directors, attorneys and other parties as Lessee deems necessary in connection with its reorganization.

14.   **Miscellaneous.**

(a)   The parties hereto covenant and agree to indemnify and hold each other harmless from and against any and all claims for commissions and other compensation made by any agent or agents and/or broker or brokers based on any dealing between either party hereto and any agent or agents and/or broker or brokers, together with all costs and expenses incurred by either party hereto in resisting such claims (including, without limitation, attorney's fees).

(b)   Except as modified by this Amendment and subject to **Section 9** of this Amendment, the Lease and all the terms, covenants, conditions and agreements thereof are hereby ratified, confirmed and approved. Subject to **Section 10** of this Amendment, any defaults or any offsets and defenses by either Lessor or Lessee under the Lease and existing (or which may exist after the giving of notice or passage of time) on the date of this Amendment (except as otherwise specifically addressed in this Amendment) are hereby waived by Lessee and Lessor, and Lessee and Lessor hereby release each other from all liabilities, claims, controversies, causes of action and other matters of every nature which, through the date hereof, have or might have arisen out of or in any way in connection with the Lease and/or the Demised Premises demised thereunder.

(c)   This Amendment contains the entire understanding between the parties with respect to the matters contained herein. No representations, warranties, covenants or agreements have been made concerning or affecting the subject matter of this agreement, except as are contained herein and in the Lease.

(d)   This Amendment may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change or modification or discharge is sought.

(e)   Except as modified by this Amendment and subject to **Section 9** of this Amendment, the Lease shall remain unchanged and shall continue in full force and effect.

(f)   The parties hereto represent and warrant to each other that this Amendment (and each term and provision hereof) has been duly and appropriately authorized by the parties hereto through proper written corporate or partnership action and approval, as applicable, and, subject to **Section 9** of this Amendment, no additional consent, agreement or approval is required with respect hereto.

(g)   This Amendment may be executed in several counterparts and by each party on a separate counterpart, each of which, when executed and delivered by facsimile, shall be an original, and all of which together shall constitute one document.

(h)   Lessee represents that (i) except as described in **Section 5** of this Amendment, neither the Demised Premises nor the building in which the same are situated are in need of repairs required to be made by Lessor under the terms of the Lease

Garden Ridge, L.P.
Webster/No. 16 - Page 7

DAL:527418.8

**PLAINTIFF EXHIBIT 3**

Clear Lake
000042

including, without limitation, Section 8.1 thereof; (ii) except with respect to the amounts that compromise the Agreed Cure Amount, there exists no breach, default, event or condition which, with the giving of notice or the passage of time, or both, would constitute a breach or default under the Lease either by Lessee or Lessor; and (iii) except as provided otherwise in this Agreement, Lessee has no existing claims, defenses or offsets against rental due or to become due under the Lease.

**[Signature Pages to Follow]**

**PLAINTIFF EXHIBIT 3**
Clear Lake
000044

IN WITNESS WHEREOF, Lessor and Lessee have executed and delivered this Amendment as of the date herein set forth above.

LESSOR:

**CLEAR LAKE CENTER, L.P.,** a
Texas limited partnership

By:    CL Group, Inc.
        its general partner

By: _____
Name:  Edwin Freeman
Title:    President


LESSEE:

**GARDEN RIDGE, L.P.,**
a Texas limited partnership

By:    GARDEN RIDGE MANAGEMENT, INC.,
        its general partner

By: _____
Name:  V. MARTIN
Title:  VICE-PRES.

**PLAINTIFF EXHIBIT 3**

Clear Lake
000045